1          IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MARYLAND
2                  NORTHERN DIVISION

3


4       UNITED STATES OF AMERICA

5            v.                          CRIMINAL CASE NO.
6                                        ELH-15-0261

        STANISLAV STEVEN YELIZAROV,
7

            Defendant
8       _____/

9


10                  (Evidentiary Hearing)
               Tuesday, February 22, 2022
11                  Baltimore, Maryland

12

        Before:  Honorable Ellen L. Hollander, Judge
13


14


15      Appearances:

16          On Behalf of the Government:
             Paul E. Budlow, Esquire
17

18          On Behalf of the Defendant:
             Sicilia C. Englert, Esquire
19

20

21

22      ----------------------------------------------------------------
                    Reported By:
23           Mary M. Zajac, RPR, FCRR
             Fourth Floor, U.S. Courthouse
24            101 West Lombard Street
              Baltimore, Maryland 21201
25

2

1              (Proceedings commenced at 10:09 a.m.)

2              MR. BUDLOW:  This is the United States of America

3    versus Stanislav Yelizarov.  It is Criminal Number ELH-15-261.

4    There's also a related civil filing under ELH-19-0973.

5              THE COURT:  Counsel.

6              MS. ENGLERT:  Good morning.  Sicilia Englert on behalf

7    of Mr. Yelizarov, who is present.

8              THE COURT:  All right.  And just so we're clear -- you

9    may all have a seat -- this is a continuation of a hearing that

10   began on January 27 of this year.

11             So, I believe we concluded with the testimony of Mr.

12   Waldman when we were here last on January 27.  And the government

13   didn't have any other witnesses.  Is that right?

14             MR. BUDLOW:  Your Honor, I just want to maybe do

15   housekeeping at the same time as answering that question.  You

16   had suggested or maybe asked if Mr. Murtha would be available.  I

17   don't think it's critical, but I do hope that he might be here in

18   time to testify this morning.  I understand that we have

19   scheduling issues in terms of timing.

20             Mr. Murtha has court this morning.  He said he would

21   attempt to make it here maybe by 11.  So I wanted to make the

22   Court aware of that.  I think his testimony would be brief and it

23   would relate only to the issue that came up during the cross

24   examination of Mr. Waldman.

25             And I would ask that if I, when he gets here, if I

1    could check with his schedule, I wouldn't want to interrupt other

2    matters for no reason, but if he does have other places to be in

3    terms of court, I would ask to interrupt the witness at that

4    time.

5              THE COURT:  All right.

6              MR. BUDLOW:  Go ahead.

7              THE COURT:  Last time you had co-counsel with you, Mr.

8    Budlow.

9              MR. BUDLOW:  That's the other thing I wanted to say.

10   Mr. Zelinsky might join me mid-proceedings if he can.

11             THE COURT:  Okay.  Then who's the next witness?

12             MR. BUDLOW:  I'm sorry.  One other housekeeping matter.

13             THE COURT:  Oh, okay.

14             MR. BUDLOW:  So I wanted to -- and I may do this later.

15   But during the proceedings last time there was a reference to an

16   email that was listed as an attachment to the defense attorney's,

17   the defendant's filing.  And it was redacted.  And I did think

18   that the -- and the Court inquired of Mr. Waldman if the portions

19   that were redacted, you said you don't need to tell me, but do

20   they relate to your conversations at that time.  And for context,

21   Mr. Waldman had just been talking about his conversations with

22   the defendant relating to the news that the government was

23   investigating a murder.  My memory of that was that counsel then

24   indicated to the Court that that did not relate to those

25   conversations.

1          However, upon viewing the full email, which Ms. Englert

2     was nice enough to provide to me I think over the summer, when it

3     was originally filed as redacted, I do think that the remainder

4     of the email does relate to the conversation and it does relate

5     to the murder.  So I just wanted the Court to be aware of that

6     and have the full document.

7          THE COURT:  Is it available for the Court to look at?

8          MR. BUDLOW:  I'm sorry, Your Honor.  I have also

9     provided some exhibits that I anticipate using today, many

10    potentially during cross examination.  But that one is listed as

11    M-16.  And it should be at the top of the package that I provided

12    to the Court.  Specifically, the portions that were redacted

13    begin with the line "you will see."

14         THE COURT:  So is it that you're going to introduce an

15    unredacted version?

16         MR. BUDLOW:  Yes.  I would, I ask that that be

17    introduced as part of the record.  I would ask that it be, this

18    document specifically remain under seal because it does identify

19    a witness by name.

20         THE COURT:  Okay.  Any objection?  So, the bottom line

21    is the Court will be able to review it but you don't want it

22    publicly filed because -- or you can just omit the name of the

23    witness and the rest would not have to be -- so the sealed

24    portion, in other words, the public portion would just redact the

25    name of the witness.

5

1          MR. BUDLOW:  So, with the Court's permission, we

2     could -- two possibilities.  One is leave this whole document

3     under seal, because Ms. Englert did file a version that is

4     redacted.  However, if you wanted me to be a little more surgical

5     I could certainly, at the end of the proceedings today, redact

6     this in a way that removes any reference to his name.  And the

7     reason I hesitate is that I think simply name, given the context,

8     isn't enough, but I think a few other redactions might be

9     necessary.

10          I'm happy to do that and submit it to the Court.

11          THE COURT:  Yes.  I think as much as can be public is

12     what should be public.

13          MR. BUDLOW:  And so I'd ask that this be under seal

14     entirely.  I will submit a redacted version for filing.

15          THE COURT:  That's fine.  Any objection?

16          MS. ENGLERT:  Well, Your Honor, if the government would

17     like to put that in, the defense --

18          THE COURT:  You've got to keep your voice up, counsel.

19          MS. ENGLERT:  Yes.  If the government would like to put

20     that in that way, defense doesn't have an objection to that.  I

21     think that as far as what was put in that was not redacted, I

22     think was correctly captured as far as Mr. Waldman's conversation

23     with the defendant, I think was in the part of the email that was

24     not redacted.  And I think the government has a broader

25     interpretation of this conversation with Mr. Yelizarov was about

1   the murder and the rest of this email was not about that

2   conversation but was, had something to do with the murder.

3            THE COURT:  Well, I haven't seen it so I have

4   absolutely no idea.

5            MS. ENGLERT:  You're right.  Fine.  No objection.

6            THE COURT:  Okay.  Thank you.  Okay.  So are we

7   finished with housekeeping matters?

8            MR. BUDLOW:  Yes.  Thank you, Your Honor.

9            THE COURT:  Okay.  So who is our next witness?

10           MS. ENGLERT:  Your Honor, we would call Mr. Yelizarov.

11           THE COURT:  All right.

12           MS. ENGLERT:  I guess as Mr. Yelizarov is taking the

13  stand, I would like to officially make the transcript of the last

14  hearing of January 27th of this year a part of the record.

15           THE COURT:  Well, the transcript is the record, isn't

16  it?

17           MS. ENGLERT:  It is.  I have a copy of it for the

18  Court, if you would --

19           THE COURT:  Okay.  That would be nice.  And we have to

20  swear in the witness.

21           THE CLERK:  Mr. Yelizarov, please stand and raise your

22  right hand for me.

23               STANISLAV YELIZAROV, DEFENDANT, SWORN

24           THE DEFENDANT:  Yes.

25           THE CLERK:  All right.  You may lower your hand and

1  have a seat.

2         While speaking clearly into the microphone, can you

3  please state and spell your name?

4         THE DEFENDANT:  Stanislav, S-T-A-N-I-S-L-A-V.

5  Yelizarov, Y-E-L-I-Z-A-R-O-V.

6         THE CLERK:  Thank you.

7         DIRECT EXAMINATION

8  BY MS. ENGLERT:

9  Q    Good morning, Mr. Yelizarov.

10  A    Good morning.

11  Q    Are you currently in prison?

12  A    Yes.

13  Q    And where are you currently in prison?

14  A    Cumberland, North Branch Correctional Institution.

15  Q    At some point --

16         THE COURT:  So is that a Maryland facility?

17         THE WITNESS:  Yes, ma'am.

18  BY MS. ENGLERT:

19  Q    At some point did you face federal charges in this case?

20  A    Yes.

21  Q    What were you charged with?

22  A    A Hobbs Act, Hobbs Act robbery, as well as kidnapping and

23  something else.  Can't exactly remember.

24  Q    Were you charged with any firearms offense?

25  A    Yeah.  Right.  Carrying or brandishing a firearm or

1    something during a crime.  It was like six indictments.

2    Q    Who represented you on those charges?

3    A    Robert Waldman.

4    Q    Did Mr. Waldman meet with you?

5    A    Yes.

6    Q    And what did you, when you first met with Mr. Waldman, what

7    did you tell him that you wanted to do with this case?

8    A    Go to trial.

9    Q    Did he come to you and review the evidence, the government's

10   evidence with you?

11   A    Yes.

12   Q    How many times would you say that he came to visit you and

13   review the government's evidence?

14   A    Say 10 to 15 times.  About 10 to 15.

15   Q    Did Mr. Waldman discuss with you pleading guilty in this

16   case?

17   A    Yes.

18   Q    And what was your response to him?

19   A    That I wanted to go to trial and put the witnesses on the

20   stand.

21            THE COURT:  I'm sorry.  What was the last part?

22            THE DEFENDANT:  Put the witnesses on the stand.

23            THE COURT:  Why did you want to go to trial?

24            THE DEFENDANT:  Because they had a bunch of

25   circumstantial evidence and unindicted and indicted

 1   coconspirators' testimony.  And their main evidence was the

 2   testimonies.

 3   BY MS. ENGLERT:

 4   Q    So how many times again would you say that Mr. Waldman came

 5   to see you and review evidence?

 6   A    I believe about 10 to 15 times in person.

 7   Q    And during those meetings, did he go over different aspects

 8   of the government's case?

 9   A    Yeah.  We reviewed a lot of circumstantial evidence.

10   Q    And what led you to change your mind about -- well, let me

11   just say.  Did Mr., Mr. Waldman present a plea offer to you in

12   October of 2015?

13        THE COURT:  Did Mr. Waldman what?

14   Q    Present a plea offer to you --

15        THE COURT:  Oh.

16   Q    -- in October --

17        THE COURT:  October of what year?

18   Q    -- of 2015?

19   A    Yeah.  I believe it was the 34 to 40 years, or something

20   like that, plea agreement.

21   Q    I'd like to show you what has been previously filed as ECF

22   442-5.  May I approach the witness?

23        THE COURT:  Yes.  Does it have an exhibit number here?

24        MS. ENGLERT:  It doesn't.  I wasn't sure because this

25   had been previously filed.  Should I -- I can go ahead and put an

DIRECT EXAMINATION OF STANISLAV YELIZAROV BY MS. ENGLERT          10

1    exhibit number on it.  This is what's been marked as Defendant's

2    Exhibit Number 2.  It's also been filed at ECF 442-5.  May I

3    approach the witness?

4                    THE COURT:  Yes.

5    BY MS. ENGLERT:

6    Q    Mr. Yelizarov, what did I just hand you?

7    A    I believe this is the first plea agreement of the 34 to 40

8    years.

9    Q    Would you please turn to Paragraph 15 of that agreement?

10   A    Yup.

11   Q    Well, first of all, when Mr. Waldman came to you with that

12   agreement, did he go over this agreement with you?

13   A    Yes.

14   Q    Did he go over what you would be pleading guilty to?

15   A    Yes.

16   Q    And did he explain to you what the government would seek as

17   far, or recommend as a sentence in this plea agreement?

18   A    Yes.

19   Q    And what did Mr. Waldman tell you about further prosecutions

20   after pleading guilty under this plea agreement?

21   A    That there wouldn't be any further prosecutions.

22   Q    Would you turn to Paragraph 15 -- Page 7, Paragraph 15?

23   A    Yup.

24   Q    What does that paragraph say?

25   A    This office represents that State's Attorney's Office for

1    Baltimore County will pursue no further criminal charges arising

2    out of the events described in the factual stipulation attached

3    hereto provided that the defendant receives a sentence pursuant

4    to the plea agreement.  No other representations with respect to

5    other conduct have been made or are contemplated under this

6    agreement.

7    Q    Mr. Yelizarov, what did Mr. Waldman explain to you that that

8    paragraph meant?

9    A    It meant that after I took the guilty plea to the said

10   document and to the charges, that there wouldn't be any further

11   prosecutions or charges or indictments coming my way.

12   Q    And did Mr. Waldman recommend that you take this plea

13   agreement?

14   A    Yes.

15        THE COURT:  And you said this was October of 2015, is

16   that right, that you met with Mr. Waldman?

17        THE DEFENDANT:  Yes, ma'am.  I believe it was about

18   that time, around the first plea agreement.

19   BY MS. ENGLERT:

20   Q    After signing this plea agreement there was a -- do you

21   remember when the plea hearing was scheduled?

22   A    No, I don't remember the exact date.  But I believe it was

23   maybe a month afterwards, about a month.  I think it was December

24   or November.

25   Q    Okay.  After signing that agreement, did Mr. Waldman come

1    and visit you in late November of 2015?

2    A    I believe so, yes.

3    Q    And did, in the meeting that, visit that I'm referencing is

4    when Mr. Waldman raised the issue of a murder to you.  Do you

5    remember that meeting?

6    A    Yes.

7    Q    What did Mr. Waldman tell you about a murder investigation?

8    A    Basically said that Mr. Budlow informed him of some kind of

9    homicide that me and my indicted and unindicted buddies may have

10   been involved in.

11   Q    And what did he tell you about this murder?

12   A    Not much.  Just something about Reisterstown Road and

13   Fallstaff Road.  He literally came with no information, was very

14   vague.  And the name of the person.

15            THE COURT:  He did or didn't give the name of the

16   person?

17            THE DEFENDANT:  Yeah.  It was Ruder's Antiques.  Gave

18   me the name of the person and the store.

19   BY MS. ENGLERT:

20   Q    Had you heard about this murder before Mr. Waldman had

21   talked to you about it?

22   A    Yes.

23   Q    And did you tell Mr. Waldman that you were involved in this

24   murder?

25   A    No.

1          THE COURT:  No, you didn't --

2          THE DEFENDANT:  No.

3          THE COURT:  The answer's confusing.

4          THE DEFENDANT:  No, I did not.

5          THE COURT:  No, you didn't tell him you were involved?

6          THE DEFENDANT:  No.

7          THE COURT:  Okay.

8          THE DEFENDANT:  I did not.  I was not involved.

9     BY MS. ENGLERT:

10    Q    Did you tell Mr. Waldman any details about this murder?

11    A    No.  I just told him in regards to the people that were

12    involved in, in the actual Hobbs Act case, that they were

13    possibly involved and they possibly knew about it.

14    Q    Did you ever tell Mr. Waldman that you weren't worried about

15    your involvement in this murder?

16    A    Mind you, it was very vague, the information that he brought

17    me.  But, no, I never told him that I wasn't worried about a

18    possible homicide indictment of any kind.

19    Q    Did you ever tell Mr. Waldman that you, that the government

20    would never get you on it?

21    A    No.

22    Q    And when you came, when it came time for your plea hearing

23    under the October 2015 plea agreement, did you go through that

24    plea agreement?

25    A    No.

1   Q    And did -- after that plea agreement didn't go through, did

2   Mr. Waldman attempt to negotiate another plea agreement for you?

3   A    Yes.

4              THE COURT:  So why didn't the plea agreement go

5   through?

6              THE DEFENDANT:  The first one?  This one right here?

7              THE COURT:  I'm sorry?

8              THE DEFENDANT:  The first one?

9              THE COURT:  Yes.

10             THE DEFENDANT:  Because I told him that I wanted to go

11  to trial, that I didn't feel comfortable with this plea.

12             THE COURT:  Wait.  But you signed it, so I'm confused.

13             THE DEFENDANT:  He told me to sign it, ma'am.  I had no

14  legal experience whatsoever.  And the attorney that was provided

15  to me by the CJA tells me that the codefendants, unindicted and

16  indicted, that their testimony was enough to convict me.  And I

17  later found out through LexisNexis and legal research that that

18  was not true.  Therefore, I backed out of the plea.

19             THE COURT:  So you're saying that -- I'm very confused.

20  I'm sorry.  You signed this plea agreement, the first one, the

21  one your lawyer showed you just a moment ago.  And then after you

22  signed it -- and this one the government was going to recommend a

23  sentence of no more than 40 years, right?

24             THE DEFENDANT:  Correct.

25             THE COURT:  Then what happened that you didn't go

1    forward on it?  Did you tell that to Mr. Waldman?  You change

2    your mind?  Or did that happen at court?  What happened?

3            THE DEFENDANT:  No, we didn't make it to court.  I told

4    him, I believe through a phone call, that I didn't want to go

5    forward with this plea agreement.

6            THE COURT:  Okay.

7            THE DEFENDANT:  And that I wanted to proceed to trial.

8    BY MS. ENGLERT:

9    Q    What was Mr. Waldman's advice to you after you refused to go

10   forward with the plea agreement?

11   A    He was telling me that I was making a mistake, the trial

12   wasn't a good idea, and that he would try to get a different plea

13   agreement.

14   Q    And did Mr. Waldman negotiate another plea agreement with

15   you or for you?

16   A    Yes.  There were several different offers that were made by

17   Mr. Budlow's office.

18   Q    Were there some offers that you rejected?

19   A    Yes.

20   Q    How many times do you recall going back and forth, or

21   different terms?

22   A    I know the least, were at least three different offers,

23   three different kind of offers.  Three to four, for sure.

24   Q    Did there end up being a plea offer that you finally signed?

25   A    Yeah.  I believe I took a (C) plea, a (C) plea, a 30-year

1    (C) plea.

2    Q    I'd like to show you what's been marked as Defendant's

3    Exhibit Number 3.  It was also filed at ECF 442-1.  May I

4    approach the witness?

5         THE COURT:  Yes.

6    Q    Mr. Yelizarov, will you please describe the document I just

7    handed to you?

8    A    This is the, well, I wouldn't say second plea agreement that

9    was offered, but that is the second plea agreement that I signed

10   or agreed to, dated February 2nd, 2016.

11   Q    What did Mr. Waldman explain to you about the terms of this

12   plea offer?

13   A    That it would basically be a 30-year (C) plea.  And if the

14   judge accepted it that, you know, it wouldn't, it wouldn't be any

15   higher than 30 years, and that there wouldn't be any further

16   prosecutions, and I'd be home by about 50 years old.

17   Q    I'd like you to turn to Paragraph 18 of the February 2nd,

18   2016 agreement.  Would you please read that paragraph?

19   A    Page 8, right?

20   Q    Correct.

21   A    This office represents that the State's Attorney's Office

22   for Baltimore County will pursue no further criminal charges

23   arising out of the events described in the factual stipulation

24   attached thereto provided that the defendant receives a sentence

25   pursuant to this plea agreement.  No other representations with

1    respect to any other conduct have been made or are contemplated

2    under this agreement.

3    Q    Would you please compare Paragraph 18 from the February 2nd,

4    2016 agreement with Paragraph 15 of the October 12th, 2015 plea

5    agreement?  What difference do you see in those two paragraphs?

6    A    There is no difference.  They're identical.  They're

7    basically identical.

8    Q    What did Paragraph 18 of the February 2016 agreement mean to

9    you?

10   A    It wasn't just what it meant to me, it's what Waldman said

11   to me, that there wouldn't be any further prosecutions, that

12   there wouldn't be any more indictments.

13   Q    Did you think that by pleading guilty under this agreement

14   that you would not be subject to any further prosecutions?

15   A    Yes.

16          THE COURT:  Now, let me ask you about that belief.  So

17   you just read Paragraph 18 out loud.  And it says that there

18   would be no further criminal charges arising out of the events

19   described in the factual stipulation that's attached.

20          The factual stipulation, sir, begins -- well, it's got

21   its own page numbers.  It's at the end of the document.  Is there

22   anything in the murder, about the murder in the factual

23   stipulations?

24          THE DEFENDANT:  No.  But I wasn't provided any

25   information about the murder by Mr. Waldman.

1          THE COURT:  You weren't what?

2          THE DEFENDANT:  I wasn't provided any information about

3     the murder by Mr. Waldman himself, either, as he stated himself.

4          THE COURT:  But at that point had he told you the

5     government was investigating the murder?

6          THE DEFENDANT:  The first time he stated the very vague

7     information that Mr. Budlow provided to him.

8          THE COURT:  And just so the record is clear for the

9     appellate court, I just want it to be understood that we're all

10    wearing masks and there's plastic around us and it does muffle

11    the sound a little bit.  So if anybody is having trouble

12    discerning something, speak up.  But I just need you to keep your

13    voice up, sir.  I know you and I are seated near each other, but

14    I still want to make sure I don't miss anything.

15          THE DEFENDANT:  I got you.

16          THE COURT:  So -- okay.  Thank you.

17    BY MS. ENGLERT:

18    Q    Did you, did you consult another attorney about this plea

19    agreement?  Well -- yeah.  Did you consult another attorney

20    specifically about this plea agreement, other than Mr. Waldman?

21    A    To be specific, my family tried to hire Joe Murtha for me.

22    And it wasn't really a consultation as much as him telling me how

23    much he was going to charge my family.

24    Q    Did he -- did you talk to him, though, about this particular

25    plea agreement to get -- did you talk to him about this plea

1    agreement?

2    A    No.  I don't believe he ever saw the plea agreement.

3    Q    Did you ever consult with him or get his opinion about

4    whether or not to plead guilty under this plea agreement?

5    A    No.  It wasn't -- no.  He wanted to get paid first.

6    Q    So did, did you ever retain Mr. Murtha --

7    A    No.

8    Q    -- to represent you?

9    A    I didn't have the money and I didn't want my family spending

10   that money that I didn't have to repay them.

11   Q    Who was the one who brought Mr. Murtha into contact with

12   you?

13   A    My family.  My father and my mother.  Mainly, my mother and

14   some of her other family members from her side of the family

15   tried to hire him.

16   Q    And were they seeking to replace Mr. Waldman --

17   A    Yes.

18   Q    -- with Mr. Murtha?

19   A    Yes.

20   Q    And did you -- and you already testified about this, but did

21   you ever retain Mr. Murtha to replace Mr. Waldman?

22   A    No, I did not.

23   Q    So getting back to your plea agreement.  Did you, in fact,

24   plead guilty on February 24th, 2016?

25   A    Yes.

1    Q    And before you, before you pled guilty, did Mr. Waldman ever

2    tell you that after pleading guilty the government could still

3    prosecute you for a murder?

4    A    No.  He told me there would be no further prosecutions, no

5    further indictments.

6    Q    All right.  After you pled guilty on February 24th, were you

7    sentenced on April 13th, 2016?

8    A    Yes.

9    Q    What was your sentence?

10   A    Thirty years.

11   Q    And was that consistent with your plea agreement?

12   A    Yes.

13   Q    Did you have any contact with Mr. Waldman after your

14   sentencing?

15   A    No, I don't believe so.

16   Q    And is there a limit to the number of people that you can

17   call while in prison?  Where were you in prison at that time?

18   A    I was in Hagerstown, Maryland Correctional Training Center.

19   Q    Did you have to get approval in order to -- did you have to

20   have a list of approved phone numbers in order to make phone

21   calls?

22   A    Yup.  You have 10 people on your phone list.  And I removed

23   Mr. Waldman shortly after our case was done because, you know, I

24   had no further contact with him.

25   Q    Were you indicted for murder on June 21st, 2016?

1    A    Yes.

2    Q    Were you -- what was your, what was your reaction to this

3    murder indictment?

4    A    I was shocked, surprised.

5    Q    And who represented you on this murder indictment?

6    A    Michael Lawlor.

7    Q    Did you complain to him about being indicted for murder

8    after you thought that the government would not pursue further

9    prosecution of you?

10   A    Yes.

11   Q    Did Mr. Lawlor do anything about your complaint?

12   A    He said that we have to file a 2255 for ineffective

13   assistance.

14   Q    In which case?  Your murder case or your robbery case?

15   A    For the Hobbs Act case in regards to Mr. Waldman's

16   misrepresentation.

17   Q    And did he do that for you?

18   A    Yes.

19   Q    Beyond that conversation Mr. Waldman had with you when he

20   first told you about this murder investigation, did he raise that

21   again with you during his representation of you?

22   A    I'm sorry.  Can you repeat that?  I kind of lost the

23   question.

24   Q    Sure.  After Mr. Waldman talked to you initially about the

25   government's murder investigation, did he continue to discuss

1    this murder investigation with you?

2    A    No.

3    Q    Did he tell you that you would likely be prosecuted for

4    murder even after you pled guilty to the robbery?

5    A    No.

6    Q    If Mr. Waldman had told you that even after pleading guilty

7    to this robbery case that the government would likely still

8    prosecute you for murder, would you have pled guilty in that

9    robbery case?

10   A    No, I would have went to trial.

11   Q    No further questions.

12          MR. BUDLOW:  You did meet with Mr. Murtha --

13          THE COURT:  Wait.  Wait.  Give me one second.

14          MR. BUDLOW:  Oh, sorry.

15          THE COURT:  So you're saying you never would have pled

16   guilty, you would have gone to trial if you had been told by Mr.

17   Waldman that an indictment was likely in the murder case?  Is

18   that what I understood?

19          THE DEFENDANT:  Yes, ma'am.

20          THE COURT:  Okay.  Thank you.

21          CROSS EXAMINATION

22   BY MR. BUDLOW:

23   Q    Thank you, Your Honor.  I just need a second.  While I'm

24   setting up, back to your comments about Mr. Murtha.  Just to be

25   clear, you and Joe Murtha met in person, didn't you?

1    A    Yes.  He came to visit me at MCTC.

2    Q    And your parents had set that up, didn't they?

3    A    Yes.

4    Q    And they had paid him for that consult, hadn't they?

5    A    No, not that I know of.

6    Q    Do you know for sure whether they did or didn't?

7    A    Not that I know of.

8    Q    So they might have?

9    A    It's a possibility.  But I believe he told me that he didn't

10   get paid, that that was a consultation visit.

11   Q    A consultation relating to the plea agreement that you had

12   already signed?

13   A    No.  Relating to me hiring him.

14   Q    So I'd like to turn to your written filings in this case.

15   And first I'm going to show you, if this works -- it's always

16   risky.  Okay.  And I'll enlarge it in a second.  This is, for the

17   record, Your Honor, ECF 299 in this case.  It's also marked as

18   Government's Exhibit M-18 for the purpose the motion.

19        Actually, Your Honor, while I'm thinking of it, I would

20   ask that in addition to the exhibits that are on my exhibit list

21   relating to the last hearing and then again today, the government

22   also would offer, just to make sure it's part of the record, all

23   of the attachments that were part of the government's filing in

24   this case.  And that filing is marked as 442.  There were a

25   number of exhibits to that, including some transcripts.  I

1   believe it goes 442-1 through at least 8.  But I'd ask that they

2   all be part of the record for these proceedings.

3            So first, Mr. Yelizarov, is that your handwriting?

4   A    I don't see it.  There's nothing up here.

5   Q    Oh, I'm sorry.

6            THE COURT:  We're going to work on that.

7   Q    Thank you.

8            THE CLERK:  Is it up?

9   A    The screen's turned on now.  The power button is blue.  Yup,

10  it's up.

11  Q    Is it up now?

12  A    Yeah.

13  Q    Great.  So is that your handwriting?

14  A    Yes.

15  Q    And that's your signature under oath at the bottom, correct?

16  A    Yes.

17  Q    I want to draw your attention and ask you to read this first

18  sentence of the second paragraph.  Could you read that out loud?

19  A    Your Honor, why would I plead guilty to 30 years if Mr.

20  Waldman would actually provide me with the information that Paul

21  Budlow informed him of, that the prosecution was looking into a

22  homicide that me and my buddies were involved in?

23  Q    And this was something that you wrote on December the 6th of

24  2018, right?

25  A    Correct.  Yup.  That's what it's dated.

1    Q    This is before you had counsel relating to the 2255,

2    correct?

3    A    Before I had Ms. Englert?

4    Q    Right.  Well, you haven't had any other counsel on this

5    2255, have you?

6    A    No.

7    Q    Okay.  So this was written by you in hand before you had

8    counsel for the 2255?

9    A    Correct.

10   Q    And it was before you filled out the affidavit that was

11   later attached as part of the 2255 that Ms. Englert did file for

12   you?

13   A    I'm sorry.  Can you repeat that?

14   Q    Yes.  This written statement by you was written out prior to

15   the affidavit that you later filled out as part of Ms. Englert's

16   filing in this case?

17   A    Oh, yes.  Correct.

18   Q    And in that sentence you -- Your Honor, why would I plead

19   guilty to 30 years if Mr. Waldman would actually provide me with

20   the information that Paul Budlow informed him that the

21   prosecution was looking into a homicide?  So you're saying there

22   that you would not have pled guilty had you known that the

23   prosecution was looking into a murder that you were involved in.

24   That's exactly what you said, right?

25   A    Can you show me the whole letter?  Because I believe -- it's

1    a little bit out of context the way you're putting it.

2    Q    Take your time and read the whole letter.

3    A    All right.

4              (Pause in proceedings.)

5    A    Okay.  And this is where I'm stating that Mr. Waldman didn't

6    come to me with any kind of information other than saying that

7    you, your office was looking into a homicide.  He came to me with

8    nothing.

9    Q    Does this letter say that you were informed of a homicide in

10   any way?

11   A    No, not exactly me as the prime target, no.

12   Q    It doesn't say that Mr. Waldman had advised you of any

13   additional investigation, does it?

14   A    No.

15   Q    Okay.  In fact, what you're saying very clearly to the judge

16   is that had you known about the murder at all, you would have

17   never pled guilty.  Isn't that what you said in this letter?

18   A    No.  I believe you're taking it out of context.

19   Q    You don't believe that this letter is you saying that

20   Waldman never told you about the murder in any way?

21   A    No.  Once again, exactly as Mr. Waldman said in his own

22   affidavit and his own testimony, he gave me vague information.

23   Q    Right.  No.  We understand --

24   A    And he said me and my buddies were involved.

25   Q    We understand what he testified to under oath.  What I'm

1    saying is before he testified to that under oath, didn't you

2    write to the judge that you didn't know about the murder at all

3    when you pled guilty?

4    A    No.   That's not what I meant whatsoever.   That I didn't know

5    about?

6    Q    It's not what you meant but it is what you said, right?   It

7    is what that says?

8    A    I wouldn't say exactly that.

9    Q    Mr. Yelizarov, isn't this your attempt early on in this case

10   to get out of this guilty plea by saying you didn't even know

11   about the murder?

12   A    No.

13   Q    All right.   Let's move on to September the 19th of 2020.   By

14   this point you had an attorney, Ms. Englert, correct?

15   A    By what date?

16   Q    The fall of 2020.

17   A    Yeah, I believe so.

18   Q    All right.   And at that point your consultation with her was

19   about vacating the guilty plea in this case?

20   A    Correct.

21   Q    And you were aware that you had, through counsel, obtained

22   Mr. Waldman's file during the preparation of that motion.   Isn't

23   that correct?

24   A    I believe so, yes.

25   Q    And you learned during your preparation of that affidavit

1    that Mr. Waldman in fact kept notes in his representation of you,

2    didn't you?

3    A    I believe so.  Sure.

4    Q    And so nearly two years after this filing in front of you,

5    299, you signed an affidavit in support of the motion for which

6    we're here today.  Is that right?

7    A    Did you say that you're trying to show me something?

8    Q    No.  You're familiar -- we'll show you the affidavit in a

9    minute.  I just want you to agree or disagree that two years

10   after you filed this affidavit, you signed another affidavit?

11   A    Oh, yes, with an attorney's help, as I'm no attorney and I

12   didn't really know exactly what I was filling out.

13   Q    And in the more recent affidavit, just like in the 2018

14   affidavit, you signed it swearing under oath that the contents

15   were true, didn't you?

16   A    Correct.

17   Q    So this is M-19 for the purposes of this hearing.  It's also

18   attached as 421-1.  This is an attachment to the defendant's most

19   recent motion under 2255.  Moving to Page 2.  Is that your

20   signature at the bottom?

21   A    Yes.

22   Q    And let's go to page, let's go to number 6.  Number 6 says

23   Mr. Waldman told me that the government was investigating a

24   murder that the government thought I was possibly involved in.

25   You swore now in 2020 that that was true, didn't you?

1    A    Yeah.  It happened when he came to see me in November or

2    December.

3    Q    Right.  And you wrote that in 2020.  Correct?

4    A    Yes, with the attorney's help.

5    Q    And after you were aware that Mr. Waldman's notes had been

6    provided?

7    A    No.  Once again, you got -- which notes are you speaking of?

8    Q    His notes relating to his meetings with you about the

9    murder.

10   A    No.  There was no such notes that he took and there wasn't

11   anything that I provided him for him to take notes.

12   Q    So part of your --

13        THE COURT:  Notes, just to be clear that counsel is

14   referencing, would be Mr. Waldman's notes, not your notes.

15        THE DEFENDANT:  I would have to see what notes he's

16   talking about.

17   BY MR. BUDLOW:

18   Q    So I want to -- Court's indulgence.  All right.  For the

19   record, Your Honor, what's on the screen now is document 421,

20   filed by the defense.  And this is M-20 for the purposes of

21   today.  I want to draw your attention to Page 12, Mr. Yelizarov.

22   And for the record, those are my highlights, Your Honor.

23        Is part of your complaint in these proceedings that

24   your attorney did not investigate the murder charge, is that

25   right?

1    A    Yes.  He didn't investigate what he was talking about, that

2    you brought to his attention.

3    Q    Right.  I just want to be clear.  Part of your complaint

4    about how he was ineffective is that he did not investigate the

5    murder charge?

6    A    Correct.

7    Q    And moving, drawing your attention to the second paragraph

8    here.  Mr. Waldman did nothing to educate himself or the client

9    regarding the murder investigation.  Mr. Waldman failed to

10   investigate what evidence the government had, how strong, or

11   whether it intended to prosecute Mr. Yelizarov.  That's part of

12   your complaint here today?

13   A    What you just showed me?

14   Q    Right.  The fact that Mr. Waldman did not properly

15   investigate the murder.

16   A    Yeah.  He said it himself, he did nothing.

17   Q    And part of your complaint, also, is that your attorney did

18   not negotiate -- Mr. Waldman, that is -- a package deal to

19   include the robbery and the murder charge?

20   A    Yes, that is one of them.

21   Q    And this is the highlighted portion that I wanted you to

22   read.  It says that despite government notice to Mr. Waldman that

23   it was investigating you for murder, Mr. Waldman conducted no

24   further investigation, did not negotiate a plea agreement that

25   precluded further prosecution, and did not pursue a combined plea

1    agreement.  So part of your complaint here today, just to be

2    clear, is that Mr. Waldman was ineffective for not pursuing a

3    combined plea agreement, correct?

4    A    As one of the issues, yes.

5    Q    Okay.  Now, let's go to Page 14 at the top where, again, on

6    the same topic it says prevailing social (sic) norms would have

7    dictated that Mr. Waldman further investigate, communicate the

8    likelihood of further prosecution and seek a combined plea

9    agreement.  That's part of your claim here today, correct?

10   A    Correct.

11   Q    And then one more.  Top of Page 16 and the bottom of Page

12   16.  Again, it says there's a reasonable probability had counsel

13   negotiated an agreement precluding further prosecution or sought

14   a combined plea agreement, that Yelizarov would have received a

15   lower sentence than pleading guilty to each case separately.

16   That's part of your claim because you're saying you would have

17   considered a combined plea agreement had he done his job?

18   A    I would have weighed all my options.

19   Q    All right.  And then at the bottom it says, had counsel

20   informed Mr. Yelizarov that there was a real possibility that he

21   would be charged in a murder case, Yelizarov would have sought a

22   plea agreement that precluded further prosecution -- again, last

23   thing is what I want you to focus on -- or combined plea

24   agreement.  That's part of your allegation, right?

25   A    One second.  Yes, correct.  Or go to trial.

1    Q    So one of the things that you're alleging about Mr. Waldman

2    was that he did not resolve both cases at the same time, meaning

3    the murder and the robbery, right?

4    A    Correct.  As well as no investigation.

5    Q    And do you realize -- well, there's multiple other things.

6    I just want to focus on that one.  Do you realize that in order

7    to resolve both the robbery and the murder, that would have

8    required you, as part of the negotiation, to plead guilty to the

9    murder charge?

10   A    That would have been one of the options, yes, I understand.

11   Q    And let's explore that option.  So that would mean in order

12   to plead guilty to that charge, that you would have had to admit

13   under oath that you shot Wayne Ruder 15 times, including 10 in

14   his head?  Do you understand that?

15   A    Yes, in regards to taking a guilty plea.

16   Q    And is it your testimony today, consistent with your

17   affidavit, that you would have pled guilty to a global resolution

18   where you would have also admitted to killing Wayne Ruder?

19   A    Not that I would have.  I would have weighed my options.

20   But I would have went to trial if I would have been charged.

21   Q    So would you have pursued a combined plea agreement

22   resolving both the murder where you would have had to plead

23   guilty to the murder, or wouldn't you have?

24   A    If I was indicted with the murder?

25   Q    No.  My question is, if Mr. Waldman came to you and said --

CROSS EXAMINATION OF STANISLAV YELIZAROV BY MR. BUDLOW     33

1   let me back it up.  You're saying Mr. Waldman, one of the things

2   he's ineffective for was that he didn't pursue a combined plea to

3   both cases.  What I'm asking you is under any circumstances would

4   you have admitted in that combined plea that you shot Wayne Ruder

5   15 times?

6   A    No, because I didn't.

7   Q    So would you agree, then, to the extent that your claims in

8   writing here today say that he was ineffective for failure to

9   seek a combined plea, you are abandoning those claims because you

10  would have never pled guilty to that murder?

11  A    That's not what I said.  In regards to actually being the

12  plea to the actual murder, it would be for my attorney and me to

13  conduct a proper investigation, for me to know all the details,

14  for me to know exactly what's going on, what I'm being indicted

15  with.  And then I would have weighed my options.

16  Q    Mr. Yelizarov, you were subsequently indicted and provided

17  discovery.  So today you know exactly what we're talking about

18  when we say the murder investigation, correct?

19  A    Partially.  Because I still wasn't provided with everything.

20  Q    My question to you is, since you're claiming he was

21  ineffective for failure to resolve this case globally, would you

22  or would you have not have pled guilty to the murder with the

23  right deal?

24  A    Once again, those options would have had to been weighed

25  with the proper representation and knowing whether or not I was

1   getting indicted.

2   Q    Would you have pled guilty to the murder under any

3   circumstances?

4   A    Once again, those options would have had to been weighed,

5   with proper representation.

6   Q    You're just saying the same thing over but you're not

7   answering my question.  Mr. Yelizarov, if he negotiated a global

8   plea, would you have said under oath I killed Wayne Ruder?

9   A    Possibly.

10  Q    Possibly.  Okay.  So is it true that you were part of a

11  post --

12          THE COURT:  Let me just ask counsel, just to be clear,

13  because that was Judge Garbis's case.  That is what happened,

14  isn't it?

15          MR. BUDLOW:  Well, there was no global plea, Your

16  Honor.  He did plead guilty.

17          THE COURT:  It wasn't global but you're asking him --

18          MR. BUDLOW:  Yes.

19          THE COURT:  -- and he keeps seeming to suggest he

20  wouldn't have admitted to something, but he did admit to it.

21          MR. BUDLOW:  And, Your Honor, because where I'm going

22  next is to the defendant's extensive filings to get out of that,

23  claiming he was innocent, as well as multiple other places --

24          THE COURT:  Okay.

25          MR. BUDLOW: -- where he professes his innocence.  And I

1    think it goes to his credibility.

2              Isn't it true that, while incarcerated in the Maryland

3    Department of Corrections, you had a recording posting to

4    Facebook?

5              MS. ENGLERT:  Objection.

6              THE COURT:  Well, I was going to ask counsel to repeat

7    the question.

8              MR. BUDLOW:  Sure.  Isn't it true that while you were

9    incarcerated in the Maryland Department of Corrections, that you

10   had a recording of your voice posted to the Facebook account in

11   your name?

12             THE COURT:  And what's the objection?

13             MS. ENGLERT:  Well, objection as to relevance because

14   this is about whether or not Mr. Yelizarov would have pled guilty

15   at that time.  The government is bringing in a lot of post

16   plea --

17             THE COURT:  Well, I have no idea when this even took

18   place, this posting.  So we don't have that.  It's hard for me

19   to --

20             MR. BUDLOW:  It's dated, Your Honor.

21             THE COURT:  Pardon?

22             MR. BUDLOW:  I'm sorry.  I didn't mean to interrupt.

23             THE COURT:  What time frame are we talking about?

24             MR. BUDLOW:  It's dated -- this was a publicly

25   available Facebook post on December 4th, 2020.  It's still there

1    now.

2              THE COURT:  Okay.  December 4 of 2020.  Okay.  Well, I

3    don't know enough about it to answer whether I think it's

4    relevant.

5    BY MR. BUDLOW:

6    Q    It will -- I mean, I think it's relevant, at least the

7    government's theory would be clear.  Mr. Yelizarov, you did the

8    post, correct?

9    A    Yes.

10   Q    And that's your face that we see, correct?

11   A    Yes.

12   Q    And that's a photograph of you, it's a still photo, even

13   though it's part of an audio, that shows at the beginning of this

14   Facebook post?

15   A    Yes.

16   Q    And in that post there's a recording of your voice, correct?

17   A    Correct.

18   Q    And in that recording you multiple times discuss the murder

19   case, don't you?  That's the basis of the recording?

20   A    Yes.

21   Q    Okay.  And in that recording you profess your innocence to

22   the murder that you've already been prosecuted for, multiple

23   times, don't you?

24   A    Prosecuted multiple times?

25   Q    Sorry.  You had made an excellent point because that was a

1    terrible question.

2              During that recording and on multiple occasions during

3    the recording you profess your innocence to the crime of the

4    murder of Wayne Ruder?

5    A    Correct.

6    Q    And in your pleadings -- let me actually go one more.  This

7    is what plays after your face is shown during the recording, the

8    words "wrongly convicted."  This is M-22.  Isn't that correct?

9    A    Correct.

10   Q    And in your pleadings, in the 2255 that was filed to vacate

11   the guilty plea in that case, the Judge Garbis case, you state

12   that you are completely innocent and that you did not kill Wayne

13   Ruder.  Isn't that true, that's what you filed?

14   A    Correct.

15   Q    And let's look at Grand Jury Exhibit 23.  I'm sorry.  This

16   is Government's Exhibit 23 for today.  It's document 129 in the

17   Judge Garbis case.

18              THE COURT:  So this is in the murder case?

19              MR. BUDLOW:  Yes.

20              THE COURT:  This is ECF 1 --

21              MR. BUDLOW:  129.

22              THE COURT:  129.

23              MR. BUDLOW:  And that's your handwriting --

24              THE COURT:  What's your exhibit number?  M-23?

25              MR. BUDLOW:  Yes.  Up on the top left hand.

1          THE COURT:  Okay.  Thank you.

2     BY MR. BUDLOW:

3     Q    Mr. Yelizarov, that's actually your handwriting again, isn't

4     it?

5     A    Yes.

6     Q    And this is something you just wrote on January 23rd, 2022,

7     correct?

8     A    Correct.

9     Q    And it was filed on February 7th, 2022.  And in this you say

10    that you're not guilty of the murder, don't you?

11    A    Correct.

12    Q    Let's go to Page 3.  Court's indulgence.  All right.  So you

13    tell the judge in that case that you didn't, you're complaining

14    about not having a private investigator who did any work who

15    could have proven several issues with the case, as well as

16    finding the real murderer.  So you would agree that in this

17    filing that you wrote at the beginning of this year you're saying

18    I'm not the real murderer of Wayne Ruder, somebody else is?

19    A    Correct.

20    Q    So based on your testimony today, again, is it fair to say

21    you're abandoning any claim that you would have negotiated a plea

22    where you would have had to plead guilty under oath to killing

23    Wayne Ruder?

24    A    No.  I'm not abandoning that at all because sometimes you

25    have to plead guilty to something that you're not guilty of.

1   Q    Well, you know there's no Alford pleas as to murder cases in

2   federal court, Mr. Yelizarov.  Do you know that?

3   A    No, I don't.

4   Q    So if I told you that the only way to plead guilty to a

5   murder case in federal court is to admit under oath that you

6   committed the murder, would you have done that in this case?

7   A    No.

8   Q    So you would agree, then, that you are abandoning your claim

9   that Mr. Waldman was ineffective for failure to negotiate a

10  global plea?

11  A    Once again, if you're going back to Mr. Waldman, then I

12  would have weighed all my options when they were brought to me.

13  This was Mr. Lawlor and his poor representation.

14  Q    Okay.  But now in this case, you do admit that Robert

15  Waldman told you about the murder case?

16  A    On the first, what was it, the first meeting.

17  Q    Do you admit that he told you about the murder case?

18  A    He told me that Mr. Budlow was looking into a homicide

19  investigation that me and my buddies were involved in.  That was

20  it.

21  Q    So, is that a yes, that you admit that he told you about the

22  murder investigation?

23  A    Yes.

24  Q    Okay.  And he came to see you at MCTC and got a private room

25  and told you that he needed to meet with you, correct?

CROSS EXAMINATION OF STANISLAV YELIZAROV BY MR. BUDLOW                    40

1   A    Correct.

2   Q    And then he told you in that meeting that I told him there

3   was an old murder case that was being investigated and that you,

4   Stanislav Yelizarov, were the suspect?

5   A    No.  That's not how he worded it at all.

6   Q    Did he convey to you that you were being investigated for

7   murder?

8   A    Me and the people that were indicted and unindicted in the

9   Hobbs Act case, yes.

10  Q    And you told him that the government would never prove it,

11  didn't you?

12  A    I never said that.

13  Q    You did not say to him "what murder case", did you?

14  A    Of course I did.

15  Q    You did say "what murder case?"

16  A    Yeah.

17  Q    Is it true that many of your friends and acquaintances had

18  been talking for years, before you ever were charged in any of

19  these cases, for years that you had committed the murder of Wayne

20  Ruder?

21  A    I have no idea --

22  Q    Is it --

23  A    -- what rumors --

24  Q    -- your testimony here today that prior to Mr. Waldman

25  telling you about that case, that you had never heard in the

1    community that people were saying that you killed Wayne Ruder?

2    A    No.  I don't know what rumors people spread left and right.

3    Q    But you do hear some rumors sometimes, right?

4    A    Sure, everybody hears rumors.

5    Q    And when Mr. Waldman told you about the murder, didn't you

6    tell him that Alex Binder knew about the murder?

7    A    I told him that the people that were unindicted and indicted

8    in the Hobbs Act case knew about it and somebody who was possibly

9    involved with the case.

10   Q    So you didn't know anything about the murder, but then you

11   knew who might know about the murder?  Is that what you're

12   saying?

13   A    No.  Once again, me not knowing who committed the murder.

14   Q    Okay.

15   A    And me not being the person that committed the murder.

16   Q    Right.  No.  My question isn't about whether you did it.  My

17   question is, did you know about the murder?

18   A    Yeah.  All of Pikesville, all of Baltimore knew.

19   Q    And you told Mr. Waldman that not only did you not do it,

20   but certainly the people who were indicted and unindicted in your

21   robbery case, you believed they knew about the murder of Wayne

22   Ruder?

23   A    People constantly talked about it.  That was it.

24   Q    I'm asking you what you told Mr. Waldman.

25   A    No.  I didn't tell him no such thing.

1    Q    Didn't you testify earlier that you told Mr. Waldman, just

2    on direct examination, that your coconspirators and unindicted

3    coconspirators, they knew about the murder, but not you?

4    A    I'm not exactly understanding how you're saying the

5    question.

6    Q    In your direct examination didn't you answer a question by

7    saying that during your meeting with Mr. Waldman you told him

8    that your coconspirators in the robbery and the unindicted

9    coconspirators knew about the murder?

10   A    Oh, okay.  Yes, correct.

11   Q    So you knew who knew about this murder?

12   A    No.  That's -- you're trying to word it your way.  That's

13   not what I said whatsoever.

14   Q    What did you say?

15   A    I said that these people possibly were involved, especially

16   the unindicted people like Alexander Binder, because he had a

17   relationship with Mr. Ruder.

18   Q    Who else did you mention?

19   A    I believe -- who was it -- Dimitriy Novozhilov, because he

20   also worked at the pawn shop that Alexander Binder worked at.

21   Q    I'm going to do a favor for the court reporter.  Could you

22   spell that, please, if you know?

23   A    No, I don't.

24   Q    How about Dimitriy?  Could you help us with that?

25   A    D-M-I-T-R-I.

1    Q    And how about, just say the last name again, a little

2    slower.

3    A    Novijiva.

4    Q    Okay.  All right.  Now I'm going to show you -- and I know

5    this is not your handwriting, correct?

6    A    No.

7    Q    And, Your Honor, I would just ask the record to reflect if

8    defense counsel agrees, that when defense counsel filed their

9    email for Mr. Waldman redacted and I asked for the unredacted

10   copy, Ms. Englert was nice enough to provide me with both that

11   email and Mr. Waldman's notes.  And that Government's Exhibit

12   M-17 initially are the notes.

13            THE COURT:  These are Mr. Waldman's notes?

14   BY MR. BUDLOW:

15   Q    I would ask that, yes, they be offered for that purpose.

16   Obviously, we didn't know they would be relevant so we didn't get

17   a chance to ask Mr. Waldman about them.

18            In fact, you told Mr. Waldman quite a bit more about

19   the murder investigation that day, didn't you?

20   A    No, I did not.

21   Q    All right.  Let's start, I just want to ask you if you

22   recognize any of these names.  Do you see on the far left side

23   these letters?  Can you tell me what those are?

24   A    No.

25   Q    Look like an I-Y to you?

CROSS EXAMINATION OF STANISLAV YELIZAROV BY MR. BUDLOW     44

1    A    I don't know who I-Y is.

2    Q    Okay.  How about, could you tell us if maybe one of the

3    indicted coconspirators in the robbery case has the initials I-Y,

4    Mr. Yelizarov?

5    A    Oh, yeah.  Igor Yasinov.

6    Q    Okay.  Great.  So below it where it says arguably I-Y --

7    that's my interpretation -- does it say Marat and Kirill?

8    A    I guess.

9    Q    And under that does it say "know" also?

10   A    I guess.  I don't know.  It's not my handwriting.

11   Q    All right.  Could you tell us who Marat is?

12   A    Marat is one of the people that was indicted in the Hobbs

13   Act case and is my brother.

14   Q    Okay.  And his last name is Yelizarov, same as yours?

15   A    Correct.

16   Q    And who is Kirill?

17   A    Kirill I'm guessing Kondratiyev, who was also -- excuse

18   me -- an unindicted coconspirator, who you gave a deal to at some

19   point.

20   Q    And do you recall, in preparation for the murder case,

21   meeting with Mr. Lawlor and reviewing the Jencks or the

22   statements that they were giving, including grand jury testimony?

23   A    Yeah.  For about 30 minutes, sure.

24   Q    And one of the grand jury testimony related to your brother,

25   Marat Yelizarov, right?  Correct?

CROSS EXAMINATION OF STANISLAV YELIZAROV BY MR. BUDLOW          45

1   A    I don't remember reading Marat's testimony.

2   Q    And one of the testimony from the grand jury related to

3   Kiril's, correct?

4   A    Once again, didn't read Kirill's.  Got little paragraphs.

5   Q    And did the paragraph about Kirill explain how it was his

6   testimony that the two of you went and threw the murder weapon

7   into Quarry Lake?

8   A    Yeah.  This was Kiril's testimony.  The one where you went

9   scuba diving for 127 hours and you found nothing?

10  Q    I wish it was me but, no, it was Baltimore County --

11  A    Sure.

12  Q    Underneath Marat and Kirill knew also, it says Michelle.

13  You had a girlfriend at the time named Michelle Braun, B-R-A-U-N?

14  A    When you say at the time, she was never my girlfriend.  Just

15  an associate.

16  Q    How many girlfriends named Michelle have you had?

17  A    Once again, can you state the time?  Because I want to have

18  that on the record.

19  Q    Do you know Michelle Braun?

20  A    Yes, I do know Michelle Braun.

21  Q    Is it fair to say you've had an off and on romantic

22  relationship with her for several years?

23  A    Sexually, yes, sure.  But not my girlfriend.

24  Q    And then underneath of it, of Michelle, it says and maybe

25  Alina.  Do you see that?

1    A    I see it.

2    Q    All right.  And do you know an Alina?

3    A    I know several Alinas.

4    Q    Do you know Alina Grigorieva?

5    A    Grigorieva, yeah.

6    Q    All right.  And are you aware that she was also listed as

7    one of the witnesses against you in the murder case?

8    A    I believe so, yes.

9    Q    All right.  So let's look at the rest of these notes.  So I

10   want to draw your attention to the part here where it has, it's

11   called a triangle.  Okay?  It says triangle paid $15,000,

12   question mark.  See that?

13   A    Yeah, I see it.

14   Q    And it says underneath that, for gold, F and AB present.  Do

15   you know who AB might be in this context?

16   A    I have no idea.

17   Q    You mentioned him earlier.

18   A    Oh, Alexander Binder.

19   Q    There you go.  Okay.  And then it says source of jewelry not

20   clear.  Could you read out loud what it says underneath of that?

21   A    I can't read that.

22   Q    See how it says tossed in a river with Kirill?

23   A    Okay.  Yeah.  Tossed in river with Kirill.

24   Q    So this is the information that you provided to Mr. Waldman

25   that day, isn't it?

1    A    No.  I provided Mr. Waldman with no such information.

2    Q    And at the end of all of your meeting with Mr. Waldman, you

3    said to him, but my friends won't talk and they'll never prove

4    it.

5    A    I never said that.  And just to answer your question really

6    quickly.  Mr. Waldman's own testimony and his affidavit stated

7    that we didn't exactly speak about the murder.  I'm not sure what

8    these notes are.  I've never seen them, never given him any kind

9    of information of that source.

10   Q    Did you get a chance to read this email that Mr. Waldman

11   sent to your attorney?

12   A    Sicilia, I found --

13   Q    I'm sorry.  It's the mask.  I said, did you get a chance to

14   read it?  You've seen it before today, right?

15   A    Yeah.  I believe just not the -- I believe it was redacted

16   at the bottom.

17   Q    Right.  Last week I think we either read or discussed all

18   the way through where it says plea at the bottom, in the middle,

19   correct?

20   A    Yeah.

21   Q    Okay.  With the Court's permission, may I read the remaining

22   out loud?

23              THE COURT:  Which part are you talking about?

24              MR. BUDLOW:  Starting at "you will see."

25              THE COURT:  Any objection?

1          MS. ENGLERT:  Yes.  I do object.  I don't see the

2     purpose of the government reading this.  This witness -- what was

3     redacted from my filing had, was not part of a conversation that

4     Mr. Waldman was having with Mr. Yelizarov.  This was something

5     that Mr. Waldman chose to email me about.  And it has facts about

6     the murder, but this is not part of a conversation that he had

7     with Mr. Yelizarov.  So --

8          MR. BUDLOW:  Frankly, Your Honor --

9          MS. ENGLERT:  -- I object to that part of it really

10    being relevant to anything that we're talking about.

11         MR. BUDLOW:  So, initially, Your Honor, my response is

12    there's no jury.  If it isn't relevant, then the defense can

13    argue that.

14         I would also add that I think on its face it seems

15    particularly relevant to Mr. Waldman's conversations with the

16    defense.  In fact, and I tried to do this tactfully earlier, Ms.

17    Englert made the argument to Your Honor last time that this

18    bottom part had nothing to do with that conversation.  And I just

19    think it certainly does.  And there's a good argument that it

20    does, even if there's maybe an argument to the other side, which

21    I don't see.

22         It also references the notes, the ones that I just

23    showed.

24         THE COURT:  Well, it does indeed explain the notes.

25    And refresh my memory.  Was this shown to Mr. Waldman?

1        MR. BUDLOW:  It was.

2        THE COURT:  That's my vague memory.

3        MR. BUDLOW:  And then, in fact, you questioned Mr.

4  Waldman about -- this was toward the end of the examination.  He

5  was being asked about, about the conversation on cross

6  examination.  And the redacted email was shown.

7        THE COURT:  I remember asking about the redaction,

8  actually.

9        MR. BUDLOW:  So right at the very end --

10        THE COURT:  But I don't remember any specific questions

11  from you all about it.

12        MR. BUDLOW:  Right.  So you specifically asked, is

13  there anything redacted that relates to the conversation?

14        THE COURT:  Right.  I did ask.  I remember that.

15        MR. BUDLOW:  Defense counsel said no.  So I initially

16  wanted to make sure that we cleared that up because that just

17  doesn't appear to be accurate.  And I think now in the context

18  of -- it just seems to me by redacting this highly relevant

19  information and not referencing the notes and putting on Mr.

20  Waldman to say that this was his limited memory of the meeting,

21  and right there hidden from him was way more information about

22  the meeting, both the notes and the redactions.

23        THE COURT:  Well, my first question is, am I right that

24  as redacted it's in evidence already?

25        MR. BUDLOW:  It is.

1          THE COURT:  So --

2          MR. BUDLOW:  Unredacted as well.

3          THE COURT:  Okay.  So then I certainly think this is no

4     issue of any substance.  It's already in evidence.  So if you

5     want to read it and highlight something in doing so, that's fine.

6          I had not seen the redacted part, obviously.

7          MR. BUDLOW:  And I certainly think that -- I'm going to

8     read the whole thing, with the Court's permission, because now it

9     puts what, the notes that we just read in significant context.

10         It says Sicilia, I found the file.  I knew I would need

11    it some day.  It's pretty thick.  I know you're looking for how

12    the murder did or did not play into things.  I have one page of

13    notes --

14         THE COURT REPORTER:  Can you please slow down?

15    BY MR. BUDLOW:

16    Q    Sorry.  Thank you.  I have one page of notes which is

17    referenced.  Attached here.  Number one, Wayne's Antiques.  As I

18    told you, I refrained from writing down too much on this event.

19    This page also contains facts about other as-yet uncharged

20    crimes.

21         Budlow had asked me to his office.  He said they knew

22    of a murder.  He asked me to find out if Yelizarov wanted a

23    combined -- to combine a plea to the kidnapping/robbery and the

24    murder.  I took that news to Yelizarov.  He said they would never

25    prove the murder.  I asked if he had told anyone else about it.

1    He told me the names.  They are in the left margin.  He said he

2    wasn't worried about it.  We did not pursue a combined plea.

3          You will see reference to Alex Binder.  His parents

4    owned a pawn shop in a strip center on Reisterstown Road in

5    Baltimore, at the opposite end of which was Wayne's Antiques.  A

6    fence, as was Binder's family pawn shop.

7          The murder took place on Christmas.  Only Yelizarov was

8    there.  I think Binder took the gold and jewelry.  F and AB were

9    present when Y got paid, but I cannot remember who they are now.

10   I know Binder accompanied Yelizarov to Brooklyn with the goods

11   from the kidnapping/robbery to meet some Russian guy.  Binder was

12   at the time of my case a 3D year U of Baltimore law student.  I

13   dropped the dime on him to the Attorney Grievance Commission.

14   His admission was held up but ultimately approved I assume

15   because he was a deep cooperator.  As it turned out, and Michael

16   Lawlor can tell you this, Yelizarov had a bunch of people -- had

17   told a bunch of people about the Wayne's Antiques murder,

18   including his girlfriend, who Y was convinced loved him and would

19   never talk.  The other events are just violent burglaries.

20   Yours, Bob Waldman.

21         Again, Mr. Yelizarov, in light of reading this or

22   having it read, do you now agree that, in fact, you did provide

23   additional information to Mr. Waldman about who you had told

24   about the murder?

25   A    No.  I never did provide him with any of that information.

1   Q    And do you agree that you did say to him, they'll never

2   prove it?

3   A    No, I never said that to him.

4   Q    So in your affidavit and here today you've said that had you

5   only known that the plea didn't cover this, that you would have

6   gone to trial?

7   A    Correct.

8            THE COURT:  Can you repeat that question, counsel?

9   Q    Yes.  Your testimony was that had known that the government

10  might prosecute you for the murder, you would have gone to trial

11  in the robbery/kidnapping case?

12  A    Correct.

13  Q    And you testified that you told Mr. Law -- I'm sorry -- Mr.

14  Waldman that you wanted to go to trial from the very beginning of

15  this case, didn't you?

16  A    Correct.

17  Q    But just so we can see where there's differences, you'd

18  agree that was not his testimony.  In fact, he said that you

19  initiated the plea discussions in this case.  Do you remember him

20  saying that?

21  A    I don't recall that, no.

22  Q    You've been charged and convicted of many crimes prior to

23  this one, correct?

24  A    I don't know about many.

25  Q    Well, let's start with August.

1    A    There are a few.

2    Q    There are a few.  Let's start with one of the few.  August

3    21st, 2009, you were arrested when you were a juvenile, but

4    charged as an adult, with robbery, is that right?

5    A    2009, I was not a juvenile.  I was 19 years old.

6    Q    All right.  Do you remember being charged with the robbery

7    in that case?  State court.

8    A    I was charged as an adult.

9    Q    Correct.  With an armed robbery.  No gun was recovered.  Do

10   you remember that?

11   A    Yes.

12   Q    Did that case go to trial?

13   A    No.

14   Q    You pled guilty, correct?

15   A    Correct.

16   Q    Also, on November the 30th, 2009, while awaiting trial for

17   that case, you were arrested for a drug-related offense, right?

18   Possession of marijuana?

19   A    Correct.  No.  Drug paraphernalia.

20   Q    Did that case go to trial?

21   A    No.

22   Q    You pled guilty, correct?

23   A    I believe it was nol processed (sic).

24   Q    On January 16th, 2010, you were arrested for driving under

25   the influence and some flight-related offenses in Baltimore

1    County, correct?

2    A     It was a DUI.

3    Q     Did that case go to trial?

4    A     No.  I was guilty of that.

5    Q     Did you plead guilty?

6    A     Yes.

7    Q     In January of 2013 you were arrested trying to cross into

8    the United States from Canada using your brother's passport.  Is

9    that correct?

10   A     Correct.

11   Q     You were charged in federal court, right?

12   A     Correct.

13   Q     Did you go to trial in that case?

14   A     No.

15   Q     You pled guilty, correct?

16   A     I was guilty.

17   Q     Then you were indicted here in federal court and had a case

18   before Judge Motz, this case, which you were charged with, among

19   other things, federal robbery and conspiracy to kidnap and

20   firearms offenses, right?

21   A     Correct.

22   Q     And in the fall of 2015 you signed a plea agreement saying

23   that you were going to plead guilty?

24   A     Yeah, the first plea agreement, the 34 to 40.

25   Q     And later you signed a second plea agreement, agreeing to

1    plead guilty?

2    A    Correct.

3    Q    And you were what's referred to as the lead defendant in

4    that case?  You were listed first in the indictment?

5    A    Yeah.  According to your office, yeah.

6    Q    But, no, the indictment listed you first?

7    A    Yeah, all right.

8    Q    And did you plead guilty and were sentenced?

9    A    Correct.

10   Q    And even the violation of probation from Baltimore County,

11   the robbery charge, where you violated when you came back into

12   the US, and you got an 11-year sentence on that violation, you

13   pled guilty to that, too, didn't you?

14   A    I was guilty.

15   Q    And the murder case that was charged in 2016, you signed a

16   plea agreement on that?

17   A    Yes.  The, the week of the trial.

18   Q    And you then came to court and entered a guilty plea under

19   oath, did you not?

20   A    Yeah, the week of the trial.

21   Q    And then you were sentenced, weren't you?

22   A    Yes, shortly after that.

23   Q    So you always plead guilty, right?

24   A    Yeah.  Sure.  I pled guilty to said charges.

25   Q    You've never, ever gone to trial, have you?

1   A   I've never really known exactly what trial is or how to go

2   to trial.  But, no.

3   Q   All right.  Now, you claim that Mr. Waldman told you about

4   the murder, right?

5   A   Yes.  On November.

6   Q   And he told you, according to your testimony, that if you

7   pled guilty to the murder -- I'm sorry -- that if you pled guilty

8   to the robbery, the kidnapping, this case, that you would not be

9   prosecuted for the murder?

10   A   Correct.

11   Q   And you do agree that that promise is not mentioned in the

12   plea agreement anywhere?

13   A   Well, sort of.  To my, to my understanding at that time

14   that's not what --

15   Q   Right.  I understand you've testified as to how you

16   interpreted.  But you do agree now you've looked at it, it's not

17   in there, correct?

18   A   Not what was interpreted.  What was told to me by Mr.

19   Waldman.

20   Q   Okay.  But you do agree that the document itself doesn't

21   contain reference to the murder and doesn't say that you wouldn't

22   be prosecuted for the murder?

23   A   Sort of.  It doesn't mention the exact murder, no.

24   Q   It doesn't mention any murder, does it?

25   A   No.

CROSS EXAMINATION OF STANISLAV YELIZAROV BY MR. BUDLOW        57

1   Q     And you would agree that the murder is, if not the most

2   serious, a very serious crime?

3   A     Yeah.

4   Q     And in your meetings with Robert Waldman when you reviewed

5   the plea agreement, the second one, you never asked him about the

6   murder not being specifically referenced in the plea agreement,

7   did you?

8   A     No.  I did.

9   Q     You did?  Did you hear him testify about that?

10  A     I don't believe he did.

11  Q     He wasn't, he wasn't asked about that, was he?

12  A     I don't recall exactly.  But he told me that there wouldn't

13  be any further prosecution.

14  Q     But my question to you is when you were reviewing the plea

15  agreement, did you say to him, why isn't the murder that you're

16  telling me isn't being prosecuted, why isn't that in the plea

17  agreement?  Did you say that to him?

18  A     I don't believe I asked him like that, no.

19  Q     Did you say it to him in any way?  Where's reference to this

20  promise about the murder?

21  A     I don't recall that.

22  Q     In fact, his testimony was the murder never came up again

23  until right before the plea, correct?

24  A     No.  I believe I did ask him right before he brought me the

25  30 (C) plea and he told me that your office wasn't pursuing that,

1    something about you didn't have jurisdiction, that it wasn't your

2    case, it was a Baltimore City case.  Said there wouldn't be any

3    prosecution.

4    Q    So your testimony is that Mr. Waldman, right before you pled

5    guilty in this case, told you something about the murder relating

6    to the government not seeking it because there wasn't

7    jurisdiction and because it wasn't in Baltimore County?  That's

8    your testimony here today?

9    A    No.  That it was in Baltimore City.  It was a Baltimore City

10   case.  He said there wouldn't be any indictment in regards to any

11   homicide.

12   Q    Mr. Waldman specifically told you that during a meeting you

13   had with him?

14   A    It was right before I signed the 30 (C) plea, the 30-year

15   (C) plea.

16   Q    And you'd agree that his testimony on that point was the

17   exact opposite, where he said, in fact he told you this does not

18   cover the murder case?

19   A    He's contradicted himself more than once.  So if that was

20   his testimony, then, sure.

21   Q    So it's your testimony that Mr. Waldman told you, he said

22   I'm telling you the government told me they're not going to

23   prosecute you?  That's your testimony?

24   A    He said that the 30 year (C) plea would be it, there would

25   be no further indictments, no further prosecutions.

1  Q    And it's your testimony that you trusted Mr. Waldman that

2  that wasn't going to happen?

3  A    I didn't know that I didn't have to trust him.  I didn't

4  know -- I thought that the Criminal Justice Act panel provides

5  decent attorneys.  And I later found out that that wasn't the

6  case.  Mr. Waldman --

7  Q    I'm not asking your view of it today, Mr. Yelizarov.  I'm

8  saying at the time that he said to you they're not going to

9  prosecute you, according to your testimony, you trusted him?

10  A    Of course.  I had to.

11  Q    And even though it wasn't written in the plea anywhere, you

12  trusted Mr. Waldman's representations?  That's your testimony?

13  A    Correct.

14  Q    And then you read the plea agreement, didn't you?

15  A    Yes.  Which one?  The newest one?

16  Q    The one that you ultimately entered the plea to.

17  A    Yes.

18  Q    All right.  So this is Exhibit 1 from the motions filing,

19  Your Honor.  This is the 2016 plea agreement that you just

20  testified to having read, correct?

21  A    Correct.

22  Q    So referencing on Page 7, Paragraph 15, it says, would you

23  agree -- wrong one.  Sorry.  Paragraph 18 on Page 8.  It says:

24  No charges from Baltimore County relating to the events described

25  in the factual stipulation.  You read that ahead of time,

CROSS EXAMINATION OF STANISLAV YELIZAROV BY MR. BUDLOW                    60

1    correct?

2    A    And this is exactly what I mean.  This office represents

3    that the State's Attorney --

4    Q    My question, sir, is did you read it ahead of time?

5    A    Yeah.  I read it.

6    Q    Do you understand what it means when it says that Baltimore

7    County will pursue no further criminal charges from the events in

8    the facts attached?  Do you understand that?

9    A    My understanding was that that was in regards to any further

10   charges.

11   Q    Right.  But my question to you is when it says in writing,

12   no charges from the factual stipulation, you understand what that

13   means?  That there's a stipulation of facts that you signed,

14   correct?

15   A    Yeah.  All the way in the back.

16   Q    And you read those facts all the way in the back and then

17   signed the bottom, didn't you?

18   A    Correct.

19   Q    And you listened in court while they were read and agreed

20   that they were true, didn't you?

21   A    Yeah, to a certain extent.  From my understanding, I had to

22   agree to the factual stipulation.

23   Q    All right.  But you were there when they were read, correct?

24   A    I believe so, yes.

25   Q    And you know that both in writing and verbally in court

CROSS EXAMINATION OF STANISLAV YELIZAROV BY MR. BUDLOW          61

1  there was no mention of any murder, correct?

2  A    I don't believe there was.

3  Q    There was no mention of any crimes other than the burglaries

4  and the robberies and home invasion, correct?

5  A    I believe so.

6  Q    All right.  And then the last sentence here says no other

7  representations with respect to any other conduct have been made

8  or are contemplated under this agreement.  You read that prior to

9  signing it, right?

10  A    Right.

11  Q    You understand what that means, no other promises, right?

12  A    I understand it better now.  But at the time it was

13  explained to me very differently by Mr. Waldman.

14  Q    You understood it to mean something different from what it

15  actually says?

16  A    From what Mr. Waldman explained to me.

17  Q    So he explained to you that even though it says one thing,

18  it actually means something way better?

19  A    No.  Just from the State's Attorney's Office of Baltimore

20  County will pursue no further criminal charges.  That was the

21  explanation that I got that there would be no further

22  indictments, no further prosecutions.

23  Q    But you agree it doesn't say that?

24  A    As I look at it now, yes.  But that's not what was said to

25  me.

1    Q    Well, you --

2    A    And I believe Mr. Waldman said that himself.

3              THE COURT:  One at a time.

4    Q    My questions are -- and if they're not well worded, I

5    apologize.  I'm trying to be very specific and just ask you about

6    the documents.  You can certainly explain how what Mr. Waldman

7    told you about it again on redirect.  But I'm asking you about

8    what the document says.

9              So let's go to Page 10 and look at the last paragraph.

10   And I am going to read this out loud.  This letter supersedes any

11   prior understandings, promises, or conditions between this office

12   and the defendant, together with the sealed supplement,

13   constitutes the complete plea agreement in this case.  The

14   defendant acknowledges that there are no other agreements,

15   promises, undertakings or understandings between the defendant

16   and this office other than those set forth in this letter and the

17   sealed supplement and none will be entered into unless in writing

18   and signed by all the parties.

19             So you read that and you said underneath of it that you

20   read every term and then you signed it, correct?

21   A    Correct.

22   Q    And even though the document twice, very clearly, says no

23   other agreements, it's your testimony that you trusted not just

24   Mr. Waldman, but you trusted that the government would do what

25   Mr. Waldman said they would do, right?

1  A    Correct.

2  Q    Even though nobody ever put it in writing, correct?

3  A    At this moment, yes.  But at that time, wasn't an attorney,

4  just followed Mr. Waldman's advice.

5  Q    Sure.  And you trusted him and you trusted what he said the

6  government would do and wouldn't do?

7  A    Correct.

8  Q    So it wasn't in writing.  But, also, when you went to the

9  plea hearing, it wasn't mentioned in the plea hearing, right?

10  A    I don't believe it was.

11  Q    Mr. Waldman didn't stand up and say "Just to clarify

12  something, this also covers a murder case from 2009?"  That did

13  not happen, did it?

14  A    I do not believe so as there was no indictment.

15  Q    Right.  And you also did not stand up and make any reference

16  on the record that, just to be clear, this also relates to the

17  murder?  You didn't do it?

18  A    Didn't know I could.

19  Q    And you were there, and Judge Motz didn't -- he was the

20  judge, right?

21  A    Yes.

22  Q    And he didn't say anything about this relating to a murder,

23  either, did he?

24  A    I don't believe Judge Motz was even notified of any such --

25  Q    But, in fact, Judge Motz said to you -- and, for the record,

1    this is on Page 18 to 19 of the plea agreement, Your Honor -- see

2    if this will it pull up.  Page 2 -- I'm sorry -- it's Exhibit 2

3    to the government's filing.  Starting at the very bottom of

4    Page 18.  I'll try to get there again.  All right.  I want you,

5    I'm going to read it again.  But starting with --

6                 THE COURT:  What page is this?

7    Q    Sorry, Your Honor.  This is page, the bottom of Page 18 is

8    going to go immediately into the top of 19, starting at Line 25,

9    where it says, and this is while you were there:  Most

10   importantly, is what I stated in the plea agreement to be -- most

11   importantly, is what I stated the plea agreement -- I did it

12   again.  Is what I stated the plea agreement to be, as

13   supplemented by counsel, what you understand the plea agreement

14   to be?  Yes, I do, you said.  Judge Motz said, has anybody

15   promised you anything else?  And you said, no, sir.

16                 That's accurate.  That happened, didn't it?

17   A    I believe so, yes.

18   Q    And you were under oath then just like you are now, correct?

19   A    Correct.

20   Q    But now you claim that even though you said under oath, and

21   signed that plea agreement, that there were no other promises,

22   now you say there was a promise, and not only was there a promise

23   but that promise was that you wouldn't be prosecuted for an

24   execution-style murder.  That's your claim today, right?

25   A    I didn't know I could.

1    Q    You didn't know you could what?

2    A    I didn't know I could say that.

3    Q    You didn't know you could answer questions truthfully?

4    A    No.  I didn't know I was supposed to even bring that up,

5    bring that to the light.  Once again, Mr. Waldman said that there

6    wouldn't be no further charges.

7    Q    But you understand --

8    A    I went with his advice.  I went with the attorney that says

9    he's practiced in law for 25 or 30 years, and I went with what he

10   said.

11   Q    But you understand the question, any other promises, right?

12   A    Sure.

13   Q    And when you're sitting there, pleading guilty and agreeing

14   to a 30-year sentence, aren't you thinking, there's one promise

15   he left out, the murder?

16   A    No. I wasn't thinking that.

17   Q    No?  Okay.  So you then were subsequently indicted by a

18   federal grand jury on June 21st, 2016, right?

19   A    I believe it was two months afterwards.  I think there was

20   an indictment that you sat on on purpose for no reason.

21   Q    This is June 21st, 2016.  Was that the date of the

22   indictment?

23   A    I believe so.  It was like two months after sentencing.

24   Q    And you testified on direct examination -- I want to get

25   your words -- you were both in shock and surprised.  That's your

1    testimony, correct?

2    A    Correct.

3    Q    You must have been because, according to your testimony, you

4    had been told that that was not going to happen, right?

5    A    Correct.

6    Q    And do you agree that you first learned that the indictment

7    was handed down when, not your girlfriend, but girl that you know

8    whose name is Michelle Braun, when she called you or you called

9    her, you have a recorded jail call?  That's when you learned

10   about the indictment, right?

11   A    No.

12   Q    No?  When did you --

13   A    I was notified by family members I believe somewhere, I

14   don't remember exactly when in June.  Somewhere in June.  I don't

15   remember exactly when.  But before I talked to Michelle Braun.

16   Q    And how did they notify you?

17   A    I believe it was by phone.  No.  Possibly a visit.

18   Q    Oh, so you think there was a visit between June 21st and

19   June 24th where your family told you about the murder?

20   A    I believe -- hold on.  I don't remember exactly.  But I

21   remember my family telling me -- who was it?  Possibly Alperstein

22   or somebody said that there was an indictment coming down.

23   Q    But you learned about it from Michelle Braun first, right?

24   A    No.

25   Q    Your Honor, I saw Mr. Murtha.  May I just have maybe 30

1    seconds to talk about the schedule?

2              THE COURT:  Sure.

3              MR. BUDLOW:  Thank you.

4              (Pause in proceedings.)

5              MR. BUDLOW:  Mr. Murtha is not in a huge rush.  He was

6    gracious enough to say that he could to wait.

7              THE COURT:  Okay.  So, counsel, just for scheduling and

8    timing, how long do you anticipate your cross will take?

9              MR. BUDLOW:  My cross is probably 15 minutes or less

10   left.

11             THE COURT:  Okay.

12   BY MR. BUDLOW:

13   Q    I hope.  Okay.  Thank you.

14             So we have the records of all the jail calls and all

15   the visits.  And you're saying there's going to be a visit

16   between June 21st and the date of the phone call that you

17   listened to this morning, before Her Honor came out on the bench.

18   A    I don't recall if it was a visit or a phone call.  I was

19   notified by my family.

20   Q    And do you know who it was that told you about this surprise

21   and shocking murder indictment?

22   A    I don't recall exactly who it was, but I was notified by my

23   family.

24   Q    Okay.  So you heard, I played the phone call earlier before

25   Her Honor came out, for you and counsel.  And you will agree that

1    that's your voice?

2    A    Yes.

3    Q    And it's Michelle Braun?

4    A    Yes.

5    Q    Okay.  And this was a call that you had while you were

6    incarcerated in the Maryland Department of Corrections that was

7    recorded, correct?

8    A    Correct.

9              THE COURT:  And what's the date?

10             MR. BUDLOW:  June 24th, 2016, three days after the

11   indictment.

12             Your Honor, the call's long.  I am not planning on

13   playing it all.  I want to play through 640.  It really isn't

14   relevant until about 140, but I think it might just be easier to

15   play it from the beginning and let it go.

16             THE COURT:  All right.

17             (Call playing.)

18   BY MR. BUDLOW:

19   Q    So that was you who said I haven't heard yet, I haven't

20   heard anything, right?

21   A    Yes, what I told her.

22   Q    Okay.  And then you mentioned that you might have learned

23   some other way.  Your Honor, Government's Exhibit M-10, which I

24   believe was submitted prior to the last proceedings, I can

25   certainly submit a copy of, I don't need to approach the

1    defendant.  I'll just tell the Court what it reflects.  This is

2    the visitor log.  And it shows that the last visit prior to June

3    25th was in January of 2016.  And then it was by an individual

4    named Marina Yelizarov.

5          And just for the record, Mr. Yelizarov, could you tell

6    us who Marina Yelizarov is?

7    A    Marina's my mother.

8    Q    So, in fact, you didn't have any visits prior to this call

9    with Ms. Braun, did you?

10   A    I guess not, if that's what you're saying.

11   Q    So after this call with Ms. Braun, you didn't call Robert

12   Waldman and say, what's this I hear about a murder, I thought you

13   said they promised not to charge me?

14   A    Robert Waldman was no longer on my phone list.

15   Q    Right.  But you had the ability to add and subtract from

16   your phone list so --

17   A    No.

18   Q    -- the question is, did you make any attempt to call Mr.

19   Waldman and say, what's going on?

20   A    No, I did not at the time.

21   Q    Okay.  You do have pen and paper there, right?  In fact, you

22   file written pleadings in all of your cases quite regularly,

23   don't you?

24   A    I don't know about quite regularly.  But as of 2017 to 2018.

25   This was post-ECI days.  So let's not put it like that.

1  Q    Let's put it this way.  Did you try to write Mr. Waldman?

2  A    No.  I don't really write attorneys.  I try to speak to them

3  on the phone.

4  Q    So, in fact, just to be clear, even after you learned about

5  the indictment, you never contacted Robert Waldman, did you?

6  A    No, I don't believe I did.

7  Q    And at that moment in time you had no lawyers for any cases,

8  did you?

9  A    At that moment in time, no.

10  Q    Later you had a lawyer for your initial appearance in

11  federal court in what we're calling either the murder or the

12  Judge Garbis case, right?

13  A    Yeah, Lawlor.

14  Q    And that was Michael Lawlor, right?

15  A    Correct.

16  Q    And you have since fired him, correct?

17  A    Correct.

18  Q    And you filed a 2255, correct?

19  A    Correct.

20  Q    In fact, he testified at a hearing on your motion to

21  withdraw the guilty plea in the murder case, didn't he?

22  A    Yes.

23  Q    And you never told Michael Lawlor that the murder case that

24  he was representing you on was promised not to be indicted?

25  A    Of course I did.  That's why we filed the 2255.

1    Q    But it doesn't say in the 2255 that the government breached

2    a promise not to prosecute you, does it?

3    A    I don't know how Mr. Lawlor filed it.  Once again, wasn't an

4    attorney at the time, wasn't learned in any way.

5    Q    And Mr. Lawlor represented you throughout the guilty plea,

6    correct, in the murder case?

7    A    Correct, yeah.

8    Q    And prior to the guilty plea there was some motions filed,

9    right?

10   A    Yeah, he filed a few motions, yeah.

11   Q    Okay.  And those were litigated.  In fact, there was a

12   hearing, correct?

13   A    There was one hearing about Facebook, Facebook pictures and

14   verses of songs, and he didn't know what to do with that.

15   Q    To be clear, at the hearing and in the written filings, it

16   never says this entire prosecution shouldn't happen because the

17   government promised not to bring it?  You agree that didn't come

18   up, right?

19   A    I don't believe it did.

20   Q    All right.  And again, after your guilty plea, you filed a

21   motion to withdraw the guilty plea, right?

22   A    Correct.

23   Q    And you later filed a 2255 relating to Mr. Lawlor, right?

24   A    Correct.

25   Q    And you said that Mr. Lawlor was ineffective, in general,

1    correct?

2    A    Correct.

3    Q    And one of your complaints was that he didn't meet with you

4    enough?

5    A    This is factual.  He didn't see me two months -- no.

6    Q    My question is, did you, did you claim in your motions that

7    one of the issues you have was that he didn't meet with you

8    enough?

9    A    Yes.

10   Q    And did you also say that he didn't file enough motions?

11   A    Yes, several motions.

12   Q    And in his motions that he filed, you've already said they

13   didn't relate to the murder shouldn't have been brought because

14   of a breach of an agreement, right?

15   A    I didn't know I could do that.

16   Q    All right.  Now, when you later filed your 2255 complaining

17   about Michael Lawlor, nowhere in those pleadings did you say he

18   failed to file a motion about this breach of the promise by the

19   government not to bring this case.  You didn't claim that, did

20   you?

21   A    Didn't know that it was a thing.

22   Q    Well, you knew a lot of things were things because they were

23   pro se.  You filed whatever you wanted, didn't you?

24   A    No, I did not.  I filed what I knew to the best of my

25   ability, what I was learning.

1    Q    And if we back up to the motion to withdraw the guilty plea,

2    you had a lawyer in that case, right?

3    A    Sorry?  To the what?

4    Q    Chris Davis represented you in your motion?

5    A    Yeah, Mr. Davis.

6    Q    In your motion to withdraw the guilty plea, right?

7    A    Yeah.

8    Q    And would you agree that nowhere in the record on the motion

9    to withdraw the guilty plea did you claim or Mr. Davis claim that

10   the entire prosecution was a violation of what you were promised

11   in this case?

12   A    The only thing that he raised was the fact that the federal

13   government had no jurisdiction, and that was it.

14   Q    Well, there was a lot of discussion in the pleadings and in

15   the hearing about Mr. Lawlor's ineffectiveness, correct?

16   A    Yeah.  There was some vague -- yeah.

17   Q    Well, you testified as well, didn't you?

18   A    Yeah.

19   Q    And when you testified and when you filed your pleadings, do

20   you agree that nowhere in the motion to withdraw the guilty plea,

21   in any of that, was there a claim by you or your lawyer that the

22   entire prosecution was a violation of this agreement?

23   A    I guess so.

24   Q    Now, you later signed an agreement --

25   A    I don't know nothing about it.

1  Q    -- and in fact pled guilty under oath to the execution-style

2  murder of Wayne Ruder, didn't you?

3  A    I believe Lawlor said that we agreed to certain facts and

4  not to all the factual, or all the stipulated facts that you put

5  in your plea agreement.

6  Q    Right.  And so my characterization to execution-style

7  notwithstanding, you didn't dispute the number of times Mr. Ruder

8  was shot in the head, did you?

9  A    I don't know how many times he was shot in the head.  I

10 didn't know that I could, once again.

11 Q    My question was, that was not in dispute, was it?

12 A    I don't think so.  Not by Lawlor at least, no.

13 Q    And you went to a hearing to plead guilty to that crime in

14 open court under oath, right?

15 A    Yeah.  The week of the trial.

16 Q    And to be clear, nobody at that hearing said anything about

17 the breach in bringing this murder investigation, that had

18 breached this agreement, right?

19 A    I didn't know that I could.  Lawlor did not.

20 Q    We understand you didn't know you could.  The question is,

21 was it brought up or wasn't it?

22 A    Lawlor did not.  Lawlor did not.

23 Q    All right.  Lawlor didn't.  And then when you were sentenced

24 and Chris Davis represented you, at that hearing you didn't say

25 anything at the sentencing hearing that the whole prosecution was

1    a breach, did you?

2    A    I'm pretty sure I stated that, just in a different way.

3    Q    How did you say it?

4    A    In regards to saying that Waldman told me there wasn't going

5    to be any further prosecutions.

6    Q    Your testimony today --

7    A    That there was no jurisdiction for the federal government.

8    I stated that.  I wrote a letter.

9    Q    Let's take the first thing you said.  Is it your testimony

10   that under oath at the sentencing hearing -- sorry.  Your

11   testimony here today is that while under oath at the sentencing

12   hearing you claimed that you were promised you wouldn't be

13   prosecuted for the murder?  You know there's a transcript of

14   that, right?

15   A    At the sentencing hearing I believe I read a letter, if you

16   recall.  Right before I got sentenced, I read a letter.  And I

17   believe I mentioned something about that.

18   Q    You believe you mentioned it?

19   A    It's a little while ago.

20   Q    This was a while ago.  It wasn't --

21   A    I don't have the paperwork --

22          THE COURT:  Wait.  Wait.

23   A    -- something that I would remember.

24          THE COURT:  Wait.  Whoa, whoa.  Only one person can

25   talk at a time.  So, let the witness finish his answer.  What's

1    your answer?

2              THE WITNESS:  Once again, I don't remember exactly.  I

3    don't recall it because I don't have the transcripts.  But I do

4    vaguely recall addressing that in the letter that I read to the

5    judge before sentencing.

6    BY MR. BUDLOW:

7    Q    To be clear, when you say "addressing that", what did you

8    say about the murder case -- I'm sorry -- about the promise in

9    this case at your sentencing?

10   A    That I wasn't supposed to be prosecuted or indicted.  That's

11   what Waldman told me.  I'm pretty sure I said that.

12   Q    So you're pretty sure you said it or maybe you're not sure

13   at all?

14   A    Pretty sure I said it.

15             THE COURT:  Who did you say that to?

16             THE DEFENDANT:  That was right before I got sentenced,

17   to the judge.  I read a letter to the judge that I wrote right

18   before I got sentenced, and how my case was mistreated.  And I

19   believe I stated something vaguely in regards to how I was told

20   that I wasn't going to be prosecuted for any kind of homicide.  I

21   wasn't going to be indicted for any kind of homicide.

22   BY MR. BUDLOW:

23   Q    You think you said that vaguely in some regards?  That's

24   your testimony today?

25   A    Correct.

1  Q   Do you have a copy of that letter?

2  A   No, I don't have any legal work other than what I've been

3  provided by Ms. Englert.  It was destroyed at Jessup.

4  Q   Would you agree that, aside from what you did or didn't say

5  at the hearing, that your lawyer, who was fighting for the least

6  possible sentence for you at the murder sentencing, did not raise

7  the fact that this was some breach of this agreement not to

8  prosecute?

9  A   No, I don't believe Mr. Davis did.

10 Q   And he didn't put it in any of his sentencing filings,

11 either?

12 A   I do not believe Mr. Davis did.

13 Q   And that murder sentence -- but you only got 20 years,

14 right?

15 A   Yes.  Right.

16 Q   That sentence, the whole case was sent up on appeal to the

17 Fourth Circuit, right?

18 A   I believe, yeah, Mary Davis filed it.  She filed something.

19 Q   And she met with you prior to filing it, right?

20 A   No, she did not meet with me whatsoever.

21 Q   You never met with either Mr. Davis relating to the appeal?

22 A   No.  Mr. Davis -- no -- me and Mr. Davis never discussed the

23 appeal.  Mrs. Davis is the one that got appointed by the court to

24 file the appeal.

25 Q   His wife?

1    A    Yes, his wife.

2    Q    Is it your testimony that she never once met with you prior

3    to filing that appeal?

4    A    I have no idea what she looks like.

5    Q    You've seen the appeal, correct?

6    A    Yes.  She sent me a copy.

7    Q    And would you agree that this alleged breach of this

8    agreement is not referenced in the appeal at all?

9    A    I don't believe it is.

10   Q    And that's because you never told either Mr. or Mrs. Davis

11   about any of this, did you?

12   A    No, of course I did.  There are phone calls that should be

13   recorded that have that.

14   Q    Well, we listened to a lot of recorded phone calls, Mr.

15   Yelizarov.  We do not listen to the phone calls that you have

16   with your attorney.

17            Court's indulgence.

18            THE COURT:  Sure.

19   BY MR. BUDLOW:

20   Q    Just a couple places of maybe daylight, if you will, between

21   your and Mr. Waldman's testimony.  It's your testimony that you

22   never said to him, I wasn't worried about it, the murder case?

23   A    Never said that.

24   Q    And it's your testimony that you never told him that they

25   would never prove it, right?

1    A    Never said that.

2    Q    You never said those people won't testify against me?

3    A    What people?

4    Q    Kirill, Alina, Marat, Igor, Michelle.

5    A    All of those people are already indicted or unindicted

6    cooperators.  So I would never say that they wouldn't testify

7    against me.

8    Q    Mr. Yelizarov, are you aware that both indicted

9    coconspirators and unindicted coconspirators can testify and

10   juries can believe them?

11   A    They can believe them and they can be questioned.  Some of

12   them are promised something.  Some promise no indictments.  Hence

13   why they would tell your story.

14   Q    Right.  But you know that those can lead to convictions?

15   A    Sure.

16   Q    All right.  It's your testimony that you didn't say to Mr.

17   Waldman that Michelle, your romantic interest, would never

18   testify against you?

19   A    I would never say that.  She's called the police on me

20   several times, lied on me several times.  And I actually already

21   knew that she was cooperating with you.  Hence why you guys

22   didn't indict her for any crimes.

23   Q    That was her that was on the jail call with you, right?

24   A    Correct.

25   Q    And she couldn't call you at jail, could she?

1    A    No.

2    Q    How did that call actually happen?

3    A    I call out.

4    Q    Oh, you called her?

5    A    I call out.

6    Q    You called her?

7    A    I call out, yes.  I pick up the phone and I call out whoever

8    I call.

9    Q    You dialed Michelle Braun's phone number?

10   A    Correct.

11   Q    Many, many times, right?

12   A    She was one of the people that I called, sure.

13   Q    All right.  And you mentioned that when you first met with

14   Mr. Waldman, you said that you wanted to go to trial because all

15   of the testimony, all of the evidence was I think you said

16   circumstantial and the coconspirators and unindicted

17   coconspirators.  You're aware that it also included recorded jail

18   calls?

19   A    Yeah.

20   Q    There was a period of time when you were incarcerated and

21   Mr. Yasinov was home on home detention, right?

22   A    Correct.

23   Q    And there were a lot of recorded jail calls between the two

24   of you relating to the investigation and people who were being

25   served with subpoenas and whatnot?

1    A    Yeah, I believe we had a few talks about people being

2    questioned and approached by your office and Baltimore County.

3    Q    But that was part of what Mr. Waldman told you the evidence

4    consisted of, right?

5    A    Yes, sir.  For the Hobbs Act case, correct.

6    Q    In addition to eyewitnesses who were present with you and

7    were going to say that you were there when Alex Voskovsky's car

8    was pulled over.  You knew they were going to say that, right?

9    A    I believe I was provided with certain testimonies for

10   codefendants were saying that, yeah.

11   Q    And you knew that they were going to say that the whole plan

12   took months, right?

13   A    I don't believe it stated anything like that.

14   Q    And you knew that they were all going to say that it was all

15   your idea?

16   A    No, I did not know that.  But I knew from the indictment

17   that I was number one and apparently some kind of mastermind, as

18   your office stated.

19   Q    That's all I have, Your Honor.  I don't want, I don't want

20   to presume, in light of the timing -- I don't know the break

21   situation -- I would ask that maybe Mr. Murtha could testify

22   before any redirect just so we can get him out.  Or we can also

23   consult with him to see if he minds waiting.

24            THE COURT:  Well, let me see in anybody needs a quick

25   recess.  I don't.  But if anybody does, this is the time to tell

1    me.

2              We're going to take a five-minute recess.

3              MR. BUDLOW:  Great.  And we'll consult with Mr. Murtha

4    and figure that out.

5              THE COURT:  That's fine.  Okay.  As soon as everyone's

6    ready, let me know.  We'll stand in recess.

7              (Recess at 12:02 p.m.)

8              (Proceedings resume at 12:17 p.m.)

9              THE COURT:  I see Mr. Murtha here.  Seems to be a

10   frequent visitor these days, Mr. Murtha.  Are you going to

11   interrupt the testimony, as you were saying?

12             MR. BUDLOW:  Yes.  Thank you, Your Honor.

13             THE COURT:  Okay.

14             MR. BUDLOW:  Appreciate it.  At this time the

15   government calls Joseph Murtha.

16             THE CLERK:  Remain standing and raise your right hand.

17              JOSEPH MURTHA, GOVERNMENT'S WITNESS, SWORN

18             THE WITNESS:  I do.

19             THE CLERK:  You may have a seat.  And can you please

20   state and spell your full name for the record?

21             THE DEFENDANT:  Joseph Murtha.  J-O-S-E-P-H.

22   M-U-R-T-H-A.

23             THE CLERK:  Thank you.

24             DIRECT EXAMINATION

25   BY MR. BUDLOW:

1    Q    Mr. Murtha, if you could, just very briefly tell us what you

2    do for a living, how long you've been a criminal defense

3    attorney, and where you practice.

4    A    I've been practicing law in the State of Maryland since

5    1990.  I've been admitted to the federal bar since 1995.  The

6    first five-plus years of my career I was a prosecutor in the

7    Office of the State's Attorney for Howard County.  I then became

8    an associate at the firm of Irwin, Kerr, Green, McDonald and

9    Dexter, where I was an associate to Dave Irwin.

10              I then started federally or being involved

11   substantively in federal cases.  And since that time I have been

12   involved exclusively in representing people in state and federal

13   courts in criminal cases.

14   Q    Okay.  And do you handle a significant amount of federal

15   violent crime in the District of Maryland?

16   A    I do.  I tried, I believe, every potential type of violent

17   criminal act in federal court, including actually the last death

18   penalty case that was tried in this district from 2008.

19   Q    And you're familiar, in referencing the 2015 to 2016 time

20   frame, are you familiar with the bench in Baltimore?

21   A    Absolutely.  I have practiced and appeared regularly since

22   1995 in this courthouse.

23   Q    Mr. Murtha, did there come a time when you were contacted by

24   the family of the defendant.  The defendant is Stanislav or

25   Steven Yelizarov.  Were you contacted by his parents?

1    A    I was.

2    Q    And do the names Marina and Zarakh Yelizarov sound familiar

3    to you?

4    A    They do.

5    Q    And, roughly, was this in the fall of 2015?

6    A    Although I don't have notes and I can't specifically

7    identify when, that is around the time from looking at the, the

8    time frame of the, of where I was in my practice.  And I have

9    vivid memories of meeting with his mother.  She was a very dear

10   woman and very kind person.  And I met with his father.  And I

11   believe I even met with either his cousin or his uncle.  I can't

12   recall what the relationship was.

13   Q    And were those meetings that you just referenced in person

14   in your office?

15   A    They were.

16   Q    Okay.  And do you recall whether or not you were paid in any

17   way, retained for your services?

18   A    I looked to see if I had any file at all.  We had merged

19   with another firm.  I don't have anything.  I can't tell you

20   whether I was or I wasn't.  If I was retained, it was for a

21   limited basis of consulting with the family and also with Steven.

22   Q    And can you describe what that limited basis was?

23   A    There was a concern because the gravity of the offense,

24   whether or not any plea agreement would be an appropriate way to

25   resolve the case.  He was represented by Mr. Waldman and I

1    believe it was a CJA panel case.  And I was asked to discuss the

2    nature of the offense and the options that were available.

3              And there was obviously a very great concern by his

4    parents of what the outcome of the case could be, either by way

5    of a negotiated plea or by proceeding to trial.

6    Q    And did you reach out to Mr. Waldman at some point?

7    A    I did.

8    Q    And did he provide you, on a telephone call, with his

9    summary of the case?

10   A    Yes.

11   Q    And did he gave you any documents?

12   A    I know at some point I had a copy of a plea agreement.  I've

13   been made aware that there were two, I believe.  I can't tell you

14   which plea agreement I reviewed.

15   Q    And did there come a time when you met with the defendant,

16   Stanislav Yelizarov?

17   A    I did.

18   Q    And do you remember where that was?

19   A    It was a detention facility.  Without notes, I can't tell

20   you the specific facility.

21   Q    In Maryland?

22   A    Yes, in Maryland.

23   Q    Department of Corrections?  And did you meet with him on one

24   occasion or more than one occasion?

25   A    I do not know the answer to that question.

1    Q    And did you review the nature of the plea agreement?

2    A    I did.

3    Q    And did you review the facts?

4    A    Yes.

5    Q    And did you get a sense from your discussion with Mr.

6    Waldman what the basis of government's proof was?

7    A    Yes.

8    Q    And would it refresh your recollection that the plea

9    agreement you reviewed had a government cap of 40 years?

10   A    I believe we were in the hallway.  The first number I

11   mentioned was 40.  So that is my recollection, that there was a

12   cap of 40 years.

13   Q    And when you met with the defendant, did you provide him

14   with advice as to sort of how to proceed?

15        THE COURT:  Did he what?

16   Q    Sorry.  Did you provide him with any advice about how to

17   proceed?

18   A    Well, one of the things I was careful about is -- and it was

19   with his consent that I was speaking with him because I thought

20   he was well represented.  I have a lot of respect for Mr.

21   Waldman, he had been practicing for quite sometime.  And it was

22   more of a second opinion in regard to the resolution of the case.

23        I became familiar with the facts of the case.  I was

24   aware of the details.  They had been brought to my attention.

25   And discussed in general terms, and oftentimes one of the things

1    that we discuss is the percentage of cases that go to trial in US

2    district courts that end up being convictions, and how in federal

3    cases their resources that are used and the investigative

4    techniques and efforts that are put in are much better than or,

5    actually, I would say, more extensive than those that are put in

6    state cases.  And I'm sure we had a general conversation that

7    going to trial could very likely produce a worse result.  Despite

8    the fact that 40 years is an incredibly stifling number, it could

9    even get worse.

10   Q    And is that based on your review of the stipulated facts or

11   the draft stipulated facts?

12   A    Yes.

13   Q    And in the end, what was your advice to Mr. Yelizarov in

14   terms of proceeding with counsel?

15   A    I recommended he not retain, or his family not retain

16   private counsel and that he continue to be represented by Mr.

17   Waldman.

18   Q    And Mr. Murtha, were you, when I reached out to you about

19   this, did I ask you to check for any notes that you might have

20   relating to your meetings with the family or the defendant?

21   A    You did.

22   Q    And do you have any?

23   A    I searched and I have none.

24   Q    And I haven't asked you about this, but did your knowledge

25   of the case at the time go beyond the facts in the stipulation or

1    did you, were you aware at that time of mention of an earlier

2    murder?

3    A    I can't recall.  And I was aware that there was a, that

4    there was backup time that either was being served or was to be

5    served by Judge Norman in Baltimore County Circuit Court.  I

6    became aware of murder, but I know I did not know the details of

7    the murder.  So -- and the reason being is because I know Michael

8    Ruder, who was the nephew of the victim and who came upon his

9    uncle's body.  If I had known the details of it, I know, I don't

10   know what effect it would have had, probably none, but I would

11   have recalled that specific fact pattern.

12   Q    And so in the end you did not join the case or enter your

13   appearance or represent Mr. Yelizarov in any way?

14   A    That is correct.

15   Q    And did you relay that information to his family?

16   A    I did.  I met with his mother probably at least once or

17   twice after that.  As I said, I mean, she was an incredibly kind,

18   conscientious woman, very sad that her son was in this situation.

19   I had a lot of respect for her.

20   Q    Were you made aware by Mr. Waldman that he told me that you

21   were kind of providing a second opinion and consulting the

22   defendant?

23   A    Yes.

24   Q    And did you notify him your position with respect to hiring,

25   with respect to not being hired by the family and by the

1    defendant?

2    A     Yes.

3    Q     Thank you for being here today.  That's all I have, Your

4    Honor.

5              THE COURT:  Could you, Mr. Murtha, just clarify for me?

6    I may have misunderstood.  What knowledge did you know or have

7    about the fact that there was a murder investigation ongoing?

8              THE WITNESS:  I think that's the extent of what I knew,

9    Your Honor.  That there was a murder investigation ongoing, but

10   no details at all.

11             THE COURT:  So you didn't know any details, but are you

12   saying that when you met with Mr. Yelizarov that you were aware

13   of this murder investigation?

14             THE WITNESS:  I believe I was, Your Honor.

15             THE COURT:  Okay.  And do you remember any conversation

16   about it and its potential significance with, in discussions with

17   Mr. Yelizarov?

18             THE WITNESS:  I do not, Your Honor.

19             THE COURT:  Do you even know if you talked about it?

20             THE WITNESS:  I know -- I have no recollection of

21   speaking about it, Your Honor.  I remember the focus was on the

22   alleged robbery and the facts that were associated with the

23   proposed plea.

24             THE COURT:  Okay.

25             THE WITNESS:  In regard to the robbery case.

1          THE COURT:  And just, you may have said this, too, but

2     let me just be sure I got it right.  How did you learn about the

3     murder investigation?

4          THE WITNESS:  In the time -- the time frame's a little

5     unclear, Your Honor, because I don't have notes.  Whether I found

6     out about it in conversations with Mr. Budlow or Mr. Waldman, I

7     can't tell you.

8          THE COURT:  Okay.  But you believe you knew about it

9     when you met with Mr. Yelizarov?

10          THE WITNESS:  Yes, Your Honor.

11          THE COURT:  Okay.  Thank you.  Cross examine.

12          CROSS EXAMINATION

13     BY MS. ENGLERT:

14     Q    Mr. Murtha, so following up with what Judge Hollander said.

15     You believe you were aware of this murder at the time you met

16     with Mr. Yelizarov?  Is that what you're testifying to?

17     A    It's unclear, but I believe I was aware that there was a

18     murder investigation.  I know that there hadn't been any charges.

19     But I believe that I was aware that there was an ongoing

20     investigation.

21     Q    And was that investigation targeting Mr. Yelizarov?

22     A    I believe that he was a person of interest or a suspect at

23     that time.

24     Q    And you didn't discuss this in the context of reviewing with

25     him this plea agreement?

CROSS EXAMINATION OF JOSEPH MURTHA BY MS. ENGLERT                    91

1    A    The answer is no.  My limited role, as I understood it,

2    because there were no pending charges where there was an

3    accusation or a charge of murder, was, and I don't mean "simply"

4    to diminish the seriousness of the offense, but it was simply to

5    review the nature of the plea agreement, review the nature of the

6    underlying facts, and make a determination whether I thought that

7    I could offer assistance that was not being offered by Mr.

8    Waldman.

9    Q    So you have no recollection of discussing the impact of the

10   murder investigation on the plea agreement.

11   A    That is correct.

12   Q    How long was your meeting with Mr. Yelizarov?

13   A    I do not know the answer to that but -- I mean, it would

14   have been an hour, two hours.  Whatever time was needed because

15   it was, whatever questions he would have had, whatever

16   information was needed, I was there for the extent of time that

17   was desired.

18   Q    And so your primary -- so Mr. Waldman did not, was not the

19   person who contacted you to give Mr. Yelizarov a second opinion?

20   A    That is correct.  Yes.

21   Q    It was his family who contacted you, correct?

22   A    That is correct.

23   Q    And it was -- they contacted you to see if you would, could

24   be a replacement for Mr. Waldman, isn't that right?

25   A    That is correct.

1   Q    And at the, after you just had your discussion with Mr.

2   Yelizarov, is it your recollection that the plea agreement that

3   you were reviewing with him had a 40-year cap?

4   A    That is my recollection.

5   Q    Okay.  And at the end of your meeting isn't it correct that

6   you recommended that Mr. Yelizarov stick to Mr. Waldman as his

7   counsel?

8   A    Yes.

9   Q    And to follow Mr. Waldman's advice?

10  A    Well, I don't know whether I specifically said that.  I

11  think my, the answer would have been yes, maintain Mr. Waldman, I

12  respect him as a lawyer, if this is what he advises you, I would

13  seriously consider taking his advice.

14  Q    No further questions.

15           THE COURT:  Any redirect?

16           MR. BUDLOW:  No.  Thank you, again.

17           THE COURT:  Mr. Murtha, that means that the testimony

18  is concluded.  Thank you very much --

19           THE WITNESS:  Thank you, Your Honor.

20           THE COURT:  -- for taking the time to come in.  You are

21  excused.

22           THE WITNESS:  Thank you, Your Honor.

23           THE COURT:  So we can resume with -- we're ready for

24  the redirect.

25           MR. BUDLOW:  Yes.  Thanks again, counsel, for allowing

1    us to interrupt.

2        STANISLAV YELIZAROV, DEFENDANT WITNESS, PREVIOUSLY SWORN

3            REDIRECT EXAMINATION

4    BY MS. ENGLERT:

5    Q    Mr. Yelizarov, I'd like to start with the notes that Mr.

6    Budlow showed you.  These are handwritten notes from Mr.

7    Waldman's file.  Do you recall those notes?

8    A    Yes.

9    Q    Do you recall looking at them --

10   A    Yeah.

11   Q    -- when they were up on the screen?  And those, do you

12   recall that those notes had some names in the margin?

13   A    They had names of the indicted and unindicted coconspirators

14   from the outside case.

15   Q    Did you provide those names to Mr. Waldman?

16   A    Just one or two of the, one or two of the names.

17   Q    Did you tell Mr. Waldman that these were people that you had

18   told, had confessed the murder to?

19   A    No.  I told him I believed that these people know about it

20   and were possibly involved.

21   Q    Do you recall that there were some notes about Wayne's

22   Antiques?  Did you provide details about this murder to Mr.

23   Waldman?

24   A    No, I did not.

25   Q    Do you know when Mr. Waldman wrote these notes?

1    A    I have no idea.

2    Q    Do you know where Mr. Waldman got this information?

3    A    I have no idea.

4    Q    I'd also like to point you to the email that the government

5    had put up on the screen.  Do you recall that there was an email

6    from Mr. Bud -- sorry -- from Mr. Waldman addressed to me as your

7    lawyer?

8    A    Yeah.  The redacted version?

9    Q    Yes.

10   A    Yes.

11   Q    And did you, were you able to look at the unredacted version

12   of it?

13   A    Yeah, today.

14   Q    The unredacted version of it do you recall had some

15   information about a cooperating witness?

16   A    Yes.

17   Q    You don't need to say the name of that person.

18   A    Yes.

19   Q    Did you discuss, have a discussion with Mr. Waldman about

20   the details in that email?  Did you give those details to Mr.

21   Waldman?

22   A    Not those exact details, no, I did not.

23   Q    Do you know where Mr. Waldman got that information?

24   A    I'm not sure.  Either from the government --

25   Q    Do you know where Mr. Waldman got that information?

1    A    No, I have no idea.

2    Q    In deciding whether or not to plead guilty -- well, let

3    me -- in deciding whether or not to agree to a plea agreement, is

4    the amount of time that you're likely to receive, the amount of

5    imprisonment that you're likely to be sentenced to, is that a

6    factor in your decision?

7    A    Yeah, of course.

8    Q    Is your guilt, when you are weighing your options, is your

9    guilt or innocence the only factor in whether or not you're going

10   to take the plea agreement?

11   A    No.

12   Q    How important is it, the amount of time that you might have

13   to be imprisoned?

14   A    I'd say it's very important because it's, you know, it's a

15   factor whether you make it out of prison or not.  Whether you

16   benefit from the agreement.

17            THE COURT:  But let me ask you this, because at a

18   guilty plea proceeding, you make statements under oath.  So, I'm

19   not sure what you're telling me.

20            Are you saying that you would say under oath that you

21   did something even if you didn't in order to get a disposition

22   that you thought was a good one?

23            THE DEFENDANT:  Not exactly.  Just from what evidence

24   and what witnesses were presented.  Because sometimes people get

25   up here and say whatever they need to say to save their skin and

1    not be indicted, as at least five people from the Hobbs Act case

2    weren't indicted with anything whatsoever.  So apparently, as Mr.

3    Budlow said, their testimony is enough to get a jury to convict

4    you.

5          So even if you're not guilty, what can you do when an

6    attorney is telling you, hey, man, there's nothing I can do for

7    you?  So what's the point of going to trial with an attorney that

8    can't represent you, that has no winning record of any kind at

9    trials?  You weigh your options and you go with what you got.

10   There's plenty of people that plead guilty that weren't guilty

11   before.  And they'll do it again, I'm sure.

12   BY MS. ENGLERT:

13   Q    Mr. Yelizarov, you, in fact, pled guilty in this robbery

14   case before Judge Motz?

15   A    Correct.

16   Q    And if you had known that the government was likely to

17   prosecute you for murder after you were sentenced in this robbery

18   case, what difference would that have made in your decision to

19   plead guilty to the robbery?

20   A    I wouldn't have pled guilty.  I would have went to trial.

21   Because at the same time when I did take that guilty plea, it

22   would also be credibility to those unindicted and indicted

23   coconspirators.  And they were used again in the homicide case.

24   So I would have went to trial 100%.

25   Q    And how much reliance did you put on Mr. Waldman in

1   deciding, in interpreting that plea agreement?

2   A    At that time, 2015, early 2016, my full confidence was with

3   him because I didn't know anything about the law.  I truly wasn't

4   learned in any way.  I didn't study.  So I followed his advice to

5   the T.

6   Q    What did Mr. Waldman say about further prosecutions?

7   A    He said that there wouldn't be any further prosecutions, no

8   further indictments, after I took the 30 year (C) plea.

9   Q    Did you believe what he told you?

10  A    Absolutely.

11  Q    No other questions.

12          MR. BUDLOW:  May I briefly, Your Honor?

13          THE COURT:  Recross.

14          RECROSS EXAMINATION

15  BY MR. BUDLOW:

16  Q    So you say that people say things under oath all the time to

17  save their skin, right?

18  A    Absolutely.

19  Q    All right.  And, in fact, I believe that you're saying that

20  if the deal was good enough, you'd have pled guilty to anything?

21  A    No, that's not what I'm saying at all.

22  Q    If the deal was good enough, would you have pled guilty to

23  the murder?

24  A    I would have weighed my options at the time.

25  Q    Would one of the options been pleading guilty?  You've been

1     asked that question now about four times, including by Judge

2     Hollander.  Would, if the deal was good, if the options were

3     things that you liked and you thought you were going to be

4     convicted, would you plead guilty to the murder to get the right

5     sentence?

6     A     It's a possibility.  Once again, it's not something that you

7     can answer without being presenting, presented with the

8     evidence --

9     Q     So you're saying --

10    A     -- presented with the fact that you're going to get

11    indicted.  So you're telling me to answer a hypothetical

12    question.

13    Q     So there's a chance, you're saying, that you would plead

14    guilty under oath to a crime that you didn't commit to save your

15    skin, wouldn't you?

16    A     If the attorney couldn't represent me properly, and those

17    witnesses that you had, apparently which had a lot of weight, and

18    you didn't indict at least five of them, for their cooperation,

19    yeah, what other choice would you have?

20    Q     So under those circumstances, you would admit to things

21    under oath that weren't true, under those circumstances, right?

22    A     If I had no other options.  If the attorney couldn't

23    represent me, what choice do you have other than to plead guilty?

24    Q     And that oath that you would have taken when pleading

25    guilty, to tell the truth under the penalties of perjury, is the

1    same oath that you took when you swore out that affidavit about

2    Mr. Waldman, what he did and didn't tell you, isn't it?

3    A    What Mr. Waldman did and didn't tell me?

4    Q    Right.  About the murder.

5    A    It's the same, yes, it's the same.

6    Q    The oath that you say that you would have violated if you

7    got the right deal on the murder charge is the same oath that you

8    took today when you're saying to this Court under oath that Mr.

9    Waldman promised you that the government said they wouldn't

10   prosecute for murder.  It's the same oath, isn't it?

11   A    I'm not saying that exactly.  I'm saying I would weigh my

12   options.

13   Q    Are you weighing your options right now in trying to save

14   your skin?

15   A    I'm not trying to save my skin.  I'm giving you the truth

16   about what happened.  And that's just what it is.

17   Q    But it wouldn't be the truth if the deal was good enough.

18   Then you'd say something different, wouldn't you?

19   A    No, I wouldn't.

20            MR. BUDLOW:  Nothing further.

21            THE COURT:  Anything else?

22            MS. ENGLERT:  No, Your Honor.

23            THE COURT:  Thank you, sir.  You may step down.

24            Do you have any experts, Ms. Englert, who are going to

25   address whether somehow the performance of Mr. Waldman fell below

1    the standard of care, so to speak?

2              MS. ENGLERT:  I am not prepared today with any experts.

3              THE COURT:  Okay.  Is there any other evidence?

4              MS. ENGLERT:  No, Your Honor.

5              THE COURT:  Any evidence from the government?

6              MR. BUDLOW:  Your Honor, just -- no, there's no other

7    evidence.  I believe that the documents that I have filed

8    previously and submitted at the last hearing and today are, are

9    the evidence, as well as the testimony.

10             THE COURT:  Okay.  So what I was going to suggest, if

11   the evidence is closed, is that perhaps counsel would like to

12   file post-hearing submissions.  And I would suggest simultaneous

13   filing, and then simultaneous reply, so both sides can file on

14   the same day.  That saves time.  You've already filed other

15   submissions, anyway.  But this would allow you to incorporate the

16   evidence that's been educed and then address it.

17             So, what amount of time would you all like?  I don't

18   know if you plan to get the transcript, and then that would

19   affect the amount of time you need.  I'm happy to accommodate

20   your request.  I just need you to give me an idea.

21             MR. BUDLOW:  Well, certainly, if the Court wants

22   supplemental filing, I'm going, I'm going to file it.

23             I think that the evidence is fairly clear or stark,

24   depending on how you want to view it.  And I would say if the

25   defense isn't planning on filing anything, then I don't believe

1   that the government will, either.

2           THE COURT:  Okay.  It's up to you.

3           MR. BUDLOW:  I would leave it up, I guess, then up to

4   the defense.  Certainly, if they're going to file something, I'm

5   going to want to file as well.

6           I think, I would have suggested that the defense file

7   first since it's their motion.  But if the Court wishes to have

8   simultaneous briefing, then I will comply.

9           THE COURT:  I just thought it would save time.  Then

10  we'd only have one round -- two rounds.

11          MR. BUDLOW:  I actually love the idea for sentencing.

12  I think that's a great idea.  But that's not what we're

13  discussing.

14          THE COURT:  But it saves time.  And it eliminates one

15  filing when we've already had quite a few.  That was my

16  reasoning.  But I'm happy to accommodate your preferences.

17          Let me start with you, Ms. Englert.  Do you wish to

18  file anything?

19          MS. ENGLERT:  I would be happy to file, file something.

20  I would like to first have the transcript, though.

21          THE COURT:  Okay.  So, I don't know how long that would

22  take, if somebody places an order for the transcript.

23          MS. ENGLERT:  I guess --

24          THE COURT:  It's not a very long hearing so it

25  shouldn't take very long.  So how much time would -- let's go

1    from how much time you think you would like.  From whenever you

2    get the transcript, I'll add two weeks, three weeks?  What would

3    you like?

4                MS. ENGLERT:  Thirty days after.

5                THE COURT:  Thirty days after you get the transcript?

6    Okay.  So, then the supplemental filing of the defense --

7                MS. ENGLERT:  I guess -- yeah.  I have another large

8    filing right around then.  I guess maybe 45 days to accommodate

9    the transcript in the case.

10               THE COURT:  How long?

11               MS. ENGLERT:  45 days?

12               THE COURT:  So that's why I want it to be simultaneous,

13   then.  Because that's going to cause another two weeks after

14   that, at the earliest.

15               So, then, if you want 45 days, I would suggest

16   simultaneous filings, 45 days after.

17               MR. BUDLOW:  I'm sorry?  Are we saying 45 days after

18   the transcript is received?

19               THE COURT:  Yes.  And then we could do replies, which

20   would also be simultaneous.  Two or three weeks later.  Whatever

21   you want.  Two weeks, three weeks?

22               MR. BUDLOW:  I'll be honest with Your Honor.  It's just

23   very -- not knowing when the, when we're starting the counting

24   and looking at my trial schedule, it's hard to say.  But what I

25   will say for sure is that if I need a delay for any reason, I'm

1    not going to wait until the defense files.  I will reach out to

2    Ms. Englert so we still can file simultaneously.

3              THE COURT:  Okay.  Why don't we -- 45 days plus two

4    more weeks for replies puts us at two months from whenever the

5    transcript is, which is a lot.  So why don't we say two weeks?

6    The replies are due 14 days after the supplemental submission.

7    And then would you like oral argument?

8              MR. BUDLOW:  Not on behalf of the government, Your

9    Honor.

10             MS. ENGLERT:  I think the written submissions, two

11   written submissions are probably sufficient.

12             THE COURT:  Okay.  So then the question will be whether

13   when I read them if I have questions, I'll get in touch with you

14   and we'll set something up.  But right now I'm hearing that there

15   is no request for oral argument.  We'll just go with the written

16   submissions.

17             Okay.  So we'll plan on a -- somebody's going to order

18   the transcript.  I don't know who that is.  And then the

19   supplemental simultaneous briefing due within 45 days after the

20   transcript is received.  And simultaneous replies 14 days later.

21             Did somebody want to volunteer to give me an order?

22             MS. ENGLERT:  I'm happy to do it.

23             THE COURT:  Okay.  We'll look for that order.

24             Okay.  Well, thank you very much.  I think that

25   concludes everything.

1        And we are resuming at two, is that right?  We'll stand

2   in recess.

3            MR. BUDLOW:  Thank you, Your Honor.

4            (Conclusion of Proceedings at 12:47 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    INDEX

2

3                                                          PAGE

4     DEFENDANT'S WITNESS

5     WITNESS:  STANISLAV YELIZAROV
      DIRECT EXAMINATION BY MS. ENGLERT                      7
6     CROSS EXAMINATION BY MR. BUDLOW                       22

7     GOVERNMENT WITNESS

8     WITNESS: JOSEPH MURTHA
      DIRECT EXAMINATION BY MR. BUDLOW                      82
9     CROSS EXAMINATION BY MS. ENGLERT                      90

10    DEFENDANT'S WITNESS

11    WITNESS: STANISLAV YELIZAROV (CONTINUED TESTIMONY)
      REDIRECT EXAMINATION BY MS. ENGLERT                   93
12    RECROSS EXAMINATION BY MR. BUDLOW                     97

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                         REPORTER'S CERTIFICATE

5

6          I, Mary M. Zajac, do hereby certify that I recorded

7    stenographically the proceedings in the matter of USA v.

8    Stanislav Steven Yelizarov, Case Number(s) ELH-15-261, on

9    February 22, 2022.

10         I further certify that the foregoing pages constitute

11   the official transcript of proceedings as transcribed by me to

12   the within matter in a complete and accurate manner.

13         In Witness Whereof, I have hereunto affixed my

14   signature this _____ day of _____, 2022.

15

16

17

18                         _____/S/_____

                           Mary M. Zajac,
19                         Official Court Reporter

20

21

22

23

24

25

## $

**$15,000** [1] - 46:11

## /

**/S** [1] - 106:18

## 1

**1** [2] - 37:20, 59:18
**10** [6] - 8:14, 9:6, 20:22, 32:13, 62:9
**100%** [1] - 96:24
**101** [1] - 1:24
**10:09** [1] - 2:1
**11** [1] - 2:21
**11-year** [1] - 55:12
**12** [1] - 29:21
**127** [1] - 45:9
**129** [3] - 37:16, 37:21, 37:22
**12:02** [1] - 82:7
**12:17** [1] - 82:8
**12:47** [1] - 104:4
**12th** [1] - 17:4
**13th** [1] - 20:7
**14** [3] - 31:5, 103:6, 103:20
**140** [1] - 68:14
**15** [11] - 8:14, 9:6, 10:9, 10:22, 17:4, 32:13, 33:5, 59:22, 67:9
**16** [2] - 31:11, 31:12
**16th** [1] - 53:24
**18** [8] - 16:17, 17:3, 17:8, 17:17, 59:23, 64:1, 64:4, 64:7
**19** [3] - 53:5, 64:1, 64:8
**1990** [1] - 83:5
**1995** [2] - 83:5, 83:22
**19th** [1] - 27:13

## 2

**2** [4] - 10:2, 28:19, 64:2
**20** [1] - 77:13
**2008** [1] - 83:18
**2009** [4] - 53:3, 53:5, 53:16, 63:12
**2010** [1] - 53:24
**2013** [1] - 54:7
**2015** [10] - 9:12, 9:18, 11:15, 12:1, 13:23, 17:4, 54:22, 83:19, 84:5, 97:2
**2016** [15] - 16:10, 16:18, 17:4, 17:8, 19:24, 20:7,

**20:25**, 55:15, 59:19, 65:18, 65:21, 68:10, 69:3, 83:19, 97:2
**2017** [1] - 69:24
**2018** [3] - 24:24, 28:13, 69:24
**2020** [6] - 27:13, 27:16, 28:25, 29:3, 35:25, 36:2
**2022** [5] - 1:10, 38:6, 38:9, 106:9, 106:14
**21201** [1] - 1:24
**21st** [6] - 20:25, 53:3, 65:18, 65:21, 66:18, 67:16
**22** [3] - 1:10, 105:6, 106:9
**2255** [12] - 21:12, 25:1, 25:5, 25:8, 25:11, 28:19, 37:10, 70:18, 70:25, 71:1, 71:23, 72:16
**23** [2] - 37:15, 37:16
**23rd** [1] - 38:6
**24th** [4] - 19:24, 20:6, 66:19, 68:10
**25** [2] - 64:8, 65:9
**25th** [1] - 69:3
**27** [2] - 2:10, 2:12
**27th** [1] - 6:14
**299** [2] - 23:17, 28:5
**2nd** [3] - 16:10, 16:17, 17:3

## 3

**3** [2] - 16:3, 38:12
**30** [10] - 16:15, 24:19, 25:19, 44:23, 57:25, 58:14, 58:24, 65:9, 66:25, 97:8
**30-year** [4] - 15:25, 16:13, 58:14, 65:14
**30th** [1] - 53:16
**34** [3] - 9:19, 10:7, 54:24
**3D** [1] - 51:12

## 4

**4** [1] - 36:2
**40** [8] - 9:19, 10:7, 14:23, 54:24, 86:9, 86:11, 86:12, 87:8
**40-year** [1] - 92:3
**421** [1] - 29:19
**421-1** [1] - 28:18
**442** [1] - 23:24
**442-1** [2] - 16:3, 24:1
**442-5** [2] - 9:22, 10:2

**45** [7] - 102:8, 102:11, 102:15, 102:16, 102:17, 103:3, 103:19
**4th** [1] - 35:25

## 5

**50** [1] - 16:16

## 6

**6** [2] - 28:22
**640** [1] - 68:13
**6th** [1] - 24:23

## 7

**7** [3] - 10:22, 59:22, 105:5
**7th** [1] - 38:9

## 8

**8** [3] - 16:19, 24:1, 59:23
**82** [1] - 105:8

## 9

**90** [1] - 105:9
**93** [1] - 105:11
**97** [1] - 105:12

## A

**a.m** [1] - 2:1
**AB** [3] - 46:14, 46:15, 51:8
**abandoning** [4] - 33:9, 38:21, 38:24, 39:8
**ability** [2] - 69:15, 72:25
**able** [2] - 4:21, 94:11
**absolutely** [4] - 6:4, 83:21, 97:10, 97:18
**accepted** [1] - 16:14
**accommodate** [3] - 100:19, 101:16, 102:8
**accompanied** [1] - 51:10
**according** [4] - 55:5, 56:6, 59:9, 66:3
**account** [1] - 35:10
**accurate** [3] - 49:17, 64:16, 106:12
**accusation** [1] - 91:3
**acknowledges** [1] -

62:14
**acquaintances** [1] - 40:17
**act** [1] - 83:17
**Act** [10] - 7:22, 13:12, 21:15, 40:9, 41:8, 44:13, 59:4, 81:5, 96:1
**actual** [2] - 13:12, 33:12
**add** [3] - 48:14, 69:15, 102:2
**addition** [1] - 23:20, 81:6
**additional** [2] - 26:13, 51:23
**address** [2] - 99:25, 100:16
**addressed** [1] - 94:6
**addressing** [2] - 76:4, 76:7
**admission** [1] - 51:14
**admit** [4] - 32:12, 34:20, 39:5, 39:14, 39:17, 39:21, 98:20
**admitted** [4] - 32:18, 33:4, 34:20, 83:5
**adult** [2] - 53:4, 53:8
**advice** [9] - 15:9, 63:4, 65:8, 86:14, 86:16, 87:13, 92:9, 92:13, 97:4
**advised** [1] - 26:12
**advises** [1] - 92:12
**affect** [1] - 100:19
**affidavit** [14] - 25:10, 25:15, 26:22, 27:25, 28:5, 28:8, 28:10, 28:13, 28:14, 32:17, 47:6, 52:4, 99:1
**affixed** [1] - 106:13
**afterwards** [2] - 11:23, 65:19
**ago** [3] - 14:21, 75:19, 75:20
**agree** [23] - 28:9, 33:7, 38:16, 39:8, 51:22, 52:1, 52:18, 56:11, 56:16, 56:20, 57:1, 58:16, 59:23, 60:22, 61:23, 66:6, 67:25, 71:17, 73:8, 73:20, 77:4, 78:7, 95:3
**agreed** [3] - 16:10, 60:19, 74:3
**agreeing** [2] - 54:25, 65:13
**agreement** [90] - 9:20, 10:7, 10:9, 10:12, 10:17, 10:20, 11:4, 11:6, 11:13, 11:18, 11:20, 11:25, 13:23, 13:24, 14:1, 14:2, 14:4, 14:20, 15:5, 15:10, 15:13, 15:14, 16:8, 16:9,

16:18, 16:25, 17:2, 17:4, 17:5, 17:8, 17:13, 18:19, 18:20, 18:25, 19:1, 19:2, 19:4, 19:23, 20:11, 23:11, 30:24, 31:1, 31:3, 31:9, 31:13, 31:14, 31:17, 31:22, 31:24, 32:21, 54:22, 54:24, 54:25, 55:16, 56:12, 57:5, 57:6, 57:15, 57:17, 59:14, 59:19, 61:8, 62:13, 64:1, 64:10, 64:11, 64:12, 64:13, 64:21, 72:14, 73:22, 73:24, 74:5, 74:18, 77:7, 78:8, 84:24, 85:12, 85:14, 86:1, 86:9, 90:25, 91:5, 91:10, 92:2, 95:3, 95:10, 95:16, 97:1
**agreements** [2] - 62:14, 62:23
**agrees** [1] - 43:8
**ahead** [4] - 3:6, 9:25, 59:25, 60:4
**Alex** [3] - 41:6, 51:3, 81:7
**Alexander** [3] - 42:16, 42:20, 46:18
**Alford** [1] - 39:1
**Alina** [4] - 45:25, 46:2, 46:4, 79:4
**Alinas** [1] - 46:3
**allegation** [1] - 31:24
**alleged** [2] - 78:7, 89:22
**alleging** [1] - 32:1
**allow** [1] - 100:15
**allowing** [1] - 92:25
**Alperstein** [1] - 66:21
**AMERICA** [1] - 1:4
**America** [1] - 2:2
**amount** [6] - 83:14, 95:4, 95:12, 100:17, 100:19
**answer** [12] - 36:3, 42:6, 47:5, 65:3, 75:25, 76:1, 85:25, 91:1, 91:13, 92:11, 98:7, 98:11
**answer's** [1] - 13:3
**answering** [2] - 2:15, 34:7
**anticipate** [2] - 4:9, 67:8
**Antiques** [5] - 12:17, 50:17, 51:5, 51:17, 93:22
**anyway** [1] - 100:15
**apologize** [1] - 62:5
**appeal** [7] - 77:16, 77:21, 77:23, 77:24, 78:3, 78:5, 78:8
**appear** [1] - 49:17
**appearance** [2] - 70:10,

88:13

**Appearances** [1] - 1:15
**appeared** [1] - 83:21
**appellate** [1] - 18:9
**appointed** [1] - 77:23
**appreciate** [1] - 82:14
**approach** [4] - 9:22, 10:3, 16:4, 68:25
**approached** [1] - 81:2
**appropriate** [1] - 84:24
**approval** [1] - 20:19
**approved** [2] - 20:20, 51:14
**April** [1] - 20:7
**arguably** [1] - 44:6
**argue** [1] - 48:13
**argument** [5] - 48:17, 48:19, 48:20, 103:7, 103:15
**arising** [3] - 11:1, 16:23, 17:18
**armed** [1] - 53:9
**arrested** [4] - 53:3, 53:17, 53:24, 54:7
**as-yet** [1] - 50:19
**aside** [1] - 77:4
**aspects** [1] - 9:7
**assistance** [2] - 21:13, 91:7
**associate** [3] - 45:15, 83:8, 83:9
**associated** [1] - 89:22
**assume** [1] - 51:14
**attached** [7] - 11:2, 16:24, 17:19, 25:11, 28:18, 50:17, 60:8
**attachment** [2] - 3:16, 28:18
**attachments** [1] - 23:23
**attempt** [4] - 2:21, 14:2, 27:9, 69:18
**attention** [6] - 24:17, 29:21, 30:2, 30:7, 46:10, 86:24
**Attorney** [3] - 51:13, 60:3, 83:7
**attorney** [18] - 14:14, 18:18, 18:19, 27:14, 28:11, 29:24, 30:17, 33:12, 47:11, 63:3, 65:8, 71:4, 78:16, 83:3, 96:6, 96:7, 98:16, 98:22
**Attorney's** [3] - 10:25, 16:21, 61:19
**attorney's** [3] - 3:16, 28:11, 29:4
**attorneys** [2] - 59:5, 70:2
**audio** [1] - 36:13
**August** [2] - 52:25, 53:2

## B

**backed** [1] - 14:18
**backup** [1] - 88:4
**Baltimore** [20] - 1:11, 1:24, 11:1, 16:22, 41:18, 45:10, 51:5, 51:12, 53:25, 55:10, 58:2, 58:7, 58:9, 59:24, 60:6, 61:19, 81:2, 83:20, 88:5
**bar** [1] - 83:5
**based** [2] - 38:20, 87:10
**basis** [4] - 36:19, 84:21, 84:22, 86:6
**became** [3] - 83:7, 86:23, 88:6
**began** [1] - 2:10
**begin** [1] - 4:13
**beginning** [4] - 36:13, 38:17, 52:14, 68:15
**begins** [1] - 17:20
**Behalf** [2] - 1:16, 1:18
**behalf** [2] - 2:6, 103:8
**belief** [1] - 17:16
**below** [4] - 44:6, 99:25
**bench** [2] - 67:17, 83:20
**benefit** [1] - 95:16
**best** [1] - 72:24
**better** [3] - 61:12, 61:18, 87:4
**between** [6] - 62:11, 62:15, 66:18, 67:16, 78:20, 80:23
**beyond** [2] - 21:19, 87:25
**Binder** [8] - 41:6, 42:16, 42:20, 46:18, 51:3, 51:8, 51:10, 51:11
**Binder's** [1] - 51:6
**bit** [3] - 18:11, 26:1, 43:18
**blue** [1] - 24:9
**Bob** [1] - 51:20
**body** [1] - 88:9
**bottom** [11] - 4:20, 24:15, 28:20, 31:11, 31:19, 47:16, 47:18, 48:18, 60:17, 64:3, 64:7
**Branch** [1] - 7:14

**brandishing** [1] - 7:25
**Braun** [9] - 45:13, 45:19, 45:20, 66:8, 66:15, 66:23, 68:3, 69:9, 69:11
**BRAUN** [1] - 45:13
**Braun's** [1] - 80:9
**breach** [6] - 72:14, 72:18, 74:17, 75:1, 77:7, 78:7
**breached** [2] - 71:1, 74:18
**break** [1] - 81:20
**brief** [1] - 2:22
**briefing** [2] - 101:8, 103:19
**briefly** [2] - 83:1, 97:12
**bring** [4] - 65:4, 65:5, 71:17, 72:19
**bringing** [2] - 35:15, 74:17
**broader** [1] - 5:24
**Brooklyn** [1] - 51:10
**brother** [2] - 44:13, 44:24
**brother's** [1] - 54:8
**brought** [8] - 13:16, 19:11, 30:2, 39:12, 57:24, 72:13, 74:21, 86:24
**bud** [1] - 94:6
**buddies** [4] - 12:9, 24:22, 26:24, 39:19
**Budlow** [11] - 1:16, 3:8, 12:8, 18:7, 24:21, 25:20, 39:18, 50:21, 90:6, 93:6, 96:3
**BUDLOW** [71] - 2:2, 2:14, 3:6, 3:9, 3:12, 3:14, 4:8, 4:16, 5:1, 5:13, 6:8, 22:12, 22:14, 22:22, 29:17, 34:15, 34:18, 34:21, 34:25, 35:8, 35:20, 35:22, 35:24, 36:5, 37:19, 37:21, 37:23, 37:25, 38:2, 43:14, 47:24, 48:8, 48:11, 49:1, 49:3, 49:9, 49:12, 49:15, 49:25, 50:2, 50:7, 50:15, 67:3, 67:5, 67:9, 67:12, 68:10, 68:18, 76:6, 76:22, 78:19, 82:3, 82:12, 82:14, 82:25, 92:16, 92:25, 97:12, 97:15, 99:20, 100:6, 100:21, 101:3, 101:11, 102:17, 102:22, 103:8, 104:3, 105:6, 105:8, 105:12
**Budlow's** [1] - 15:17

**bunch** [3] - 8:24, 51:16, 51:17
**burglaries** [2] - 51:19, 61:3
**button** [1] - 24:9
**BY** [31] - 7:8, 7:18, 9:3, 10:5, 11:19, 12:19, 13:9, 15:8, 18:17, 22:22, 29:17, 36:5, 38:2, 43:14, 50:15, 67:12, 68:18, 76:6, 76:22, 78:19, 82:25, 90:13, 93:4, 96:12, 97:15, 105:5, 105:6, 105:8, 105:9, 105:11, 105:12

## C

**call's** [1] - 68:12
**Canada** [1] - 54:8
**cannot** [2] - 51:9
**cap** [3] - 86:9, 86:12, 92:3
**captured** [1] - 5:22
**car** [1] - 81:7
**care** [1] - 100:1
**career** [1] - 83:6
**careful** [1] - 86:18
**carrying** [1] - 7:25
**Case** [1] - 106:8
**CASE** [1] - 1:5
**case** [99] - 7:19, 8:7, 8:16, 9:8, 13:12, 20:23, 21:14, 21:15, 22:7, 22:9, 22:17, 23:14, 23:17, 23:24, 25:16, 27:9, 27:9, 31:15, 31:21, 33:21, 34:13, 36:19, 37:11, 37:17, 37:18, 38:13, 38:15, 39:5, 39:6, 39:14, 39:15, 39:17, 40:3, 40:9, 40:13, 40:15, 40:25, 41:8, 41:9, 41:21, 44:3, 44:13, 44:20, 46:7, 51:12, 52:11, 52:15, 52:19, 53:7, 53:12, 53:17, 53:20, 54:3, 54:13, 54:17, 54:18, 55:4, 55:15, 56:8, 58:2, 58:5, 58:10, 58:18, 59:6, 62:13, 63:12, 70:12, 70:21, 70:23, 71:6, 72:19, 73:2, 73:11, 76:8, 76:9, 76:18, 77:6, 78:22, 81:5, 83:18, 84:25, 85:1, 85:4, 85:9, 86:22, 86:23, 87:25, 88:12, 89:25, 93:14, 96:1, 96:14, 96:18,

**check** [3] - 3:1, 87:19
**choice** [2] - 98:19, 98:23
**chose** [1] - 48:5
**Chris** [2] - 73:4, 74:24
**Christmas** [1] - 51:7
**Circuit** [2] - 77:17, 88:5
**circumstances** [4] - 33:3, 34:3, 98:20, 98:21
**circumstantial** [3] - 8:25, 9:9, 80:16
**City** [3] - 58:2, 58:9
**civil** [1] - 2:4
**CJA** [2] - 14:15, 85:1
**claim** [12] - 31:9, 31:16, 38:21, 39:8, 56:3, 64:20, 64:24, 72:6, 72:19, 73:9, 73:21
**claimed** [1] - 75:12
**claiming** [2] - 33:20, 34:23
**claims** [2] - 33:7, 33:9
**clarify** [2] - 63:11, 89:5
**clear** [15] - 2:8, 18:8,

96:23, 102:9

**cases** [11] - 32:2, 33:3, 39:1, 40:19, 69:22, 70:7, 83:11, 83:13, 87:1, 87:3, 87:6
**center** [1] - 51:4
**Center** [1] - 20:18
**certain** [3] - 60:21, 74:3, 81:9
**certainly** [9] - 5:5, 41:20, 48:19, 50:3, 50:7, 62:6, 68:25, 100:21, 101:4
**CERTIFICATE** [1] - 106:4
**certify** [2] - 106:6, 106:10
**chance** [4] - 43:17, 47:10, 47:13, 98:13
**change** [2] - 9:10, 15:1
**characterization** [1] - 74:6
**charge** [10] - 18:23, 29:24, 30:5, 30:19, 32:9, 32:12, 55:11, 69:13, 91:3, 99:7
**charged** [12] - 7:21, 7:24, 31:21, 32:20, 40:18, 52:22, 53:4, 53:6, 53:8, 54:11, 54:18, 55:15
**charges** [16] - 7:19, 8:2, 11:1, 11:10, 11:11, 16:22, 17:18, 55:24, 59:24, 60:7, 60:10, 60:12, 61:20, 65:6, 90:18, 91:2

22:25, 29:13, 30:3, 31:2, 34:12, 36:7, 46:20, 63:16, 70:4, 71:15, 74:16, 76:7, 100:23

**cleared** [1] - 49:16

**clearly** [3] - 7:2, 26:15, 62:22

**CLERK** [7] - 6:21, 6:25, 7:6, 24:8, 82:16, 82:19, 82:23

**client** [1] - 30:8

**closed** [1] - 100:11

**co** [1] - 3:7

**co-counsel** [1] - 3:7

**coconspirator** [1] - 44:18

**coconspirators** [11] - 42:2, 42:3, 42:8, 42:9, 44:3, 79:9, 80:16, 80:17, 93:13, 96:23

**coconspirators'** [1] - 9:1

**codefendants** [2] - 14:15, 81:10

**combine** [1] - 50:23

**combined** [12] - 30:25, 31:3, 31:8, 31:14, 31:17, 31:23, 32:21, 33:2, 33:4, 33:9, 50:23, 51:2

**comfortable** [1] - 14:11

**coming** [2] - 11:11, 66:22

**commenced** [1] - 2:1

**comments** [1] - 22:24

**Commission** [1] - 51:13

**commit** [1] - 98:14

**committed** [4] - 39:6, 40:19, 41:13, 41:15

**communicate** [1] - 31:7

**community** [1] - 41:1

**compare** [1] - 17:3

**complain** [1] - 21:7

**complaining** [2] - 38:13, 72:16

**complaint** [6] - 21:11, 29:23, 30:3, 30:12, 30:17, 31:1

**complaints** [1] - 72:3

**complete** [2] - 62:13, 106:12

**completely** [1] - 37:12

**comply** [1] - 101:8

**concern** [2] - 84:23, 85:3

**concluded** [2] - 2:11, 92:18

**concludes** [1] - 103:25

**conclusion** [1] - 104:4

**conditions** [1] - 62:11

**conduct** [4] - 11:5,

17:1, 33:13, 61:7

**conducted** [1] - 30:23

**confessed** [1] - 93:18

**confidence** [1] - 97:2

**confused** [2] - 14:12, 14:19

**confusing** [1] - 13:3

**conscientious** [1] - 88:18

**consent** [1] - 86:19

**consider** [1] - 92:13

**considered** [1] - 31:17

**consisted** [1] - 81:4

**consistent** [2] - 20:11, 32:16

**conspiracy** [1] - 54:19

**constantly** [1] - 41:23

**constitute** [1] - 106:10

**constitutes** [1] - 62:13

**consult** [6] - 18:18, 18:19, 19:3, 23:4, 81:23, 82:3

**consultation** [4] - 18:22, 23:10, 23:11, 27:18

**consulting** [2] - 84:21, 88:21

**contact** [3] - 19:11, 20:13, 20:24

**contacted** [6] - 70:5, 83:23, 83:25, 91:19, 91:21, 91:23

**contain** [1] - 56:21

**contains** [1] - 50:19

**contemplated** [3] - 11:5, 17:1, 61:8

**contents** [1] - 28:14

**context** [8] - 3:20, 5:7, 26:1, 26:18, 46:15, 49:17, 50:9, 90:24

**continuation** [1] - 2:9

**continue** [2] - 21:25, 87:16

**CONTINUED** [1] - 105:11

**contradicted** [1] - 58:19

**conversation** [12] - 4:4, 5:22, 5:25, 6:2, 21:19, 48:3, 48:6, 48:18, 49:5, 49:13, 87:6, 89:15

**conversations** [5] - 3:20, 3:21, 3:25, 48:15, 90:6

**convey** [1] - 40:6

**convict** [2] - 14:16, 96:3

**convicted** [3] - 37:8, 52:22, 98:4

**convictions** [2] - 79:14, 87:2

**convinced** [1] - 51:18

**cooperating** [2] - 79:21, 94:15

**cooperation** [1] - 98:18

**cooperator** [1] - 51:15

**cooperators** [1] - 79:6

**copy** [6] - 6:17, 43:10, 68:25, 77:1, 78:6, 85:12

**correct** [107] - 14:24, 16:20, 24:15, 24:25, 25:2, 25:9, 25:17, 27:14, 27:20, 27:23, 28:16, 29:3, 30:6, 31:3, 31:9, 31:10, 31:25, 32:4, 33:18, 36:8, 36:10, 36:16, 36:17, 37:5, 37:8, 37:9, 37:14, 38:7, 38:8, 38:11, 38:19, 39:25, 40:1, 42:10, 43:5, 44:15, 44:25, 45:3, 47:19, 52:7, 52:12, 52:16, 52:23, 53:9, 53:14, 53:15, 53:19, 53:22, 54:1, 54:9, 54:10, 54:12, 54:15, 54:21, 55:2, 55:9, 56:10, 56:17, 57:23, 59:13, 59:20, 59:21, 60:1, 60:14, 60:18, 60:23, 61:1, 61:4, 62:20, 62:21, 63:1, 63:2, 63:7, 64:18, 64:19, 66:1, 66:2, 66:5, 68:7, 68:8, 70:15, 70:16, 70:17, 70:18, 70:19, 71:6, 71:7, 71:12, 71:22, 71:24, 72:1, 72:2, 73:15, 76:25, 78:5, 79:24, 80:10, 80:22, 81:5, 88:14, 91:11, 91:20, 91:21, 91:22, 91:25, 92:5, 96:15

**Correctional** [2] - 7:14, 20:18

**Corrections** [4] - 35:3, 35:9, 68:6, 85:23

**correctly** [1] - 5:22

**counsel** [25] - 2:5, 3:7, 3:23, 5:18, 25:1, 25:4, 25:8, 27:21, 29:13, 31:12, 31:19, 34:12, 35:6, 43:8, 49:15, 52:8, 64:13, 67:7, 67:25, 87:14, 87:16, 92:7, 92:25, 100:11

**counting** [1] - 102:23

**County** [12] - 11:1, 16:22, 45:10, 54:1, 55:10, 58:7, 59:24, 60:7, 61:20, 81:2, 83:7, 88:5

**couple** [1] - 78:20

**course** [5] - 40:14, 59:10, 70:25, 78:12, 95:7

**court** [18] - 2:20, 3:3, 15:2, 15:3, 18:9, 39:2, 39:5, 42:21, 53:7, 54:11, 54:17, 55:18, 60:19, 60:25, 70:11, 74:14, 77:23, 83:17

**COURT** [126] - 1:1, 2:5, 2:8, 3:5, 3:7, 3:11, 3:13, 4:7, 4:14, 4:20, 5:11, 5:15, 5:18, 6:3, 6:6, 6:9, 6:11, 6:15, 6:19, 7:16, 8:21, 8:23, 9:13, 9:15, 9:17, 9:23, 10:4, 11:15, 12:15, 13:1, 13:3, 13:5, 13:7, 14:4, 14:7, 14:9, 14:12, 14:19, 14:25, 15:6, 16:5, 17:16, 18:1, 18:4, 18:8, 18:16, 22:13, 22:15, 22:20, 24:6, 29:13, 34:12, 34:17, 34:19, 34:24, 35:6, 35:12, 35:17, 35:21, 35:23, 36:2, 37:18, 37:20, 37:22, 37:24, 38:1, 43:13, 47:23, 47:25, 48:24, 49:2, 49:7, 49:10, 49:14, 49:23, 50:1, 50:3, 50:14, 52:8, 62:3, 64:6, 67:2, 67:7, 67:11, 68:9, 68:16, 75:22, 75:24, 76:15, 78:18, 81:24, 82:5, 82:9, 82:13, 86:15, 89:5, 89:11, 89:15, 89:19, 89:24, 90:1, 90:8, 90:11, 92:15, 92:17, 92:20, 92:23, 95:17, 97:13, 99:21, 99:23, 100:3, 100:5, 100:10, 101:2, 101:9, 101:14, 101:21, 101:24, 102:5, 102:10, 102:12, 102:19, 103:3, 103:12, 103:23

**Court** [15] - 2:22, 3:18, 3:24, 4:5, 4:7, 4:12, 4:21, 5:10, 6:18, 69:1, 88:5, 99:8, 100:21, 101:7, 106:19

**Court's** [5] - 5:1, 29:18, 38:12, 47:21, 50:8, 78:17

**courthouse** [1] - 83:22

**Courthouse** [1] - 1:23

**courts** [2] - 83:13, 87:2

**cousin** [1] - 84:11

**cover** [2] - 52:5, 58:18

**covers** [1] - 63:12

**credibility** [2] - 35:1, 96:22

**crime** [6] - 8:1, 37:3, 57:2, 74:13, 83:15, 98:14

**crimes** [4] - 50:20, 52:22, 61:3, 79:22

**Criminal** [2] - 2:3, 59:4

**criminal** [8] - 11:1, 16:22, 17:18, 60:7, 61:20, 83:2, 83:13, 83:17

**CRIMINAL** [1] - 1:5

**critical** [1] - 2:17

**CROSS** [2] - 22:21, 90:12, 105:6, 105:9

**cross** [7] - 2:23, 4:10, 49:5, 54:7, 67:8, 67:9, 90:11

**Cumberland** [1] - 7:14

**D**

**D-M-I-T-R-I** [1] - 42:25

**date** [5] - 11:22, 27:15, 65:21, 67:16, 68:9

**dated** [4] - 16:10, 24:25, 35:20, 35:24

**Dave** [1] - 83:9

**Davis** [12] - 73:4, 73:5, 73:9, 74:24, 77:9, 77:12, 77:18, 77:21, 77:22, 77:23, 78:10

**daylight** [1] - 78:20

**days** [4] - 68:10, 69:25, 82:10, 102:4, 102:5, 102:8, 102:11, 102:15, 102:16, 102:17, 103:3, 103:6, 103:19, 103:20

**deal** [8] - 30:18, 33:23, 44:18, 97:20, 97:22, 98:2, 99:7, 99:17

**dear** [1] - 84:9

**death** [1] - 83:17

**December** [5] - 11:23, 24:23, 29:2, 35:25, 36:2

**decent** [1] - 59:5

**deciding** [3] - 95:2, 95:3, 97:1

**decision** [2] - 95:6, 96:18

**deep** [1] - 51:15

**Defendant** [2] - 1:7, 1:18

**defendant** [18] - 3:22, 5:23, 11:3, 16:24, 55:3, 62:12, 62:14, 62:15, 69:1, 83:24, 85:15, 86:13, 87:20, 88:22, 89:1

**DEFENDANT** [28] - 6:23, 6:24, 7:4, 8:22, 8:24, 11:17, 12:17, 13:2, 13:4, 13:6, 13:8, 14:6, 14:8, 14:10, 14:13, 14:24, 15:3, 15:7, 17:24,

18:2, 18:6, 18:15, 22:19, 29:15, 76:16, 82:21, 93:2, 95:23
  **Defendant's** [2] - 10:1, 16:2
  **defendant's** [3] - 3:17, 28:18, 34:22
  **DEFENDANTS** [2] - 105:4, 105:10
  **defense** [15] - 3:16, 5:17, 5:20, 29:20, 43:8, 48:12, 48:16, 49:15, 83:2, 100:25, 101:4, 101:6, 102:6, 103:1
  **delay** [1] - 102:25
  **Department** [4] - 35:3, 35:9, 68:6, 85:23
  **describe** [2] - 16:6, 84:22
  **described** [4] - 11:2, 16:23, 17:19, 59:24
  **desired** [1] - 91:17
  **despite** [2] - 30:22, 87:7
  **destroyed** [1] - 77:3
  **details** [11] - 13:10, 33:13, 86:24, 88:6, 88:9, 89:10, 89:11, 93:22, 94:20, 94:22
  **detention** [2] - 80:21, 85:19
  **determination** [1] - 91:6
  **Dexter** [1] - 83:9
  **dialed** [1] - 80:9
  **dictated** [1] - 31:7
  **difference** [3] - 17:5, 17:6, 96:18
  **differences** [1] - 52:17
  **different** [9] - 7:9, 15:12, 15:16, 15:21, 15:22, 15:23, 61:14, 75:2, 99:18
  **differently** [1] - 61:13
  **dime** [1] - 51:13
  **diminish** [1] - 91:4
  **Dimitriy** [2] - 42:19, 42:24
  **DIRECT** [4] - 7:7, 82:24, 105:5, 105:8
  **direct** [3] - 42:2, 42:6, 65:24
  **disagree** [1] - 28:9
  **discerning** [1] - 18:12
  **discovery** [1] - 33:17
  **discuss** [7] - 8:15, 21:25, 36:18, 85:1, 87:1, 90:24, 94:19
  **discussed** [3] - 47:17, 77:22, 86:25
  **discussing** [2] - 91:9, 101:13

**discussion** [4] - 73:14, 86:5, 92:1, 94:19
**discussions** [2] - 52:19, 89:16
**disposition** [1] - 95:21
**dispute** [2] - 74:7, 74:11
**District** [1] - 83:15
**DISTRICT** [2] - 1:1, 1:1
**district** [2] - 83:18, 87:2
**diving** [1] - 45:9
**DIVISION** [1] - 1:2
**document** [11] - 4:6, 4:18, 5:2, 11:10, 16:6, 17:21, 29:19, 37:16, 56:20, 62:8, 62:22
**documents** [3] - 62:6, 85:11, 100:7
**done** [3] - 20:23, 31:17, 39:6
**down** [5] - 50:14, 50:18, 66:7, 66:22, 99:23
**draft** [1] - 87:11
**draw** [3] - 24:17, 29:21, 46:10
**drawing** [1] - 30:7
**driving** [1] - 53:24
**dropped** [1] - 51:13
**drug** [2] - 53:17, 53:19
**drug-related** [1] - 53:17
**due** [2] - 103:6, 103:19
**DUI** [1] - 54:2
**during** [13] - 2:23, 3:15, 4:10, 8:1, 9:7, 21:21, 27:22, 27:25, 37:2, 37:7, 42:7, 58:12

### E

**earliest** [1] - 102:14
**early** [2] - 27:9, 97:2
**easier** [1] - 68:14
**ECF** [5] - 9:21, 10:2, 16:3, 23:17, 37:20
**ECI** [1] - 69:25
**educate** [1] - 30:8
**educed** [1] - 100:16
**effect** [1] - 88:10
**efforts** [1] - 87:4
**either** [12] - 18:3, 47:17, 63:23, 70:11, 77:11, 77:21, 78:10, 84:11, 85:4, 88:4, 94:24, 101:1
**ELH-15-0261** [1] - 1:6
**ELH-15-261** [2] - 2:3, 106:8
**ELH-19-0973** [1] - 2:4
**eliminates** [1] - 101:14
**Ellen** [1] - 1:12
**email** [13] - 3:16, 4:1,

4:4, 5:23, 6:1, 43:9, 43:11, 47:10, 48:5, 49:6, 94:4, 94:5, 94:20
**end** [11] - 5:5, 15:24, 17:21, 47:2, 49:4, 49:9, 51:5, 87:2, 87:13, 88:12, 92:5
**ENGLERT** [37] - 2:6, 5:16, 5:19, 6:5, 6:10, 6:12, 6:17, 7:8, 7:18, 9:3, 9:24, 10:5, 11:19, 12:19, 13:9, 15:8, 18:17, 35:5, 35:13, 48:1, 48:9, 90:13, 93:4, 96:12, 99:22, 100:2, 100:4, 101:19, 101:23, 102:4, 102:7, 102:11, 103:10, 103:22, 105:5, 105:9, 105:11
**Englert** [13] - 1:18, 2:6, 4:1, 5:3, 25:3, 25:11, 27:14, 43:10, 48:17, 77:3, 99:24, 101:17, 103:2
**Englert's** [1] - 25:15
**enlarge** [1] - 23:16
**enter** [1] - 88:12
**entered** [3] - 55:18, 59:16, 62:17
**entire** [3] - 71:16, 73:10, 73:22
**entirely** [1] - 5:14
**especially** [1] - 42:15
**Esquire** [2] - 1:16, 1:18
**event** [1] - 50:18
**events** [6] - 11:2, 16:23, 17:18, 51:19, 59:24, 60:7
**evidence** [21] - 8:9, 8:10, 8:13, 8:25, 9:1, 9:5, 9:9, 30:10, 49:24, 50:4, 80:15, 81:3, 95:23, 98:8, 100:3, 100:5, 100:7, 100:9, 100:11, 100:16, 100:23
**Evidentiary** [1] - 1:10
**exact** [4] - 11:22, 56:23, 58:17, 94:22
**exactly** [20] - 7:23, 25:24, 26:11, 26:21, 27:8, 28:12, 33:14, 33:17, 42:4, 47:7, 56:1, 57:12, 60:2, 66:14, 66:15, 66:20, 67:22, 76:2, 95:23, 99:11
**examination** [7] - 2:24, 4:10, 42:2, 42:6, 49:4, 49:6, 65:24
**EXAMINATION** [12] - 7:7, 22:21, 82:24, 90:12, 93:3, 97:14, 105:5,

105:6, 105:8, 105:9, 105:11, 105:12
**examine** [1] - 90:11
**excellent** [1] - 36:25
**exclusively** [1] - 83:12
**excuse** [1] - 44:17
**excused** [1] - 92:21
**execution** [3] - 64:24, 74:1, 74:6
**execution-style** [3] - 64:24, 74:1, 74:6
**exhibit** [4] - 9:23, 10:1, 23:20, 37:24
**Exhibit** [9] - 10:2, 16:3, 23:18, 37:15, 37:16, 43:11, 59:18, 64:2, 68:23
**exhibits** [3] - 4:9, 23:20, 23:25
**experience** [1] - 14:14
**experts** [2] - 99:24, 100:2
**explain** [6] - 10:16, 11:7, 16:11, 45:5, 48:24, 62:6
**explained** [3] - 61:13, 61:16, 61:17
**explanation** [1] - 61:21
**explore** [1] - 32:11
**extensive** [2] - 34:22, 87:5
**extent** [4] - 33:7, 60:21, 89:8, 91:16
**eyewitnesses** [1] - 81:6

### F

**face** [4] - 7:19, 36:10, 37:7, 48:14
**Facebook** [6] - 35:4, 35:10, 35:25, 36:14, 71:13
**facility** [3] - 7:16, 85:19, 85:20
**fact** [26] - 19:23, 26:15, 28:1, 30:14, 43:18, 48:16, 49:3, 51:22, 52:18, 57:22, 58:17, 63:25, 69:8, 69:21, 70:4, 70:20, 71:11, 73:12, 74:1, 77:7, 87:8, 88:11, 89:7, 96:13, 97:19, 98:10
**factor** [3] - 95:6, 95:9, 95:15
**facts** [14] - 48:5, 50:19, 60:8, 60:13, 60:16, 74:3, 74:4, 86:3, 86:23, 87:10, 87:11, 87:25, 89:22, 91:6
**factual** [10] - 11:2, 16:23, 17:19, 17:20,

17:22, 59:25, 60:12, 60:22, 72:5, 74:4
**failed** [2] - 30:9, 72:18
**failure** [3] - 33:8, 33:21, 39:9
**fair** [2] - 38:20, 45:21
**fairly** [1] - 100:23
**fall** [3] - 27:16, 54:22, 84:5
**Fallstaff** [1] - 12:13
**familiar** [5] - 28:8, 83:19, 83:20, 84:2, 86:23
**family** [18] - 18:21, 18:23, 19:9, 19:13, 19:14, 51:6, 66:13, 66:19, 66:21, 67:19, 67:23, 83:24, 84:21, 87:15, 87:20, 88:15, 88:25, 91:21
**far** [4] - 5:21, 5:22, 10:17, 43:22
**father** [2] - 19:13, 84:10
**favor** [1] - 42:21
**FCRR** [1] - 1:23
**February** [9] - 1:10, 16:10, 16:17, 17:3, 17:8, 19:24, 20:6, 38:9, 106:9
**federal** [7] - 7:19, 39:2, 39:5, 54:11, 54:17, 54:19, 65:18, 70:11, 73:12, 75:7, 83:5, 83:11, 83:12, 83:14, 83:17, 87:2
**federally** [1] - 83:10
**fell** [1] - 99:25
**fence** [1] - 51:6
**few** [7] - 5:8, 53:1, 53:2, 71:10, 81:1, 101:15
**fighting** [1] - 77:5
**figure** [1] - 82:4
**file** [21] - 5:3, 21:12, 25:11, 27:22, 50:10, 69:22, 72:10, 72:18, 77:24, 84:18, 93:7, 100:12, 100:13, 100:22, 101:4, 101:5, 101:6, 101:18, 101:19, 103:2
**filed** [28] - 4:3, 4:22, 9:21, 9:25, 10:2, 16:3, 28:10, 29:20, 37:10, 37:13, 38:9, 43:8, 70:18, 70:25, 71:3, 71:8, 71:10, 71:20, 71:23, 72:12, 72:16, 72:23, 72:24, 73:19, 77:18, 100:7, 100:14
**files** [1] - 103:1
**filing** [19] - 2:4, 3:17, 5:14, 23:23, 23:24, 25:16, 28:4, 38:17, 48:3, 59:18, 64:3, 77:19, 78:3,

**general** [3] - 71:25, 86:25, 87:6
**girl** [1] - 66:7
**girlfriend** [5] - 45:13, 45:14, 45:23, 51:18, 66:7
**girlfriends** [1] - 45:16
**given** [2] - 5:7, 47:8
**global** [2] - 32:17, 34:7, 34:15, 34:17, 39:10
**globally** [1] - 33:21
**gold** [2] - 46:14, 51:8
**goods** [1] - 51:10
**Government** [1] - 1:16
**GOVERNMENT** [1] - 105:7
**government** [39] - 2:12, 3:22, 5:16, 5:19, 5:24, 10:16, 13:19, 14:22, 18:5, 20:2, 21:8, 22:7, 23:21, 28:23, 28:24, 30:10, 30:22, 35:15, 40:10, 48:2, 52:9, 58:6, 58:22, 62:24, 63:6, 71:1, 71:17, 72:19, 73:13, 75:7, 82:15, 86:9, 94:4, 94:24, 96:16, 99:9, 100:5, 101:1, 103:8
**government's** [8] - 8:9, 8:13, 9:8, 21:25, 23:23, 36:7, 64:3, 86:6
**GOVERNMENT'S** [1] - 82:17
**Government's** [4] - 23:18, 37:16, 43:11, 68:23
**gracious** [1] - 67:6
**Grand** [1] - 37:15
**grand** [4] - 44:22, 44:24, 45:2, 65:18
**gravity** [1] - 84:23
**great** [5] - 24:13, 44:6, 82:3, 85:3, 101:12
**Green** [1] - 83:8
**Grievance** [1] - 51:13
**Grigorieva** [2] - 46:4, 46:5
**guess** [9] - 6:12, 44:8, 44:10, 69:10, 73:23, 101:3, 101:23, 102:7, 102:8
**guessing** [1] - 44:17
**guilt** [2] - 95:8, 95:9
**guilty** [8] - 8:15, 10:14, 10:20, 11:9, 17:13, 19:4, 19:24, 20:1, 20:2, 20:6, 22:4, 22:6, 22:8, 22:16, 24:19, 25:19, 25:22, 26:17, 27:3, 27:10, 27:19, 31:15, 32:8, 32:12, 32:15, 32:17,

## G

**Garbis** [3] - 37:11, 37:17, 70:12
**Garbis's** [1] - 34:13

100:13, 100:22, 100:25, 101:15, 102:6, 102:8
**filings** [5] - 23:14, 34:22, 71:15, 77:10, 102:16
**filled** [2] - 25:10, 25:15
**filling** [1] - 28:12
**finally** [1] - 15:24
**fine** [4] - 5:15, 6:5, 50:5, 82:5
**finish** [1] - 75:25
**finished** [1] - 6:7
**firearm** [1] - 7:25
**firearms** [2] - 7:24, 54:20
**fired** [1] - 70:16
**firm** [2] - 83:8, 84:19
**first** [27] - 8:6, 10:7, 10:11, 11:18, 14:6, 14:8, 14:20, 18:6, 19:5, 21:20, 23:15, 24:3, 24:17, 39:16, 49:23, 54:24, 55:4, 55:6, 66:6, 66:23, 75:9, 80:13, 83:6, 86:10, 101:7, 101:20
**five** [4] - 82:2, 83:6, 96:1, 98:18
**five-minute** [1] - 82:2
**five-plus** [1] - 83:6
**flight** [1] - 53:25
**flight-related** [1] - 53:25
**Floor** [1] - 1:23
**focus** [3] - 31:23, 32:6, 89:21
**follow** [1] - 92:9
**followed** [2] - 63:4, 97:4
**following** [1] - 90:14
**FOR** [1] - 1:1
**foregoing** [1] - 106:10
**forth** [2] - 15:20, 62:16
**forward** [3] - 15:1, 15:5, 15:10
**four** [2] - 15:23, 98:1
**Fourth** [1] - 1:23, 77:17
**frame** [3] - 35:23, 83:20, 84:8
**frame's** [1] - 90:4
**frankly** [1] - 48:8
**frequent** [1] - 82:10
**friends** [2] - 40:17, 47:3
**front** [1] - 28:4
**full** [4] - 4:1, 4:6, 82:20, 97:2

32:23, 33:10, 33:22, 34:2, 34:16, 35:14, 37:11, 38:10, 38:22, 38:25, 39:4, 53:14, 53:22, 54:4, 54:5, 54:15, 54:16, 54:23, 55:1, 55:8, 55:13, 55:14, 55:18, 55:23, 55:24, 56:7, 58:5, 65:13, 70:21, 71:5, 71:8, 71:20, 71:21, 73:1, 73:6, 73:9, 73:20, 74:1, 74:13, 95:2, 95:18, 96:5, 96:10, 96:13, 96:19, 96:20, 96:21, 97:20, 97:22, 97:25, 98:4, 98:14, 98:23, 98:25
**gun** [1] - 53:9
**guy** [1] - 51:11
**guys** [1] - 79:21

## H

**Hagerstown** [1] - 20:18
**hallway** [1] - 86:10
**hand** [6] - 6:22, 6:25, 10:6, 25:7, 37:25, 82:16
**handed** [2] - 16:7, 66:7
**handle** [1] - 83:14
**handwriting** [6] - 24:3, 24:13, 37:23, 38:3, 43:5, 44:10
**handwritten** [1] - 93:6
**happy** [5] - 5:10, 100:19, 100:16, 101:19, 103:22
**hard** [2] - 35:18, 102:24
**head** [4] - 32:14, 74:8, 74:9
**hear** [2] - 41:3, 57:9, 69:12
**heard** [5] - 12:20, 40:25, 67:24, 68:19, 68:20
**hearing** [26] - 2:9, 6:14, 11:21, 13:22, 23:21, 28:17, 63:9, 70:20, 71:12, 71:13, 71:15, 73:15, 74:13, 74:16, 74:24, 74:25, 75:10, 75:12, 75:15, 77:5, 100:8, 100:12, 101:24, 103:14
**Hearing** [1] - 1:10
**hears** [1] - 41:4
**held** [1] - 51:14
**help** [3] - 28:11, 29:4, 42:24
**hence** [1] - 79:12
**Hence** [1] - 79:21
**hereby** [1] - 106:6

**hereto** [1] - 11:3
**hereunto** [1] - 106:13
**hesitate** [1] - 5:7
**hidden** [1] - 49:21
**higher** [1] - 16:15
**highlight** [1] - 50:5
**highlighted** [1] - 30:21
**highlights** [1] - 29:22
**highly** [1] - 49:18
**himself** [6] - 18:3, 30:8, 30:16, 58:19, 62:2
**hire** [2] - 18:21, 19:15
**hired** [1] - 88:25
**hiring** [2] - 23:13, 88:24
**Hobbs** [9] - 7:22, 13:12, 21:15, 40:9, 41:8, 44:12, 81:5, 96:1
**hold** [1] - 66:20
**Hollander** [3] - 1:12, 90:14, 98:2
**home** [4] - 16:16, 61:4, 80:21
**homicide** [11] - 12:9, 26:12, 26:24, 25:21, 26:7, 26:9, 39:18, 58:11, 76:20, 76:21, 96:23
**honest** [1] - 102:22
**Honor** [45] - 2:14, 4:8, 5:16, 6:8, 6:10, 22:23, 23:17, 23:19, 24:19, 25:18, 29:19, 29:22, 34:16, 34:21, 35:20, 43:7, 48:8, 48:11, 48:17, 59:19, 64:1, 64:7, 66:25, 67:17, 67:25, 68:12, 68:23, 81:19, 82:12, 89:4, 89:9, 89:14, 89:18, 89:21, 90:5, 90:10, 92:19, 92:22, 97:12, 99:22, 100:4, 100:6, 102:22, 103:9, 104:3
**Honorable** [1] - 1:12
**hope** [2] - 2:17, 67:13
**hour** [1] - 91:14
**hours** [2] - 45:9, 91:14
**housekeeping** [3] - 2:15, 3:12, 6:7
**Howard** [1] - 83:7
**huge** [1] - 67:5
**hypothetical** [1] - 98:11

## I

**idea** [13] - 6:4, 15:12, 35:17, 40:21, 46:16, 78:4, 81:15, 94:1, 94:3, 95:1, 100:20, 101:11, 101:12
**identical** [2] - 17:6, 17:7

**identify** [2] - 4:18, 84:7
**Igor** [2] - 44:5, 79:4
**immediately** [1] - 64:8
**impact** [1] - 91:9
**important** [2] - 95:12, 95:14
**importantly** [2] - 64:10, 64:11
**imprisoned** [1] - 95:13
**imprisonment** [1] - 95:5
**IN** [1] - 1:1
**incarcerated** [4] - 35:2, 35:9, 68:6, 80:20
**include** [1] - 30:19
**included** [1] - 80:17
**including** [6] - 23:25, 32:13, 44:22, 51:18, 83:17, 98:1
**incorporate** [1] - 100:15
**incredibly** [2] - 87:8, 88:17
**indeed** [1] - 48:24
**INDEX** [1] - 105:1
**indicated** [1] - 3:24
**indict** [2] - 79:22, 98:18
**indicted** [26] - 8:25, 12:9, 14:16, 20:25, 21:7, 32:24, 33:14, 33:16, 34:1, 40:8, 41:7, 41:20, 44:3, 44:12, 54:17, 65:17, 70:24, 76:10, 76:21, 79:5, 79:8, 93:13, 96:1, 96:2, 96:22, 98:17
**indictment** [17] - 13:18, 21:3, 21:5, 22:17, 55:4, 55:6, 58:10, 63:14, 65:20, 65:22, 66:6, 66:10, 66:22, 67:21, 68:11, 70:5, 81:16
**indictments** [8] - 8:1, 11:11, 17:12, 20:5, 58:25, 61:22, 79:12, 97:8
**individual** [1] - 69:3
**indulgence** [3] - 29:18, 38:12, 78:17
**ineffective** [8] - 21:12, 30:4, 31:2, 33:2, 33:8, 33:21, 39:9, 71:25
**ineffectiveness** [1] - 73:15
**influence** [1] - 53:25
**information** [22] - 12:13, 13:16, 17:25, 18:2, 18:7, 24:20, 25:20, 26:6, 26:22, 46:24, 47:1, 47:9, 49:19, 49:21, 51:23, 51:25, 88:15, 91:16, 94:2, 94:15, 94:23, 94:25
**informed** [5] - 12:8,

24:21, 25:20, 26:9, 31:20
**initial** [1] - 70:10
**initials** [1] - 44:3
**initiated** [1] - 52:19
**innocence** [4] - 34:25, 36:21, 37:3, 95:9
**innocent** [2] - 34:23, 37:12
**inquired** [1] - 3:18
**Institution** [1] - 7:14
**intended** [1] - 30:11
**interest** [2] - 79:17, 90:22
**interpretation** [2] - 5:25, 44:7
**interpreted** [2] - 56:16, 56:18
**interpreting** [1] - 97:1
**interrupt** [3] - 3:1, 3:3, 35:22, 82:11, 93:1
**introduce** [1] - 4:14
**introduced** [1] - 4:17
**invasion** [1] - 61:4
**investigate** [6] - 29:24, 30:1, 30:4, 30:10, 30:15, 31:7
**investigated** [2] - 40:3, 40:6
**investigating** [4] - 3:23, 18:5, 28:23, 30:23
**investigation** [23] - 12:7, 21:20, 21:25, 22:1, 26:13, 30:9, 30:24, 32:4, 33:13, 33:18, 39:19, 39:22, 43:19, 74:17, 80:24, 89:7, 89:9, 89:13, 90:3, 90:18, 90:20, 90:21, 91:10
**investigative** [1] - 87:3
**investigator** [1] - 38:14
**involved** [16] - 12:10, 12:23, 13:5, 13:8, 13:12, 13:13, 24:22, 25:23, 26:24, 28:24, 39:19, 41:9, 42:15, 83:10, 83:12, 93:20
**involvement** [1] - 13:15
**Irwin** [2] - 83:8, 83:9
**issue** [3] - 2:23, 12:4, 50:4
**issues** [4] - 2:19, 31:4, 38:15, 72:7
**itself** [1] - 56:20
**IY** [4] - 43:25, 44:1, 44:3, 44:6

**J**

**J-O-S-E-P-H** [1] - 82:21

**jail** [6] - 66:9, 67:14, 79:23, 79:25, 80:17, 80:23
**January** [7] - 2:10, 2:12, 6:14, 38:6, 53:24, 54:7, 69:3
**Jencks** [1] - 44:21
**Jessup** [1] - 77:3
**jewelry** [2] - 46:19, 51:8
**job** [1] - 31:17
**Joe** [2] - 18:21, 22:25
**join** [2] - 3:10, 88:12
**Joseph** [2] - 82:15, 82:21
**JOSEPH** [2] - 82:17, 105:8
**Judge** [14] - 1:12, 34:13, 37:11, 37:17, 54:18, 63:19, 63:24, 63:25, 64:14, 70:12, 88:5, 90:14, 96:14, 98:1
**judge** [8] - 16:14, 26:15, 27:2, 38:13, 63:20, 76:5, 76:17
**June** [10] - 20:25, 65:18, 65:21, 66:14, 66:18, 66:19, 67:16, 68:10, 69:2
**juries** [1] - 79:10
**jurisdiction** [4] - 58:1, 58:7, 73:13, 75:7
**jury** [6] - 44:22, 44:24, 45:2, 48:12, 65:18, 96:3
**Jury** [1] - 37:15
**Justice** [1] - 59:4
**juvenile** [2] - 53:3, 53:5

**K**

**keep** [2] - 5:18, 18:12
**keeps** [1] - 34:19
**kept** [1] - 28:1
**Kerr** [1] - 83:8
**kidnap** [1] - 54:19
**kidnapping** [2] - 7:22, 56:8
**kidnapping/robbery** [2] - 50:23, 51:11
**kill** [1] - 37:12
**killed** [2] - 34:8, 41:1
**killing** [2] - 32:18, 38:22
**kind** [13] - 12:8, 13:18, 15:23, 21:22, 26:6, 47:8, 76:20, 76:21, 81:17, 84:10, 88:17, 88:21, 96:8
**Kiril's** [2] - 45:3, 45:8
**Kirill** [8] - 44:7, 44:16, 44:17, 45:5, 45:12, 46:22, 46:23, 79:4

**Kirill's** [1] - 45:4
**knowing** [3] - 33:25, 41:13, 102:23
**knowledge** [2] - 87:24, 89:6
**known** [5] - 25:22, 26:16, 52:5, 52:9, 56:1, 88:9, 96:16
**Kondratiyev** [1] - 44:17

**L**

**Lake** [1] - 45:7
**large** [1] - 102:7
**last** [17] - 2:12, 3:7, 3:15, 6:13, 8:21, 23:21, 31:22, 43:1, 44:14, 47:17, 48:17, 61:6, 62:9, 68:24, 69:2, 83:17, 100:8
**late** [1] - 12:1
**law** [5] - 51:12, 52:13, 65:9, 83:4, 97:3
**Lawlor** [19] - 21:6, 21:11, 39:13, 44:21, 51:16, 70:13, 70:14, 70:23, 71:3, 71:5, 71:23, 71:25, 72:17, 74:3, 74:12, 74:19, 74:22, 74:23
**Lawlor's** [1] - 73:15
**lawyer** [7] - 14:21, 70:10, 73:2, 73:21, 77:5, 92:12, 94:7
**lawyers** [1] - 70:7
**lead** [2] - 55:3, 79:14
**learn** [1] - 90:2
**learned** [8] - 27:25, 66:6, 66:9, 66:23, 68:22, 70:4, 71:4, 97:4
**learning** [1] - 72:25
**least** [9] - 15:22, 24:1, 36:6, 74:12, 77:5, 88:16, 96:1, 98:18
**leave** [2] - 5:2, 101:3
**led** [1] - 9:10
**left** [6] - 37:25, 41:2, 43:22, 51:1, 65:15, 67:10
**legal** [3] - 14:14, 14:17, 77:2
**less** [1] - 67:9
**letter** [13] - 25:25, 26:2, 26:9, 26:17, 26:19, 62:10, 62:16, 75:8, 75:15, 75:16, 76:4, 76:17, 77:1
**letters** [1] - 43:23
**LexisNexis** [1] - 14:17
**lied** [1] - 79:20
**light** [3] - 51:21, 65:5,

81:20
**likelihood** [1] - 31:8
**likely** [7] - 22:3, 22:7, 22:17, 87:7, 95:4, 95:5, 96:16
**limit** [1] - 20:16
**limited** [4] - 49:20, 84:21, 84:22, 91:1
**Line** [1] - 64:8
**line** [2] - 4:13, 4:20
**list** [5] - 20:20, 20:22, 23:20, 69:14, 69:16
**listed** [5] - 3:16, 4:10, 46:6, 55:4, 55:6
**listen** [1] - 78:15
**listened** [3] - 60:19, 67:17, 78:14
**literally** [1] - 12:13
**litigated** [1] - 71:11
**living** [1] - 83:2
**log** [1] - 69:2
**Lombard** [1] - 1:24
**look** [8] - 4:7, 37:15, 43:25, 46:9, 61:24, 62:9, 94:11, 103:23
**looked** [2] - 56:16, 84:18
**looking** [9] - 24:21, 25:21, 25:23, 26:7, 39:18, 50:11, 84:7, 93:9, 102:24
**looks** [1] - 78:4
**lost** [1] - 21:22
**loud** [5] - 17:17, 24:18, 46:20, 47:22, 62:10
**love** [1] - 101:11
**loved** [1] - 51:18
**lower** [2] - 6:25, 31:15

**M**

**M-10** [1] - 68:23
**M-16** [1] - 4:11
**M-17** [1] - 43:12
**M-18** [1] - 23:18
**M-19** [1] - 28:17
**M-20** [1] - 29:20
**M-22** [1] - 37:8
**M-23** [1] - 37:24
**M-U-R-T-H-A** [1] - 82:22
**ma'am** [4] - 7:17, 11:17, 14:13, 22:19
**main** [1] - 9:1
**maintain** [1] - 92:11
**man** [1] - 96:6
**manner** [1] - 106:12
**Marat** [4] - 44:7, 44:11, 44:12, 44:25, 45:12, 79:4
**Marat's** [1] - 45:1

**margin** [2] - 51:1, 93:12
**marijuana** [1] - 53:18
**Marina** [3] - 69:4, 69:6, 84:2
**marina's** [1] - 69:7
**mark** [1] - 46:12
**marked** [4] - 10:1, 16:2, 23:17, 23:24
**Mary** [4] - 1:23, 77:18, 106:6, 106:18
**MARYLAND** [1] - 1:1
**Maryland** [11] - 1:11, 1:24, 7:16, 20:18, 35:2, 35:9, 68:6, 83:4, 83:15, 85:21, 85:22
**mask** [1] - 47:13
**masks** [1] - 18:10
**mastermind** [1] - 81:17
**matter** [3] - 3:12, 106:7, 106:12
**matters** [2] - 3:2, 6:7
**McDonald** [1] - 83:8
**MCTC** [2] - 23:1, 39:24
**mean** [9] - 17:8, 32:11, 35:22, 36:6, 60:2, 61:14, 88:17, 91:3, 91:13
**meaning** [1] - 32:2
**means** [6] - 60:6, 60:13, 61:11, 61:18, 92:17
**meant** [5] - 11:8, 11:9, 17:10, 27:4, 27:6
**meet** [8] - 8:4, 22:12, 39:25, 51:11, 72:3, 72:7, 77:20, 85:23
**meeting** [13] - 12:3, 12:5, 39:16, 40:2, 42:7, 44:21, 47:2, 49:20, 49:22, 58:12, 84:9, 91:12, 92:5
**meetings** [5] - 9:7, 29:8, 57:4, 84:13, 87:20
**members** [2] - 19:14, 66:13
**memories** [1] - 84:9
**memory** [4] - 3:23, 48:25, 49:2, 49:20
**mention** [6] - 42:18, 56:23, 56:24, 61:1, 61:3, 88:1
**mentioned** [8] - 46:17, 56:11, 63:9, 68:22, 75:17, 75:18, 80:13, 86:11
**merged** [1] - 84:18
**met** [15] - 8:6, 11:16, 22:25, 77:19, 77:21, 78:2, 80:13, 84:10, 84:13, 85:15, 86:13, 88:16, 89:12, 90:9, 90:15
**Michael** [6] - 21:6,

51:15, 70:14, 70:23, 72:17, 88:7
**Michelle** [13] - 45:12, 45:13, 45:16, 45:19, 45:20, 45:24, 66:8, 66:15, 66:23, 68:3, 79:4, 79:17, 80:9
**microphone** [1] - 7:2
**mid** [1] - 3:10
**mid-proceedings** [1] - 3:10
**middle** [1] - 47:18
**might** [11] - 2:17, 3:10, 5:8, 23:8, 41:11, 46:15, 52:10, 68:14, 68:22, 87:19, 95:12
**mind** [3] - 9:10, 13:16, 15:2
**minds** [1] - 81:23
**minute** [2] - 28:9, 82:2
**minutes** [2] - 44:23, 67:9
**misrepresentation** [1] - 21:16
**miss** [1] - 18:14
**mistake** [1] - 15:11
**mistreated** [1] - 76:18
**misunderstood** [1] - 89:6
**moment** [4] - 14:21, 63:3, 70:7, 70:9
**money** [2] - 19:9, 19:10
**month** [2] - 11:23
**months** [5] - 65:19, 65:23, 72:5, 81:12, 103:4
**morning** [6] - 2:6, 2:18, 2:20, 7:9, 7:10, 67:17
**most** [4] - 28:18, 57:1, 64:9, 64:10
**mother** [5] - 19:13, 69:7, 84:9, 88:16
**motion** [13] - 23:18, 27:22, 28:5, 28:19, 70:20, 71:21, 72:18, 73:1, 73:4, 73:6, 73:8, 73:20, 101:7
**motions** [7] - 59:18, 71:8, 71:10, 72:6, 72:10, 72:11, 72:12
**Motz** [6] - 54:18, 63:19, 63:24, 63:25, 64:14, 96:14
**move** [1] - 27:13
**moving** [2] - 28:19, 30:7
**MR** [71] - 2:2, 2:14, 3:6, 3:9, 3:12, 3:14, 4:8, 4:16, 5:1, 5:13, 6:8, 22:12, 22:14, 22:22, 29:17, 34:15, 34:18, 34:21, 34:25, 35:8,

35:20, 35:22, 35:24, 36:5, 37:19, 37:21, 37:23, 37:25, 38:2, 43:14, 47:24, 48:8, 48:11, 49:1, 49:3, 49:9, 49:12, 49:15, 49:25, 50:2, 50:7, 50:15, 67:3, 67:5, 67:9, 67:12, 68:10, 68:18, 76:6, 76:22, 78:19, 82:3, 82:12, 82:14, 82:25, 92:16, 92:25, 97:12, 97:15, 99:20, 100:6, 100:21, 101:3, 101:11, 102:17, 102:22, 103:8, 104:3, 105:6, 105:8, 105:12
**MS** [37] - 2:6, 5:16, 5:19, 6:5, 6:10, 6:12, 6:17, 7:8, 7:18, 9:3, 9:24, 10:5, 11:19, 12:19, 13:9, 15:8, 18:17, 35:5, 35:13, 48:1, 48:9, 90:13, 93:4, 96:12, 99:22, 100:2, 100:4, 101:19, 101:23, 102:4, 102:7, 102:11, 103:10, 103:22, 105:5, 105:9, 105:11
**muffle** [1] - 18:10
**multiple** [6] - 32:5, 34:23, 36:18, 36:22, 36:24, 37:2
**murder** [149] - 3:23, 4:5, 6:1, 6:2, 12:4, 12:7, 12:11, 12:20, 12:24, 13:10, 13:15, 17:22, 17:25, 18:3, 18:5, 20:3, 20:25, 21:3, 21:5, 21:7, 21:14, 21:20, 21:25, 22:1, 22:4, 22:8, 22:17, 25:23, 26:16, 26:20, 27:2, 27:11, 28:24, 29:9, 29:24, 30:5, 30:9, 30:15, 30:19, 30:23, 31:21, 32:3, 32:7, 32:9, 32:22, 32:23, 32:24, 33:10, 33:12, 33:18, 33:22, 34:2, 36:18, 36:22, 37:4, 37:18, 38:10, 39:1, 39:5, 39:6, 39:15, 39:17, 39:22, 40:3, 40:7, 40:13, 40:15, 40:19, 41:5, 41:6, 41:10, 41:11, 41:13, 41:15, 41:17, 41:21, 42:3, 42:9, 42:11, 43:19, 44:20, 45:6, 46:7, 47:7, 48:6, 50:12, 50:22, 50:24, 50:25, 51:7, 51:17, 51:24, 52:10, 55:15, 56:4, 56:7, 56:9, 56:21, 56:22, 56:23, 56:24, 57:1, 57:6, 57:15,

57:20, 57:22, 58:5, 58:18, 61:1, 63:12, 63:17, 63:22, 64:24, 65:15, 66:19, 67:21, 69:12, 70:11, 70:21, 70:23, 71:6, 72:13, 74:2, 74:17, 75:13, 76:8, 77:6, 77:13, 78:22, 88:2, 88:6, 88:7, 89:7, 89:9, 89:13, 90:3, 90:15, 90:18, 91:3, 91:10, 93:18, 93:22, 96:17, 97:23, 98:4, 99:4, 99:7, 99:10
**murderer** [2] - 38:16, 38:18
**MURTHA** [2] - 82:17, 105:8
**Murtha** [24] - 2:16, 2:20, 18:21, 19:6, 19:11, 19:18, 19:21, 22:12, 22:24, 22:25, 66:25, 67:5, 81:21, 82:3, 82:9, 82:10, 82:15, 82:21, 83:1, 83:23, 87:18, 89:5, 90:14, 92:17
**must** [1] - 66:3

## N

**name** [15] - 4:19, 4:22, 4:25, 5:6, 5:7, 7:3, 12:14, 12:15, 12:18, 35:11, 43:1, 44:14, 66:8, 82:20, 94:17
**named** [1] - 45:13, 45:16, 69:4
**names** [1] - 43:22, 51:1, 84:2, 93:12, 93:13, 93:15, 93:16
**nature** [4] - 85:2, 86:1, 91:5
**near** [1] - 18:13
**nearly** [1] - 28:4
**necessary** [1] - 5:9
**need** [10] - 3:19, 18:12, 22:23, 50:10, 68:25, 94:17, 95:25, 100:19, 100:20, 102:25
**needed** [3] - 39:25, 91:14, 91:16
**needs** [1] - 81:24
**negotiate** [5] - 14:2, 15:14, 30:18, 30:24, 39:9
**negotiated** [4] - 31:13, 34:7, 38:21, 85:5
**negotiation** [1] - 32:8
**nephew** [1] - 88:8
**never** [39] - 13:17, 13:20, 22:15, 26:17,

26:20, 33:10, 40:10, 40:12, 40:25, 45:14, 47:3, 47:5, 47:8, 50:24, 51:19, 51:25, 52:1, 52:3, 55:25, 56:1, 57:5, 57:22, 70:5, 70:23, 71:16, 77:21, 77:22, 78:2, 78:10, 78:22, 78:23, 78:24, 78:25, 79:1, 79:2, 79:6, 79:17, 79:19
**newest** [1] - 59:15
**news** [2] - 3:22, 50:24
**next** [3] - 3:11, 6:9, 34:22
**nice** [3] - 4:2, 6:19, 43:10
**NO** [1] - 1:5
**nobody** [2] - 63:2, 74:16
**nol** [1] - 53:23
**none** [2] - 62:17, 87:23, 88:10
**Norman** [1] - 88:5
**norms** [1] - 31:6
**North** [1] - 7:14
**NORTHERN** [1] - 1:2
**notes** [32] - 28:1, 29:5, 29:7, 29:8, 29:10, 29:11, 29:13, 29:14, 29:15, 43:11, 43:12, 43:13, 46:9, 47:8, 48:22, 48:24, 49:19, 49:22, 50:9, 50:13, 50:16, 84:6, 85:19, 87:19, 90:5, 93:5, 93:6, 93:7, 93:12, 93:21, 93:25
**nothing** [9] - 24:4, 26:8, 30:8, 30:16, 45:9, 48:18, 73:25, 96:6, 99:20
**notice** [1] - 30:22
**notified** [4] - 63:24, 66:13, 67:19, 67:22
**notify** [2] - 66:16, 88:24
**notwithstanding** [1] - 74:7
**November** [5] - 11:24, 12:1, 29:1, 53:16, 56:5
**Novijiva** [1] - 43:3
**Novozhilov** [1] - 42:19
**nowhere** [3] - 72:17, 73:8, 73:20
**number** [13] - 9:23, 10:1, 20:16, 23:25, 28:22, 37:24, 50:17, 74:7, 80:9, 81:17, 86:10, 87:8
**Number** [3] - 2:3, 10:2, 16:3
**Number(s** [1] - 106:8
**numbers** [2] - 17:21,

20:20

## O

**oath** [26] - 24:15, 26:25, 27:1, 28:14, 32:13, 34:8, 38:22, 39:5, 55:19, 64:18, 64:20, 74:1, 74:14, 75:10, 75:11, 95:18, 95:20, 97:16, 98:14, 98:21, 98:24, 99:1, 99:6, 99:7, 99:8, 99:10
**object** [2] - 48:1, 48:9
**objection** [8] - 4:20, 5:15, 5:20, 6:5, 35:5, 35:12, 35:13, 47:25
**obtained** [1] - 27:21
**obviously** [3] - 43:16, 50:6, 85:3
**occasion** [2] - 85:24
**occasions** [1] - 37:2
**October** [6] - 9:12, 9:16, 9:17, 11:15, 13:23, 17:4
**OF** [2] - 1:1, 1:4
**offense** [5] - 7:24, 53:17, 84:23, 85:2, 91:4
**offenses** [2] - 53:25, 54:20
**offer** [6] - 9:11, 9:14, 15:24, 16:12, 23:22, 91:7
**offered** [3] - 16:9, 43:15, 91:7
**offers** [4] - 15:16, 15:18, 15:22, 15:23
**office** [13] - 10:25, 15:17, 16:21, 26:7, 50:21, 55:5, 57:25, 60:2, 62:11, 62:16, 81:2, 81:18, 84:14
**Office** [4] - 10:25, 16:21, 61:19, 83:7
**official** [1] - 106:11
**Official** [1] - 106:19
**officially** [1] - 6:13
**oftentimes** [1] - 86:25
**old** [3] - 16:16, 40:3, 53:5
**omit** [1] - 4:22
**once** [16] - 26:21, 29:7, 33:24, 34:4, 39:11, 41:13, 45:4, 45:17, 58:19, 65:5, 71:3, 74:10, 76:2, 78:2, 88:16, 98:6
**one** [56] - 3:12, 4:10, 5:2, 14:6, 14:8, 14:20, 14:21, 14:22, 19:11, 22:13, 30:20, 31:4, 31:11, 31:25, 32:1, 32:6,

32:10, 33:1, 37:6, 44:2, 44:12, 44:24, 45:2, 45:8, 46:7, 50:12, 50:16, 50:17, 52:23, 53:2, 57:5, 59:15, 59:16, 59:23, 61:17, 62:3, 65:14, 71:13, 72:3, 72:7, 75:24, 77:23, 80:12, 81:17, 85:23, 85:24, 86:18, 86:25, 93:16, 95:22, 97:25, 101:10, 101:14
**ones** [1] - 48:22
**ongoing** [3] - 89:7, 89:9, 90:19
**open** [1] - 74:14
**opinion** [4] - 19:3, 86:22, 88:21, 91:19
**opposite** [2] - 51:5, 58:17
**option** [1] - 32:11
**options** [16] - 31:18, 32:10, 32:19, 33:15, 33:24, 34:4, 39:12, 85:2, 95:8, 96:9, 97:24, 97:25, 98:2, 98:22, 99:12, 99:13
**oral** [2] - 103:7, 103:15
**order** [9] - 20:19, 20:20, 32:6, 32:11, 95:21, 101:22, 103:17, 103:21, 103:23
**originally** [1] - 4:3
**outcome** [1] - 85:4
**outside** [1] - 93:14
**own** [4] - 17:21, 26:21, 26:22, 47:6
**owned** [1] - 51:4

**P**

**p.m** [3] - 82:7, 82:8, 104:4
**package** [2] - 4:11, 30:18
**PAGE** [1] - 105:3
**page** [8] - 17:21, 28:22, 50:12, 50:16, 50:19, 64:2, 64:6, 64:7
**Page** [14] - 10:22, 16:19, 28:19, 29:21, 31:5, 31:11, 38:12, 59:22, 59:23, 62:9, 64:1, 64:4, 64:7
**pages** [1] - 106:10
**paid** [6] - 19:5, 23:4, 23:10, 46:11, 51:9, 84:16, 94:17
**panel** [2] - 59:4, 85:1
**paper** [1] - 69:21
**paperwork** [1] - 75:21
**Paragraph** [9] - 10:9,

10:22, 16:17, 17:3, 17:4, 17:8, 17:17, 59:22
**paragraph** [8] - 10:24, 11:8, 16:18, 24:18, 30:7, 45:5, 59:23, 62:9
**paragraphs** [2] - 17:5, 45:4
**paraphernalia** [1] - 53:19
**pardon** [1] - 35:21
**parents** [4] - 23:2, 51:3, 83:25, 85:4
**part** [29] - 4:17, 5:23, 6:14, 8:21, 23:22, 23:23, 24:2, 25:11, 25:15, 29:12, 29:23, 30:3, 30:11, 30:17, 31:1, 31:9, 31:16, 31:24, 32:8, 34:10, 36:13, 46:10, 47:23, 48:3, 48:6, 48:9, 48:18, 50:6, 81:3
**partially** [1] - 33:19
**particular** [1] - 18:24
**particularly** [1] - 48:15
**parties** [1] - 62:18
**passport** [1] - 54:8
**pattern** [1] - 88:11
**Paul** [3] - 1:16, 24:20, 25:20
**pause** [2] - 26:4, 67:4
**pawn** [3] - 42:20, 51:4, 51:6
**pen** [1] - 69:21
**penalties** [1] - 98:25
**penalty** [1] - 83:18
**pending** [1] - 91:2
**people** [27] - 13:11, 20:16, 20:22, 40:8, 41:1, 41:2, 41:7, 41:20, 41:23, 42:15, 42:16, 44:12, 51:16, 51:17, 79:2, 79:3, 79:5, 80:12, 80:24, 81:1, 83:12, 93:17, 93:19, 95:24, 96:1, 96:10, 97:16
**percentage** [1] - 87:1
**performance** [1] - 99:25
**perhaps** [1] - 100:11
**period** [1] - 80:20
**perjury** [1] - 98:25
**permission** [3] - 5:1, 47:21, 50:8
**person** [12] - 9:6, 12:14, 12:16, 12:18, 22:25, 41:15, 75:24, 84:10, 84:13, 90:22, 91:19, 94:17
**phone** [16] - 15:4, 20:20, 20:22, 66:17, 67:16, 67:18, 67:24, 69:14, 69:16, 70:3,

78:12, 78:14, 78:15, 80:7, 80:9
**photo** [1] - 36:12
**photograph** [1] - 36:12
**pick** [1] - 80:7
**pictures** [1] - 71:13
**Pikesville** [1] - 41:18
**place** [2] - 35:18, 51:7
**places** [4] - 3:2, 34:23, 78:20, 101:22
**plan** [3] - 81:11, 100:18, 103:17
**planning** [2] - 68:12, 100:25
**plastic** [1] - 18:10
**play** [3] - 50:12, 68:13, 68:15
**played** [1] - 67:24
**playing** [2] - 68:13, 68:17
**plays** [1] - 37:7
**plea** [126] - 9:11, 9:14, 9:20, 10:7, 10:17, 10:20, 11:4, 11:9, 11:12, 11:18, 11:20, 11:21, 13:22, 12:23, 13:24, 14:1, 14:2, 14:4, 14:11, 14:18, 14:20, 15:5, 15:10, 15:12, 15:14, 15:24, 15:25, 16:1, 16:8, 16:9, 16:12, 16:13, 16:25, 17:4, 18:18, 18:20, 18:25, 19:2, 19:4, 19:23, 20:11, 23:11, 27:10, 27:19, 30:24, 30:25, 31:3, 31:8, 31:14, 31:17, 31:22, 31:23, 32:15, 32:21, 33:2, 33:4, 33:9, 33:12, 34:8, 34:15, 35:16, 37:11, 38:21, 39:10, 47:18, 50:23, 51:2, 52:5, 52:19, 54:22, 54:24, 54:25, 55:16, 55:18, 56:12, 57:5, 57:6, 57:14, 57:16, 57:23, 57:25, 58:14, 58:15, 58:24, 59:11, 59:14, 59:16, 59:19, 62:13, 63:9, 64:1, 64:10, 64:11, 64:12, 64:13, 64:21, 70:21, 71:5, 71:8, 71:20, 71:21, 73:1, 73:6, 73:9, 73:20, 74:5, 84:24, 85:5, 85:12, 85:14, 86:1, 86:8, 89:23, 90:25, 91:5, 91:10, 92:2, 95:3, 95:10, 95:18, 96:21, 97:1, 97:8
**plead** [23] - 19:4, 19:24, 24:19, 25:18, 32:8, 32:12, 32:22, 34:16,

38:22, 38:25, 39:4, 54:5, 54:23, 55:1, 55:8, 55:23, 74:13, 95:2, 96:10, 96:19, 98:4, 98:13, 98:23
**pleading** [10] - 8:15, 10:14, 10:20, 17:13, 20:2, 22:6, 31:15, 65:13, 97:25, 98:24
**pleadings** [2] - 37:6, 37:10, 69:22, 72:17, 73:14, 73:19
**pleas** [1] - 39:1
**pled** [26] - 20:1, 20:6, 22:4, 22:8, 22:15, 25:22, 26:17, 27:3, 32:17, 33:10, 33:22, 34:2, 35:14, 53:14, 53:22, 54:15, 55:13, 55:24, 56:7, 58:4, 74:1, 96:13, 96:20, 97:20, 97:22
**plenty** [1] - 96:10
**plus** [2] - 83:6, 103:3
**point** [12] - 7:15, 7:19, 18:4, 27:14, 27:18, 36:25, 44:19, 58:16, 85:6, 85:12, 94:4, 96:7
**police** [1] - 79:19
**poor** [1] - 39:13
**portion** [3] - 4:24, 30:21
**portions** [2] - 3:18, 4:12
**position** [1] - 88:24
**possession** [1] - 53:18
**possibilities** [1] - 5:2
**possibility** [3] - 23:9, 31:20, 98:6
**possible** [2] - 13:18, 77:6
**possibly** [10] - 13:13, 28:24, 34:9, 34:10, 41:8, 42:15, 66:17, 66:21, 93:20
**post** [8] - 34:11, 35:15, 35:25, 36:8, 36:14, 36:16, 69:25, 100:12
**post-ECI** [1] - 69:25
**post-hearing** [1] - 100:12
**posted** [1] - 35:10
**posting** [2] - 35:3, 35:18
**potential** [2] - 83:16, 89:16
**potentially** [1] - 4:10
**power** [1] - 24:9
**practice** [2] - 83:3, 84:8
**practiced** [2] - 65:9, 83:21
**practicing** [2] - 83:4, 86:21
**precluded** [2] - 30:25,

31:22
**precluding** [1] - 31:13
**preferences** [1] - 101:16
**preparation** [3] - 27:22, 27:25, 44:20
**prepared** [1] - 100:2
**present** [6] - 2:7, 9:11, 9:14, 46:14, 51:9, 81:6
**presented** [3] - 95:24, 98:7, 98:10
**presenting** [1] - 98:7
**presume** [1] - 81:20
**pretty** [5] - 50:11, 75:2, 76:11, 76:12, 76:14
**prevailing** [1] - 31:6
**previously** [4] - 9:21, 9:25, 100:8
**PREVIOUSLY** [1] - 93:2
**primary** [1] - 91:18
**prime** [1] - 26:11
**prison** [5] - 7:11, 7:13, 20:17, 95:15
**private** [3] - 38:14, 39:24, 87:16
**pro** [1] - 72:23
**probability** [1] - 31:12
**probation** [1] - 55:10
**proceed** [3] - 15:7, 86:14, 86:17
**proceeding** [3] - 85:5, 87:14, 95:18
**Proceedings** [2] - 82:8, 104:4
**proceedings** [11] - 2:1, 3:10, 3:15, 5:5, 24:2, 26:4, 29:23, 67:4, 68:24, 106:7, 106:11
**processed** [1] - 53:23
**produce** [1] - 87:7
**profess** [2] - 36:21, 37:3
**professes** [1] - 34:25
**promise** [6] - 56:11, 57:20, 64:22, 64:23, 65:14, 71:2, 72:18, 76:8, 79:12
**promised** [8] - 64:15, 69:13, 70:24, 71:17, 73:10, 75:12, 79:12, 99:9
**promises** [5] - 61:11, 62:11, 62:15, 64:21, 65:11
**proof** [1] - 86:6
**proper** [3] - 33:13, 33:25, 34:5
**properly** [1] - 30:14, 98:16
**proposed** [1] - 89:23
**prosecute** [10] - 20:3,

22:8, 30:11, 52:10, 58:23, 59:9, 71:2, 77:8, 96:17, 99:10
**prosecuted** [10] - 22:3, 36:22, 36:24, 56:9, 56:22, 57:16, 64:23, 75:13, 76:10, 76:20
**prosecution** [14] - 21:9, 24:21, 25:21, 25:23, 30:25, 31:8, 31:13, 31:22, 57:13, 58:3, 71:16, 73:10, 73:22, 74:25
**prosecutions** [12] - 10:19, 10:21, 11:11, 16:16, 17:11, 17:14, 20:4, 58:25, 61:22, 75:5, 97:6, 97:7
**prosecutor** [1] - 83:6
**prove** [5] - 40:10, 47:3, 50:25, 52:2, 78:25
**proven** [1] - 38:15
**provide** [11] - 4:2, 24:20, 25:19, 43:10, 51:22, 51:25, 85:8, 86:13, 86:16, 93:15, 93:22
**provided** [16] - 4:9, 4:11, 11:3, 14:14, 16:24, 17:24, 18:2, 18:7, 29:6, 29:11, 33:16, 33:19, 46:24, 47:1, 77:3, 81:9
**provides** [1] - 59:4
**providing** [1] - 88:21
**public** [3] - 4:24, 5:11, 5:12
**publicly** [2] - 4:22, 35:24
**pull** [1] - 64:2
**pulled** [1] - 81:8
**purpose** [4] - 23:18, 43:15, 48:2, 65:20
**purposes** [2] - 28:17, 29:20
**pursuant** [2] - 11:3, 16:25
**pursue** [8] - 11:1, 16:22, 21:8, 30:25, 33:2, 51:2, 60:7, 61:20
**pursued** [1] - 32:21
**pursuing** [1] - 31:2, 57:25
**put** [15] - 5:17, 5:19, 5:21, 8:19, 8:22, 9:25, 63:2, 69:25, 70:1, 74:4, 77:10, 87:4, 87:5, 94:5, 96:25
**puts** [1] - 50:9, 103:4
**putting** [2] - 26:1, 49:19

**Q**

**Quarry** [1] - 45:7
**questioned** [3] - 49:3, 79:11, 81:2
**questions** [8] - 22:11, 49:10, 62:4, 65:3, 91:15, 92:14, 97:11, 103:13
**quick** [1] - 81:24
**quickly** [1] - 47:6
**quite** [5] - 43:18, 69:22, 69:24, 86:21, 101:15

**R**

**raise** [4] - 6:21, 21:20, 77:6, 82:16
**raised** [2] - 12:4, 73:12
**reach** [2] - 85:6, 103:1
**reached** [1] - 87:18
**reaction** [1] - 21:2
**read** [35] - 16:18, 17:17, 24:17, 24:18, 26:2, 30:22, 45:4, 46:20, 46:21, 47:10, 47:14, 47:17, 47:21, 50:5, 50:8, 50:9, 51:22, 59:14, 59:20, 59:25, 60:4, 60:5, 60:16, 60:19, 60:23, 61:8, 62:10, 62:19, 62:20, 64:5, 75:15, 75:16, 76:4, 76:17, 103:13
**reading** [3] - 45:1, 48:2, 51:21
**ready** [2] - 82:6, 92:23
**real** [3] - 31:20, 38:16, 38:18
**realize** [2] - 32:5, 32:6
**really** [7] - 18:22, 28:12, 47:5, 48:9, 56:1, 68:13, 70:2
**reason** [5] - 3:2, 5:7, 65:20, 88:7, 102:25
**reasonable** [1] - 31:12
**reasoning** [1] - 101:16
**recalled** [1] - 88:11
**receive** [1] - 95:4
**received** [3] - 31:14, 102:18, 103:20
**receives** [1] - 11:3, 16:24
**recent** [2] - 28:13, 28:19
**recess** [5] - 81:25, 82:2, 82:6, 82:7, 104:2
**recognize** [1] - 43:22
**recollection** [6] - 86:8, 86:11, 89:20, 91:9, 92:2,

92:4
**recommend** [3] - 10:17, 11:12, 14:22
**recommended** [2] - 87:15, 92:6
**record** [17] - 4:17, 6:14, 6:15, 18:8, 23:17, 23:22, 24:2, 29:19, 29:22, 43:7, 45:18, 63:16, 63:25, 69:5, 73:8, 82:20, 96:8
**recorded** [7] - 66:9, 68:7, 78:13, 78:14, 80:17, 80:23, 106:6
**recording** [9] - 35:3, 35:10, 36:16, 36:18, 36:19, 36:21, 37:2, 37:3, 37:7
**records** [1] - 67:14
**recovered** [1] - 53:9
**recross** [1] - 97:13
**RECROSS** [2] - 97:14, 105:12
**redact** [2] - 4:24, 5:5
**redacted** [16] - 3:17, 3:19, 4:3, 4:12, 5:4, 5:14, 5:21, 5:24, 43:9, 47:15, 48:3, 49:6, 49:13, 49:24, 50:6, 94:8
**redacting** [1] - 49:18
**redaction** [1] - 49:7
**redactions** [2] - 5:8, 49:22
**REDIRECT** [2] - 93:3, 105:11
**redirect** [4] - 62:7, 81:22, 92:15, 92:24
**reference** [6] - 3:15, 5:6, 51:3, 56:21, 57:19, 63:15
**referenced** [4] - 50:17, 57:6, 78:8, 84:13
**references** [1] - 48:22
**referencing** [2] - 12:3, 29:14, 49:19, 59:22, 83:19
**referred** [1] - 55:3
**reflect** [1] - 43:7
**reflects** [1] - 69:1
**refrained** [1] - 50:18
**refresh** [2] - 48:25, 86:8
**refused** [1] - 15:9
**regard** [2] - 86:22, 89:25
**regarding** [1] - 30:9
**regards** [9] - 13:11, 21:15, 32:15, 33:11, 58:10, 60:9, 75:4, 76:19, 76:23
**regularly** [3] - 69:22, 69:24, 83:21

**Reisterstown** [2] - 12:12, 51:4
**rejected** [1] - 15:18
**relate** [6] - 2:23, 3:20, 3:24, 4:4, 72:13
**related** [5] - 2:4, 44:24, 45:2, 53:17, 53:25
**relates** [2] - 49:13, 63:16
**relating** [13] - 3:22, 23:11, 23:13, 23:21, 25:1, 29:8, 58:5, 59:24, 63:22, 71:23, 77:21, 80:24, 87:20
**relationship** [3] - 42:17, 45:22, 84:12
**relay** [1] - 88:15
**relevance** [1] - 35:13
**relevant** [8] - 36:4, 36:6, 43:16, 48:10, 48:12, 48:15, 49:18, 68:14
**reliance** [1] - 96:25
**remain** [2] - 4:18, 82:16
**remainder** [1] - 4:3
**remaining** [1] - 47:21
**remember** [21] - 7:23, 11:21, 11:22, 12:5, 45:1, 49:7, 49:10, 49:14, 51:9, 52:19, 53:6, 53:10, 66:14, 66:15, 66:20, 66:21, 75:23, 76:2, 85:18, 89:15, 89:21
**removed** [1] - 20:22
**removes** [1] - 5:6
**repay** [1] - 19:10
**repeat** [4] - 21:22, 25:13, 35:6, 52:8
**replace** [1] - 19:16, 19:21
**replacement** [1] - 91:24
**replies** [4] - 102:19, 103:4, 103:6, 103:20
**reply** [1] - 100:13
**Reported** [1] - 1:22
**Reporter** [1] - 106:19
**REPORTER** [1] - 50:14
**reporter** [1] - 42:21
**REPORTER'S** [1] - 106:4
**represent** [5] - 19:8, 88:13, 96:8, 98:16, 98:23
**representation** [5] - 21:21, 28:1, 33:25, 34:5, 39:13
**representations** [4] - 11:4, 16:25, 59:12, 61:7
**represented** [8] - 8:2, 21:5, 71:5, 73:4, 74:24, 84:25, 86:20, 87:16
**representing** [2] -

70:24, 83:12
**represents** [3] - 10:25, 16:21, 60:2
**request** [2] - 100:20, 103:15
**required** [1] - 32:8
**research** [1] - 14:17
**resolution** [2] - 32:17, 86:22
**resolve** [4] - 32:2, 32:7, 33:21, 84:25
**resolving** [1] - 32:22
**resources** [1] - 87:3
**respect** [8] - 11:4, 17:1, 61:7, 86:20, 88:19, 88:24, 88:25, 92:12
**response** [2] - 8:18, 48:11
**rest** [3] - 4:23, 6:1, 46:9
**result** [1] - 87:7
**resume** [2] - 82:8, 92:23
**resuming** [1] - 104:1
**retain** [4] - 19:6, 19:21, 87:15
**retained** [2] - 84:17, 84:20
**review** [9] - 4:21, 8:9, 8:13, 9:5, 86:1, 86:3, 87:10, 91:5
**reviewed** [4] - 9:9, 57:4, 85:14, 86:9
**reviewing** [4] - 44:21, 57:14, 90:24, 92:3
**risky** [1] - 23:16
**river** [2] - 46:22, 46:23
**Road** [3] - 12:12, 12:13, 51:4
**robberies** [1] - 61:4
**robbery** [22] - 7:22, 21:14, 22:4, 22:7, 22:9, 30:19, 32:3, 32:7, 41:21, 42:8, 44:3, 53:4, 53:6, 53:9, 54:19, 55:11, 56:8, 89:22, 89:25, 96:13, 96:17, 96:19
**robbery/kidnapping** [1] - 52:11
**Robert** [6] - 8:3, 39:14, 57:4, 69:11, 69:14, 70:5
**role** [1] - 91:1
**romantic** [2] - 45:21, 79:17
**room** [1] - 39:24
**roughly** [1] - 84:5
**round** [1] - 101:10
**rounds** [1] - 101:10
**RPR** [1] - 1:23
**Ruder** [15] - 32:13, 32:18, 33:4, 34:8, 37:4, 37:13, 38:18, 38:23,

40:20, 41:1, 41:22, 42:17, 74:2, 74:7, 88:8
**Ruder's** [1] - 12:17
**rumors** [4] - 40:23, 41:2, 41:3, 41:4
**rush** [1] - 67:5
**Russian** [1] - 51:11

## S

**S-T-A-N-I-S-L-A-V** [1] - 7:4
**sad** [1] - 88:18
**sat** [1] - 65:20
**save** [6] - 95:25, 97:17, 98:14, 99:13, 99:15, 101:9
**saves** [2] - 100:14, 101:14
**saw** [2] - 19:2, 66:25
**schedule** [3] - 3:1, 67:1, 102:24
**scheduled** [1] - 11:21
**scheduling** [2] - 2:19, 67:7
**screen** [3] - 29:19, 93:11, 94:5
**screen's** [1] - 24:9
**scuba** [1] - 45:9
**se** [1] - 72:23
**seal** [3] - 4:18, 5:3, 5:13
**sealed** [3] - 4:23, 62:12, 62:17
**searched** [1] - 87:23
**seat** [3] - 2:9, 7:1, 82:19
**seated** [1] - 18:13
**second** [13] - 16:8, 16:9, 22:13, 22:23, 23:16, 24:18, 30:7, 31:25, 54:25, 57:5, 86:22, 88:21, 91:19
**seconds** [1] - 67:1
**see** [26] - 4:13, 9:5, 17:5, 24:4, 29:1, 29:15, 36:10, 39:24, 43:22, 45:25, 46:1, 46:12, 46:13, 46:22, 47:24, 48:1, 48:21, 51:3, 52:17, 64:1, 72:5, 81:23, 81:24, 82:9, 84:18, 91:23
**seek** [3] - 10:16, 31:8, 33:9
**seeking** [2] - 19:16, 58:6
**seeming** [1] - 34:19
**sense** [1] - 86:5
**sent** [3] - 47:11, 77:16, 78:6
**sentence** [15] - 10:17, 11:3, 14:23, 16:24, 20:9, 24:18, 25:18, 31:15, 55:12, 61:6, 65:14, 77:6, 77:13, 77:16, 98:5
**sentenced** [9] - 20:7, 55:8, 55:21, 74:23, 75:16, 76:16, 76:18, 95:5, 96:17
**sentencing** [11] - 20:14, 65:23, 74:25, 75:10, 75:11, 75:15, 76:5, 76:9, 77:6, 77:10, 101:11
**separately** [1] - 31:15
**September** [1] - 27:13
**serious** [2] - 57:2
**seriously** [1] - 92:13
**seriousness** [1] - 91:4
**served** [3] - 80:25, 88:4, 88:5
**services** [1] - 84:17
**set** [3] - 23:2, 62:16, 103:14
**setting** [1] - 22:24
**several** [7] - 15:16, 38:15, 45:22, 46:3, 72:11, 79:20
**sexually** [1] - 45:23
**shock** [1] - 65:25
**shocked** [1] - 21:4
**shocking** [1] - 67:21
**shop** [3] - 42:20, 51:4, 51:6
**shortly** [2] - 20:23, 55:22
**shot** [4] - 32:13, 33:4, 74:8, 74:9
**show** [7] - 9:21, 16:2, 23:15, 25:25, 28:7, 28:8, 43:4
**showed** [4] - 14:21, 30:13, 48:23, 93:6
**shown** [3] - 37:7, 48:25, 49:6
**shows** [2] - 36:13, 69:2
**sic** [1] - 31:6
**sic)** [1] - 53:23
**Sicilia** [4] - 1:18, 2:6, 47:12, 50:10
**side** [3] - 19:14, 43:22, 48:20
**sides** [1] - 100:13
**sign** [1] - 14:13
**signature** [3] - 24:15, 28:20, 106:14
**signed** [19] - 14:12, 14:20, 14:22, 15:24, 16:9, 23:12, 28:5, 28:10, 28:14, 54:22, 54:25, 55:15, 58:14, 60:13, 60:17, 62:18, 62:20, 64:21, 73:24
**significance** [1] - 89:16
**significant** [2] - 50:9, 83:14
**signing** [3] - 11:20, 11:25, 61:9
**simply** [3] - 5:7, 91:3, 91:4
**simultaneous** [8] - 100:12, 100:13, 101:8, 102:12, 102:16, 102:20, 103:19, 103:20
**simultaneously** [1] - 103:2
**sitting** [1] - 65:13
**situation** [2] - 81:21, 88:18
**six** [1] - 8:1
**skin** [5] - 95:25, 97:17, 98:15, 99:14, 99:15
**slow** [1] - 50:14
**slower** [1] - 43:2
**social** [1] - 31:6
**sometime** [1] - 86:21
**sometimes** [3] - 38:24, 41:3, 95:24
**somewhere** [2] - 66:13, 66:14
**son** [1] - 88:18
**songs** [1] - 71:14
**soon** [1] - 82:5
**sorry** [25] - 3:12, 4:8, 8:21, 14:7, 14:20, 21:22, 22:14, 24:5, 25:13, 35:22, 36:25, 37:15, 47:13, 50:16, 52:13, 56:7, 59:23, 64:2, 64:7, 73:3, 75:10, 76:8, 86:16, 94:6, 102:17
**sort** [3] - 56:13, 56:23, 86:14
**sought** [2] - 31:13, 31:21
**sound** [2] - 18:11, 84:2
**source** [2] - 46:19, 47:9
**speaking** [4] - 7:2, 29:7, 86:19, 89:21
**specific** [5] - 18:21, 49:10, 62:5, 85:20, 88:11
**specifically** [8] - 4:12, 4:18, 18:20, 49:12, 57:6, 58:12, 84:6, 92:10
**spell** [3] - 7:3, 42:22, 82:20
**spending** [1] - 19:9
**spread** [1] - 41:2
**stand** [8] - 6:13, 6:21, 8:20, 8:22, 63:11, 63:15, 82:6, 104:1
**standard** [1] - 100:1
**standing** [1] - 82:16
**Stanislav** [5] - 2:3, 7:4, 40:4, 83:24, 85:16
**stanislav** [1] - 106:8
**STANISLAV** [5] - 1:6, 6:23, 93:2, 105:5, 105:11
**stark** [1] - 100:23
**start** [5] - 43:21, 52:25, 53:2, 93:5, 101:17
**started** [1] - 83:10
**starting** [5] - 47:24, 64:3, 64:5, 64:8, 102:23
**state** [7] - 7:3, 37:11, 45:17, 53:7, 82:20, 83:12, 87:6
**State** [1] - 83:4
**State's** [5] - 10:25, 16:21, 60:3, 61:19, 83:7
**statement** [1] - 25:14
**statements** [2] - 44:22, 95:18
**STATES** [2] - 1:1, 1:4
**States** [2] - 2:2, 54:8
**stating** [1] - 26:5
**stenographically** [1] - 106:7
**step** [1] - 99:23
**STEVEN** [1] - 1:6
**Steven** [3] - 83:25, 84:21, 106:8
**stick** [1] - 92:6
**stifling** [1] - 87:8
**still** [7] - 18:14, 20:2, 22:7, 33:19, 35:25, 36:12, 103:2
**stipulated** [3] - 74:4, 87:10, 87:11
**stipulation** [9] - 11:2, 16:23, 17:19, 17:20, 59:25, 60:12, 60:13, 60:22, 87:25
**stipulations** [1] - 17:23
**store** [1] - 12:18
**story** [1] - 79:13
**Street** [1] - 1:24
**strip** [1] - 51:4
**strong** [1] - 30:10
**student** [1] - 51:12
**study** [1] - 97:4
**style** [3] - 64:24, 74:1, 74:6
**subject** [1] - 17:14
**submission** [1] - 103:6
**submissions** [5] - 100:12, 100:15, 103:10, 103:11, 103:16
**submit** [3] - 5:10, 5:14, 68:25
**submitted** [2] - 68:24, 100:8
**subpoenas** [1] - 80:25
**subsequently** [2] - 33:16, 65:17
**substance** [1] - 50:4
**substantively** [1] - 83:11
**subtract** [1] - 69:15
**sufficient** [1] - 103:11
**suggest** [4] - 34:19, 100:10, 100:12, 102:15
**suggested** [2] - 2:16, 101:6
**summary** [1] - 85:9
**summer** [1] - 4:2
**supersedes** [1] - 62:10
**supplement** [2] - 62:12, 62:17
**supplemental** [4] - 100:22, 102:6, 103:6, 103:19
**supplemented** [1] - 64:13
**support** [1] - 28:5
**supposed** [2] - 65:4, 76:10
**surgical** [1] - 5:4
**surprise** [1] - 67:20
**surprised** [2] - 21:4, 65:25
**suspect** [2] - 40:4, 90:22
**swear** [1] - 6:20
**swearing** [1] - 28:14
**swore** [2] - 28:25, 99:1
**SWORN** [3] - 6:23, 82:17, 93:2

## T

**tactfully** [1] - 48:16
**talks** [1] - 81:1
**target** [1] - 26:11
**targeting** [1] - 90:21
**techniques** [1] - 87:4
**telephone** [1] - 85:8
**term** [1] - 62:20
**terms** [6] - 2:19, 3:3, 15:21, 16:11, 86:25, 87:14
**terrible** [1] - 37:1
**testified** [10] - 19:20, 26:25, 27:1, 52:13, 56:15, 59:20, 65:24, 70:20, 73:17, 73:19
**testify** [8] - 2:18, 42:1, 57:9, 79:2, 79:6, 79:9, 79:18, 81:21
**testifying** [1] - 90:16
**testimonies** [2] - 9:2,

81:9

**TESTIMONY** [1] - 105:11

**testimony** [45] - 2:11, 2:22, 9:1, 14:16, 26:22, 32:16, 38:20, 40:24, 44:22, 44:24, 45:1, 45:2, 45:6, 45:8, 47:6, 52:9, 52:18, 56:6, 57:22, 58:4, 58:8, 58:16, 58:20, 58:21, 58:23, 59:1, 59:9, 59:12, 62:23, 66:1, 66:3, 75:6, 75:9, 75:11, 76:24, 78:2, 78:21, 78:24, 79:16, 80:15, 82:11, 92:17, 96:3, 100:9

**THE** [172] - 1:1, 1:1, 2:5, 2:8, 3:5, 3:7, 3:11, 3:13, 4:7, 4:14, 4:20, 5:11, 5:15, 5:18, 6:3, 6:6, 6:9, 6:11, 6:15, 6:19, 6:21, 6:24, 6:25, 7:4, 7:6, 7:16, 7:17, 8:21, 8:22, 8:23, 8:24, 9:13, 9:15, 9:17, 9:23, 10:4, 11:15, 11:17, 12:15, 12:17, 13:1, 13:2, 13:3, 13:4, 13:5, 13:6, 13:7, 13:8, 14:4, 14:6, 14:7, 14:8, 14:9, 14:10, 14:12, 14:13, 14:19, 14:24, 14:25, 15:3, 15:6, 15:7, 16:5, 17:16, 17:24, 18:1, 18:2, 18:4, 18:6, 18:8, 18:15, 18:16, 22:13, 22:15, 22:19, 22:20, 24:6, 24:8, 29:13, 29:15, 34:12, 34:17, 34:19, 34:24, 35:6, 35:12, 35:17, 35:21, 35:23, 36:2, 37:18, 37:20, 37:22, 37:24, 38:1, 43:13, 47:23, 47:25, 48:24, 49:2, 49:7, 49:10, 49:14, 49:23, 50:1, 50:3, 50:14, 52:8, 62:3, 64:6, 67:2, 67:7, 67:11, 68:9, 68:16, 75:22, 75:24, 76:2, 76:15, 76:16, 78:18, 81:24, 82:5, 82:9, 82:13, 82:16, 82:18, 82:19, 82:21, 82:23, 86:15, 89:5, 89:8, 89:11, 89:14, 89:15, 89:18, 89:19, 89:20, 89:24, 89:25, 90:1, 90:4, 90:8, 90:10, 90:11, 92:15, 92:17, 92:19, 92:20, 92:22, 92:23, 95:17, 95:23, 97:13, 99:21, 99:23, 100:3, 100:5,

100:10, 101:2, 101:9, 101:14, 101:21, 101:24, 102:5, 102:10, 102:12, 102:19, 103:3, 103:12, 103:23

**theory** [1] - 36:7

**therefore** [1] - 14:18

**thereto** [1] - 16:24

**thick** [1] - 50:11

**thinking** [3] - 23:19, 65:14, 65:16

**thirty** [3] - 20:10, 102:4, 102:5

**three** [7] - 15:22, 15:23, 68:10, 102:2, 102:20, 102:21

**threw** [1] - 45:6

**throughout** [1] - 71:5

**timing** [3] - 2:19, 67:8, 81:20

**today** [27] - 4:9, 5:5, 23:21, 28:6, 29:21, 30:12, 31:1, 31:9, 32:16, 33:8, 33:17, 37:16, 38:20, 40:24, 47:14, 52:4, 58:8, 59:7, 64:24, 75:6, 75:11, 76:24, 89:3, 94:13, 99:8, 100:2, 100:8

**together** [1] - 62:12

**took** [11] - 11:9, 15:25, 29:10, 35:17, 50:24, 51:7, 51:8, 81:12, 97:8, 99:1, 99:8

**top** [5] - 4:11, 31:5, 31:11, 37:25, 64:8

**topic** [1] - 31:6

**tossed** [2] - 46:22, 46:23

**touch** [1] - 103:13

**toward** [1] - 49:4

**Training** [1] - 20:18

**transcribed** [1] - 106:11

**transcript** [14] - 6:13, 6:15, 75:13, 100:18, 101:20, 101:22, 102:2, 102:5, 102:9, 102:18, 103:5, 103:18, 103:20, 106:11

**transcripts** [2] - 23:25, 76:3

**trial** [32] - 8:8, 8:19, 8:23, 14:11, 15:7, 15:11, 22:10, 22:16, 31:25, 32:20, 52:6, 52:10, 52:14, 53:12, 53:16, 53:20, 54:3, 54:13, 55:17, 55:20, 55:25, 56:1, 56:2, 74:15, 80:14, 85:5, 87:1, 87:7, 96:7, 96:20, 96:24, 102:24

**trials** [1] - 96:9

**triangle** [2] - 46:11

**tried** [5] - 18:21, 19:15, 48:16, 83:16, 83:18

**trouble** [1] - 18:11

**true** [10] - 14:18, 28:15, 28:25, 34:10, 35:2, 35:8, 37:13, 40:17, 60:20, 98:21

**truly** [1] - 97:3

**trust** [1] - 59:3

**trusted** [7] - 59:1, 59:9, 59:12, 62:23, 62:24, 63:5

**truth** [3] - 98:25, 99:15, 99:17

**truthfully** [1] - 65:3

**try** [4] - 15:12, 64:4, 70:1, 70:2

**trying** [6] - 28:7, 42:12, 54:7, 62:5, 99:13, 99:15

**Tuesday** [1] - 1:10

**turn** [4] - 10:9, 10:22, 16:17, 23:14

**turned** [2] - 24:9, 51:15

**twice** [2] - 62:22, 88:17

**two** [23] - 5:2, 17:5, 28:4, 28:9, 45:6, 65:19, 65:23, 72:5, 80:23, 85:13, 91:14, 93:16, 101:10, 102:2, 102:13, 102:20, 102:21, 103:3, 103:4, 103:5, 103:10, 104:1

**type** [1] - 83:16

# U

**U.S** [1] - 1:23

**ultimately** [2] - 51:14, 59:16

**uncharged** [1] - 50:19

**uncle** [1] - 84:11

**uncle's** [1] - 88:9

**unclear** [2] - 90:5, 90:17

**under** [40] - 2:4, 4:18, 5:3, 5:13, 10:20, 11:5, 13:23, 17:2, 17:13, 19:4, 24:15, 26:25, 27:1, 28:14, 28:19, 32:13, 33:3, 34:2, 34:8, 38:22, 39:5, 44:9, 53:24, 55:18, 61:8, 64:18, 64:20, 74:1, 74:14, 75:10, 75:11, 95:18, 95:20, 97:16, 98:14, 98:20, 98:21, 98:25, 99:8

**underlying** [1] - 91:6

**underneath** [5] - 45:12, 45:24, 46:14, 46:20,

62:19

**understandings** [2] - 62:11, 62:15

**understood** [4] - 18:9, 22:18, 61:14, 91:1

**undertakings** [1] - 62:15

**unindicted** [15] - 8:25, 12:9, 14:15, 40:8, 41:7, 41:20, 42:2, 42:8, 42:16, 44:18, 79:5, 79:9, 80:16, 93:13, 96:22

**UNITED** [2] - 1:1, 1:4

**United** [2] - 2:2, 54:8

**unless** [1] - 62:17

**unredacted** [5] - 4:15, 43:9, 50:2, 94:11, 94:14

**up** [34] - 2:23, 5:18, 15:24, 18:12, 18:13, 22:24, 23:2, 24:4, 24:8, 24:10, 24:11, 33:1, 37:25, 49:16, 51:14, 57:22, 63:11, 63:15, 64:2, 65:4, 71:18, 73:1, 74:21, 77:16, 80:7, 87:2, 90:14, 93:11, 94:5, 95:25, 101:2, 101:3, 103:14

**US** [2] - 55:12, 87:1

**USA** [1] - 106:7

# V

**vacate** [1] - 37:10

**vacating** [1] - 27:19

**vague** [6] - 12:14, 13:16, 18:6, 26:22, 49:2, 73:16

**vaguely** [3] - 76:4, 76:19, 76:23

**verbally** [1] - 60:25

**verses** [1] - 71:14

**version** [6] - 4:15, 5:3, 5:14, 94:8, 94:11, 94:14

**versus** [1] - 2:3

**victim** [1] - 88:8

**view** [2] - 59:7, 100:24

**viewing** [1] - 4:1

**violated** [2] - 55:11, 99:6

**violation** [4] - 55:10, 55:12, 73:10, 73:22

**violent** [3] - 51:19, 83:15, 83:16

**visit** [10] - 8:12, 12:1, 12:3, 23:1, 23:10, 66:17, 66:18, 67:15, 67:18, 69:2

**visitor** [2] - 69:2, 82:10

**visits** [2] - 67:15, 69:8

**vivid** [1] - 84:9

**voice** [5] - 5:18, 18:13, 35:10, 36:16, 68:1

**volunteer** [1] - 103:21

**Voskovsky's** [1] - 81:7

# W

**wait** [7] - 14:12, 22:13, 67:6, 75:22, 75:24, 103:1

**Wait** [1] - 75:22

**waiting** [1] - 81:23

**Waldman** [138] - 2:12, 2:24, 3:18, 3:21, 8:3, 8:4, 8:6, 8:15, 9:4, 9:11, 9:13, 10:11, 10:19, 11:7, 11:12, 11:16, 11:25, 12:4, 12:17, 12:20, 12:23, 13:10, 13:14, 13:19, 14:2, 15:1, 15:14, 16:11, 17:10, 17:25, 18:3, 18:20, 19:16, 19:21, 20:1, 20:13, 20:23, 21:19, 21:24, 22:6, 22:17, 24:20, 25:19, 26:5, 26:12, 26:20, 26:21, 28:1, 28:23, 30:8, 30:9, 30:14, 30:18, 30:22, 30:23, 31:2, 31:7, 32:1, 32:25, 33:1, 39:9, 39:11, 39:15, 40:24, 41:5, 41:19, 41:24, 42:1, 42:7, 43:9, 43:17, 43:18, 46:24, 47:1, 47:2, 47:10, 48:4, 48:5, 48:25, 49:4, 49:20, 51:20, 51:23, 52:14, 56:3, 56:19, 57:4, 58:4, 58:12, 58:21, 59:1, 59:6, 61:13, 61:16, 62:2, 62:6, 62:24, 62:25, 63:11, 65:5, 69:12, 69:14, 69:19, 70:1, 70:5, 75:4, 76:11, 79:17, 80:14, 81:3, 84:25, 85:6, 86:6, 86:21, 87:17, 88:20, 90:6, 91:8, 91:18, 91:24, 92:6, 92:11, 93:15, 93:17, 93:23, 93:25, 94:2, 94:6, 94:19, 94:21, 94:23, 94:25, 96:25, 97:6, 99:2, 99:3, 99:9, 99:25

**Waldman's** [15] - 5:22, 12:9, 21:15, 27:22, 29:5, 29:14, 43:11, 43:13, 47:6, 48:15, 59:12, 63:4, 78:21, 92:9, 93:7

**wants** [1] - 100:21

**Wayne** [12] - 32:13, 32:18, 33:4, 34:8, 37:4,

37:12, 38:18, 38:23, 40:19, 41:1, 41:21, 74:2

**Wayne's** [4] - 50:17, 51:5, 51:17, 93:21

**weapon** [1] - 45:6

**wearing** [1] - 18:10

**week** [4] - 47:17, 55:17, 55:20, 74:15

**weeks** [8] - 102:2, 102:13, 102:20, 102:21, 103:4, 103:5

**weigh** [2] - 96:9, 99:11

**weighed** [7] - 31:18, 32:19, 33:15, 33:24, 34:4, 39:12, 97:24

**weighing** [2] - 95:8, 99:13

**weight** [1] - 98:17

**West** [1] - 1:24

**whatnot** [1] - 80:25

**whatsoever** [5] - 14:14, 27:4, 42:13, 77:20, 96:2

**Whereof** [1] - 106:13

**whoa** [2] - 75:24

**whole** [7] - 5:2, 25:25, 26:2, 50:8, 74:25, 77:16, 81:11

**wife** [2] - 77:25, 78:1

**winning** [1] - 96:8

**wish** [2] - 45:10, 101:17

**wishes** [1] - 101:7

**withdraw** [6] - 70:21, 71:21, 73:1, 73:6, 73:9, 73:20

**WITNESS** [20] - 7:17, 76:2, 82:17, 82:18, 89:8, 89:14, 89:18, 89:20, 89:25, 90:4, 90:10, 92:19, 92:22, 93:2, 105:4, 105:5, 105:7, 105:8, 105:10, 105:11

**Witness** [1] - 106:13

**witness** [13] - 3:3, 3:11, 4:19, 4:23, 4:25, 6:9, 6:20, 9:22, 10:3, 16:4, 48:2, 75:25, 94:15

**witnesses** [6] - 2:13, 8:19, 8:22, 46:7, 95:24, 98:17

**woman** [2] - 84:10, 88:18

**word** [1] - 42:12

**worded** [2] - 40:5, 62:4

**words** [3] - 4:24, 37:8, 65:25

**works** [1] - 23:15

**worried** [4] - 13:14, 13:17, 51:2, 78:22

**worse** [2] - 87:7, 87:9

**write** [3] - 27:2, 70:1, 70:2

**writing** [7] - 33:8, 50:18, 60:11, 60:25, 62:17, 63:2, 63:8

**written** [10] - 23:14, 25:7, 25:14, 59:11, 69:22, 71:15, 103:10, 103:11, 103:15

**wrongly** [1] - 37:8

**wrote** [7] - 24:23, 29:3, 38:6, 38:17, 75:8, 76:17, 93:25

## Y

**Y-E-L-I-Z-A-R-O-V** [1] - 7:5

**Yasinov** [2] - 44:5, 80:21

**year** [7] - 2:10, 6:14, 9:17, 38:17, 51:12, 58:24, 97:8

**years** [20] - 9:19, 10:8, 14:23, 16:15, 16:16, 20:10, 24:19, 25:19, 28:4, 28:9, 40:18, 40:19, 45:22, 53:5, 65:9, 77:13, 83:6, 86:9, 86:12, 87:8

**Yelizarov** [59] - 2:3, 2:7, 5:25, 6:10, 6:12, 6:21, 7:5, 7:9, 10:6, 11:7, 16:6, 24:3, 27:9, 29:21, 30:11, 31:14, 31:20, 31:21, 33:16, 34:7, 35:14, 36:7, 38:3, 39:2, 40:4, 44:4, 44:14, 44:25, 48:4, 48:7, 50:22, 50:24, 51:7, 51:10, 51:16, 51:21, 59:7, 69:4, 69:5, 69:6, 78:15, 79:8, 83:25, 84:2, 85:16, 87:13, 88:13, 89:12, 89:17, 90:9, 90:16, 90:21, 91:12, 91:19, 92:2, 92:6, 93:5, 96:13, 106:8

**YELIZAROV** [5] - 1:6, 6:23, 93:2, 105:5, 105:11

**yup** [5] - 10:10, 10:23, 20:22, 24:9, 24:25

## Z

**Zajac** [3] - 1:23, 106:6, 106:18

**Zarakh** [1] - 84:2

**Zelinsky** [1] - 3:10